# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **IRONCLAD PERFORMANCE WEAR CORPORATION,** | |
| **Plaintiff,** | |
| **v.** | **Case No.** _____ |
| **ORR SAFETY CORPORATION,** | |
| **Defendant** | |

## INDEX OF STATE COURT MATERIALS

| No. | Date Filed | Document |
|-----|-----------|----------|
| A-1 | N/A | Docket Sheet |
| A-2 | 9/28/2015 | Original Petition |
| A-3 | 10/8/2015 | Return of Service |
| A-4 | | Answer, Additional Defenses, and Counterclaim of Defendant Orr Safety Corporation |

# Exhibit A-1

Skip to Main Content Logout My Account Search Menu New Civil District Search Refine Search Back Location : All District Civil Courts Images Help

# REGISTER OF ACTIONS
## CASE NO. DC-15-11878

| | | |
|---|---|---|
| **IRONCLAD PERFORMANCE WEAR CORPORATION vs. ORR SAFETY CORPORATION** | §<br>§<br>§<br>§<br>§ | Case Type: **OTHER (CIVIL)**<br>Date Filed: **09/28/2015**<br>Location: **193rd District Court** |

---

### PARTY INFORMATION

| | | Lead Attorneys |
|---|---|---|
| **DEFENDANT** | **ORR SAFETY CORPORATION** | |
| **PLAINTIFF** | **IRONCLAD PERFORMANCE WEAR CORPORATION** | **DANIEL H CHAREST**<br>*Retained*<br>214-754-1900(W) |

---

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 09/28/2015 | **NEW CASE FILED (OCA) - CIVIL** |
| 09/28/2015 | **ORIGINAL PETITION** |
| | *PLAINTIFFS ORIGINAL PETITION* |
| 09/28/2015 | **ISSUE CITATION** |
| | *ESERVE rlicon@burnscharest.com* |
| 09/29/2015 | **CITATION** |

| | | | |
|---|---|---|---|
| | ORR SAFETY CORPORATION | Served | 10/02/2015 |
| | | Returned | 10/19/2015 |

| | |
|---|---|
| 10/02/2015 | **CITATION ISSUED** |
| 10/19/2015 | **RETURN OF SERVICE** |
| | *RETURN OF SERVICE ON ORR SAFETY CORPORATION* |
| 01/28/2016 | **DISMISSAL FOR WANT OF PROSECUTION** (1:30 PM) (Judicial Officer GINSBERG, CARL) |

---

### FINANCIAL INFORMATION

| | | | | |
|---|---|---|---|---|
| | **PLAINTIFF IRONCLAD PERFORMANCE WEAR CORPORATION** | | | |
| | Total Financial Assessment | | | 297.00 |
| | Total Payments and Credits | | | 297.00 |
| | **Balance Due as of 10/21/2015** | | | **0.00** |
| 09/29/2015 | Transaction Assessment | | | 297.00 |
| 09/29/2015 | CREDIT CARD - TEXFILE (DC) | Receipt # 57848-2015-DCLK | IRONCLAD PERFORMANCE WEAR CORPORATION | (297.00) |

# Exhibit A-2

1 CIT-ATTY   ESERVE

FILED
DALLAS COUNTY
9/28/2015 9:38:22 AM
FELICIA PITRE
DISTRICT CLERK

Case 3:15-cv-03453-D   Document 1-1   Filed 10/23/15   Page 6 of 83   PageID 10

Christi Underwood

Cause No. _____

| | | |
|---|---|---|
| IRONCLAD PERFORMANCE WEAR CORPORATION, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | DALLAS COUNTY, TEXAS |
| | § | |
| ORR SAFETY CORPORATION, | § | |
| | § | |
| Defendants. | § | _____ JUDICIAL DISTRICT |

DC-15-11878

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff Ironclad Performance Wear Corporation ("Ironclad" or "Plaintiff") complains of Defendant ORR Safety Corporation ("ORR" or "Defendant" and, collectively with Ironclad. the "Parties") as follows:

## I.     NEED FOR ACTION

1.      By this action Ironclad, a Texas-based company located in Dallas County, seeks to remedy the numerous breaches by ORR of an exclusive license and distributorship agreement and the parties' other agreements, and seeks declaratory relief regarding Ironclad's rights and obligations under the relevant agreements.

## II.     DISCOVERY CONTROL PLAN

2.      Ironclad intends to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.3.

## III.     PARTIES

3.      Ironclad is a corporation formed under the laws of the state of Nevada. Ironclad maintains its corporate headquarters in Dallas County, Texas.

4.      ORR is a corporation formed under the laws of the State of Kentucky. ORR's corporate headquarters is located at 11601 Interchange Drive, Louisville, Kentucky 40229. ORR may

receive service through its registered agent for service, CT Corp System, at 1999 Bryan Street, Suite

900, Dallas, Texas 75201-3136.

## IV.    JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter because the amount in

controversy falls within the Court's jurisdictional limits. In this action, Ironclad seeks monetary relief

over $1,000,000.

6.      This Court may exercise jurisdiction over ORR. ORR maintains two offices in Texas

and conducts business in Texas. ORR committed many of the acts and omissions relating to these

claims in Texas. ORR, in the conduct of its business activities, has purposefully availed itself of the

benefits and protections offered by the State of Texas.

7.      This Court is the proper venue because a substantial part of the events or omissions

giving rise to the claims occurred in Dallas County. In the alternative, this Court is the proper venue

because the plaintiff resided in Dallas County at the time of the accrual of the cause of action and no

other venue provisions apply.

## V.    FACTS

**Ironclad and ORR Enter into an Exclusive License, a Distribution Agreement, and a Sub-Distributorship Agreement.**

8.      On January 6, 2009, Ironclad and ORR entered into an Exclusive License and

Distributorship Agreement (the "Distributorship Agreement"), in which ORR agreed to serve as the

exclusive distributor of certain glove product lines known as "KONG®" [which stands for "King of

Oil and Gas"], that Ironclad had designed and manufactured for use in the oil and gas industry.[1]

---

[1] The Distributorship Agreement, and the rights and obligations of the parties therein, are governed by and construed in accordance with the laws of the State of New York, without giving effect to its conflict of laws rules, including the provisions of the New York Uniform Commercial Code. *See* Distributorship Agreement at Sec. 10.6.

9.      At about the time the Parties entered into the Distributorship Agreement, Ironclad was the only major glove manufacturer to make an "impact glove" to withstand substantial impact on the hand, designed specifically for the oil and gas industry. Ironclad designed the glove and the technology contained therein from the ground up, and underwent significant testing on the glove with major petroleum companies in order to manufacture the best "impact glove" possible in the oil and gas industry. Ironclad's development of this revolutionary new product created a "first mover" advantage, in terms of both (a) Ironclad's role in materially reducing on-the-job hand injuries to oil rig workers, contrasted with ineffective gloves used for decades prior that offered minimal or no cut or impact protection, and (b) Ironclad's position as the first major manufacturer that created the demand with some of the world's largest energy companies, including Exxon Mobil, to develop what grew from zero sales to an estimated several hundred million per year industry for technical gloves. At the time of their entry into the Distributorship Agreement, the Parties discussed the importance of this "first mover" advantage and the responsibilities for superior execution that were attendant to the successful exploitation of it.

10.      The Distributorship Agreement provided that Ironclad appointed ORR as the "exclusive distributor for the Products in the Territory." Distributorship Agreement at Sec. 2.1. "Products" were defined in the Distributorship Agreement as "'KONG®' safety gloves (all sizes), together with any inventions or improvements now or hereafter embodied therein (whether or not patented or patentable in any jurisdiction) during the Term of this Distribution Agreement." Id. at Sec. 1.2 & Schedule A. The "Territory" was defined as "each country and jurisdiction in the world where the Products may lawfully be marketed and sold." Id. at Sec. 1.3. The "Term" of the original Distributorship Agreement was to continue for a period of five years, with three additional successive renewal terms of five years that would automatically commence immediately upon the expiration of

the initial term, provided that neither party was in material default at the time that such renewal term commenced. Id. at Sec. 4.1.

11.     Although ORR was designated as the "exclusive distributor" for the Products, the Parties also entered into a sub-distributorship agreement on July 22, 2010 (the "Sub-Distributorship Agreement"), in which ORR agreed to allow Ironclad to act as a subdistributor and sell certain Products included within the Distributorship Agreement to agreed-upon customers ("Specified Customers") who were not willing to purchase the products from ORR. Under the Sub-Distributorship Agreement, Ironclad was obligated to pay ORR a royalty for each pair of gloves sold to Specified Customers.

12.     Under the Distributorship Agreement, ORR covenanted that it "shall not represent, sell or distribute, directly or for or on behalf of any third party, any products specifically designed and/or marketed for the petrochemical and offshore exploration markets that are substantially similar to, or competitive with, the Products." Sec. 2.1.

13.     Ironclad agreed that during the Term, it would not:

> appoint any individual, corporation (except for [ORR], trust, partnership, joint venture, limited liability company or other entity as a distributor for the Products or sale thereof within the Territory and [Ironclad] shall refer to [ORR] any orders or inquiries which it receives for the shipment of the Products to any place within the Territory.

Id. at Sec. 2.1.

14.     Under the Distributorship Agreement, the Parties agreed that ORR "may appoint subdistributors or agents for the resale and/or distribution of the Products," and in further recognition of the fact that the Parties expected ORR to be building out a world-wide sales network for this Product, the Parties agreed that ORR could refer to itself as the exclusive "master distributor" during the Term of the Distributorship Agreement. Id. at Sections 2.1 & 7.2.

15.     In recognition of the long-term exclusive distributorship over the Products granted to ORR, the Parties expected and agreed that ORR would use its best efforts to actively promote, market and sell the Products and maintain an adequate sales force throughout the world. In furtherance thereof, section 5.1 of the Distributorship Agreement provided:

> [ORR], at its expense, shall devote such time and resources as required to actively promote, market and sell the Products in the Territory to the petrochemical, offshore exploration markets and other industrial markets, with such time and resources of [ORR] to include, without limitation, [i] maintaining an adequate sales force and support staff, suitable place of business and sufficient inventory of Products to enable it to make prompt delivery to all customers; [ii] using appropriate means, in [ORR's] commercially reasonable discretion, to promote the sale of the Products throughout the Territory, including, without limitation, advertising campaigns and trade show activities; and [iii] using its commercially reasonable efforts to preserve the goodwill of customers at all times.

16.     Exclusive distributorship arrangements like these impose a "best efforts" obligation on the distributor's part. See New York Commercial Code Section 2-306(2).

17.     On January 27, 2015, the Parties entered into the First Amendment to the Distributorship Agreements (the "Amended Distributorship Agreement."), as well as the First Amendment to the Sub-Distributorship Agreement (the "Amended Sub-Distributorship Agreement.").

18.     Pursuant to the Amended Distributorship Agreement, certain provisions were amended and restated, and were effective on January 1, 2015. However, the obligations of ORR set forth above remained in force, and in some instances were expanded, in the Amended Distributorship Agreement. Sec. 2.1 of the Amended Distributorship Agreement provides that ORR "shall not **design**, manufacture, represent, sell or distribute, directly or for or on behalf of any third party, any products specifically designed and/or marketed for the petrochemical and offshore exploration markets that are substantially similar to, or competitive with, the Products." Amended Distributorship Agreement, Sec. 2.1 (emphasis added to indicate addition to original).

PLAINTIFF'S ORIGINAL PETITION                                                                 Page 5

19.     Likewise, Sec. 5.1 of the Amended Distributorship Agreement states:

[ORR], at its expense, shall devote such time and resources as are required to actively promote, market and sell the Products in the Territory to Exclusive Customers, with such time and resources of [ORR] to include, without limitation, (A) maintaining an adequate sales force and support staff, suitable place of business and sufficient inventory of Products to enable it to make prompt delivery to all Exclusive Customers; (B) using appropriate means, in [ORR's] commercially reasonable discretion, to actively promote, market and sell the Products throughout the Territory to Exclusive Customers, including, without limitation, advertising campaigns and coordination with [Ironclad's] brand management team; (C) collaborating with [Ironclad] on an annual basis to develop a Product marketing plan for advertising campaigns and trade show activities (but with each party to bear its own expenses); and (D) using its commercially reasonable efforts to preserve the goodwill of Exclusive Customers and the Products at all times.

20.     The Amended Distributorship Agreement defined "Exclusive Customers" as "any [individual, partnership, association, corporation, limited liability company, business trust, trust or other entity] other than a Retail Customer," and "Retail Customer" as a customer whose primary business is purchasing Products for resale to individuals and non-industrial businesses. Amended Complaint at Sections 1.5 & 1.9.

21.     Products is defined in the Amended Distributorship Agreement to mean, "collectively, those products listed and described on Schedule A" to the Amended Distributorship Agreement. Schedule A defines "Products" as follows:

KONG® safety gloves (all sizes), including (i) all existing KONG® styles listed on **Schedule B** [to the Distributorship Agreement[2]]; and (ii) all gloves bearing at least one KONG® Mark, any service mark, trade name or brand name containing the term "KONG®" or the KONG® Trade Dress (as hereinafter defined).

"**KONG® Trade Dress**" shall mean, collectively, the characteristics of the visual appearance of the Products or packaging associated

---

[2] Schedule B lists the following KONG® styles: (i) SDX2, (ii) SDXC, (iii) SDXG2, (iv) SDXO2, (v) SDXW2, (vi) KRIG, (vii) KRC5, (viii) KOPR, and (ix) KKC5.

therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not."

**ORR Sells Products that are Specifically Designed and/or Marketed for the Oil and Gas Industry and that are Substantially Similar to, or Competitive with, the Products.**

22.     In contravention of Sec. 2.1 of the Distributorship Agreement, ORR has begun marketing and selling products designed and/or marketed for the petrochemical and offshore exploration markets that were substantially similar to, or competitive with, the Products.

23.     A recent survey of ORR's own website, and the products listed for sale therein, demonstrate ORR's breach of Section 2.1 of the Distributorship Agreement:

a.      HexArmor Chrome Series® Cut Resistant Gloves. Orr's website states that these gloves contain a (i) superior back-of-hand impact protection system which utilizes an advanced design to dissipate forceful blows over a large area, and (ii) a "HexArmor Mud Grip® palm" which provides reliable grip in dry or light oil situations, while increasing abrasion resistance. These gloves are specifically marketed for the oil and gas refining market and are both substantially similar to, and competitive with, certain KONG® impact protection Products being sold on ORR's website.

b.      Ergodyne ProFlex® 900 Impact Gloves. ORR's website markets these gloves, in part, as impact gloves to be used in the oil and gas refining space that (i) will dampen shock and impact and (ii) contain a neoprene knuckle pad. These gloves are specifically marketed for the oil and gas refining market and are both substantially similar to, and competitive with, certain KONG® impact protection Products being sold on ORR's website.

c.      Ergodyne ProFlex® 910 Impact Gloves. Similar to the Ergodyne ProFlex 900 Impact Gloves set forth above, ORR's website markets these gloves, in part, as half finger impact gloves to be used in the oil and gas refining space that (i) will dampen shock and impact and (ii) contain a neoprene knuckle pad. These gloves are specifically marketed for the oil and

gas refining market and are substantially similar to, and competitive with, certain KONG® impact protection Products being sold on ORR's website.

      d.    <u>Superior Glove® Emerald CX® Cut Level 3 Glove</u>. ORR's website markets these gloves, in part, as cut-resistant gloves that provide "excellent grip in oily/wet situations" and that are "economical, at half the cost of comparable cut-resistant styles." These gloves are being specifically marketed for the petrochemical market and are competitive with similar KONG® cut-resistant gloves.

      e.    <u>Ergodyne ProFlex® 800 Glove Liners</u>. ORR's website markets these gloves as gloves that (i) can be worn alone or under standard work gloves, (ii) can be used in the oil and gas refining market, and (iii) will protect against shock and impact. These gloves are specifically marketed for the oil and gas refining market and are competitive with certain KONG® impact protection Products being sold on ORR's website.

      f.    <u>Superior Glove® Dexterity Cut Resistant Gloves</u>. ORR's website markets these gloves as cut-resistant gloves that (i) are "highly dexterous" while providing "stellar cut protection," (ii) provide "ANSI Cut Level 4" protection, and (iii) provide for "superior grip in oil." These gloves are being specifically marketed for the petrochemical market and are substantially similar to, and competitive with, certain cut-resistant KONG® gloves.

24.    Upon information and belief, in addition to the six styles of gloves set forth above, ORR has sold and/or is selling additional types of gloves in breach of Sec. 2.1 of the Distributorship Agreement.

25.    ORR's sales of products that compete with the KONG® line of gloves in the marketplace has caused Ironclad substantial injury, including but not limited to lost sales of KONG® Products, lost goodwill of the KONG® brand (because KONG®'s exclusive distributor, ORR, has placed competing products on its own website, undermining the integrity and value of the KONG®

brand), and diverting ORR's sales and marketing efforts that should be expended on the KONG®
brand to products that compete with KONG®.

**ORR Fails to Actively Promote, Market and Sell KONG® Products.**

26.     ORR has failed to maintain an adequate sales force and support staff, has not actively
promoted, marketed, and sold the Products, nor has it used commercially reasonable efforts to
preserve the goodwill of the products. ORR has not used anything approaching "best efforts" in
promoting, marketing and selling the Products in the Territory to Exclusive Customers.

27.     ORR has likewise failed to collaborate with Ironclad on an annual basis to develop a
Product marketing plan for advertising campaigns, and has failed to preserve the goodwill of the
customers purchasing the Products as required by the Amended Distributorship Agreement.

28.     ORR's overall marketing and sales efforts are substantially below industry standards
used by competitors in the relevant market of oil and gas. Despite industry sales going from zero to
several hundred million dollars during the time frame 2009 through the present dominated by a
handful of glove manufacturers, Ironclad's sales of KONG® to ORR dropped significantly from
2012-2013. Since then, ORR's sales of KONG® has produced anemic sales numbers far below what
would be expected given the demand in the market. From 2011 through early 2013, ORR only
provided the services of a single sales executive, Mark Wiktorski, to market and sell the Products.
Upon information and belief, Mr. Wiktorski is also responsible for selling other products on behalf of
ORR. Beginning in early 2013, ORR utilized other sales personnel to assist with selling KONG®
products, but upon information and belief, these sales personnel were not properly trained in the
technology and specifications of the KONG® products, and they were part of ORR's general sales
force that also sold countless other ORR products to other industries, not simply the oil and gas
industry. Thus, beginning in early 2013, ORR did not have any sales representatives other than Mark

Wiktorski devoted to the KONG® brand until the summer of 2015, when ORR hired an individual in Bakersfield, California.

29.     Despite being referred to as the "master distributor" in the Distribution Agreement, upon information and belief, ORR has never set up a network of subdistributors sufficient to sell the Products actively throughout the oil and gas industry. Upon information and belief, ORR has failed and/or refuses to solicit additional subdistributors.

30.     ORR's marketing efforts for KONG® have been equally abysmal. ORR representatives have not presented Ironclad with a formal KONG® marketing plan, despite Ironclad personnel inquiring about the marketing plan for KONG® on numerous occasions. On one occasion, ORR ran the same KONG® print advertisement for four consecutive months, which shows ORR's lack of effort to market the gloves using industry standard commercial marketing techniques.

31.     As the popularity of the KONG® gloves increased over time, and as Ironclad's competitors began heavily marketing the oil and gas industry to sell gloves that compete with the KONG® brand, ORR failed to adopt many of the same competitive marketing tactics as Ironclad's competitors. All of Ironclad's competitors regularly attended trade shows and safety conferences in the U.S. in order to display their gloves geared towards the oil and gas industry. ORR did not. The biggest conference for the oil and gas industry (the "OTC" conference) takes place every year in Houston, Texas. ORR's attendance and presentation of the KONG® brand at this conference has varied between not at all and minimal, despite the fact that all of KONG's® competitors regularly attend the conference and set up booths to present their gloves. Moreover, ORR hosts a national safety "vendor" conference each year. Representatives from Ironclad have never been asked to participate in this national "vendor" conference.

32.     Because of ORR's lackluster marketing efforts, Ironclad was forced to spend $48,000 of its own funds to create a new KONG® catalog and run advertising spots in the September 2013

issue of World Oil magazine, despite the agreement in the Distributorship Agreement that ORR would actively promote, market and sell the Products "at its [own] expense." Distributorship Agreement at Sec. 5.1.

33.     Ironclad had a "first mover" advantage in the oil and gas industry. But ORR failed to exploit this opportunity despite its commitment to "actively promote, market and sell" the Products by not maintaining an adequate sales force or using industry standard marketing efforts in order to increase sales of the popular KONG® brand.

**ORR Fails to Preserve the Goodwill of the Products and the Customers.**

34.     In late 2012 and early 2013, Ironclad recognized a need in the oil and gas industry for gloves that were not "on the drill head" gloves (i.e., with different technical specifications than the KONG® Original), but which addressed the needs of other duties on an oil rig. The demand for various types of gloves in the oil and gas industry was rapidly growing in the time period 2012 and 2013, and Ironclad responded to that need by designing and developing KONG® gloves that were suited to these specific needs. For instance, Ironclad developed a KONG® Rigger glove that would be used by personnel on the deck of the oil rig, as opposed to actively working on the drill head of the oil rig. The KONG® Rigger was intended to compete with two highly successful products from Ironclad's competitors, the Ringers "Roughneck®," and the HexArmor "Rig Lizard®." When Ironclad first presented this new variation on the KONG® brand to ORR, ORR declined to include it in its KONG® line, and refused to sell the gloves. Instead, ORR requested that Ironclad supply only the KONG® Original, but at a lower price, to ORR. ORR has since purchased a few thousand pairs of the KONG® Rigger, but these few purchases were too little and too late to capture legitimate market share as a competitor of the "Roughneck®" or "Rig Lizard®" gloves.

35.     Similarly, Ironclad also developed a KONG® style glove used by mechanics and operators on the oil rig called the KONG® Operator which was a high quality but cost effective

solution for providing the trusted KONG® brand to another segment of the oil and gas industry that did not need the heavy duty "impact" protection of the KONG® Original. Again, ORR initially refused to sell this new variation, despite the existence of a specified need in the industry and, again, simply requested that Ironclad sell the KONG® Original glove at a lower price to ORR. Again, ORR has since purchased a few thousand pairs, but this is a day late and a dollar short, and ORR has never "actively" promoted the KONG® Operator.

36.     Ironclad's competitors were selling both high cost gloves that competed with the KONG® Original, as well as lower cost alternatives similar to the KONG® Rigger and KONG® Operator. But, due to ORR's refusal to implement these cost effective solutions in the KONG® brand, Ironclad was not able to sell its new categories of KONG® gloves.

37.     KONG® Rigger and KONG® Operator were intended to work as well as the KONG® Original glove, but in different environments. They were intended for a "wider audience." Ironclad responded both to ORR's request that it needed more cost-effective solutions and to developments in the industry. But ORR refused to implement that solution. While Ironclad's competitors quickly unveiled new glove lines in response to these market developments, ORR forced Ironclad to be stagnant in its KONG® offerings. ORR continues to be stagnant with the KONG® brand, and from the beginning of 2013 to the present, 73% of all sales to ORR are of KONG® Original gloves.

38.     ORR's conduct not only caused lost sales of the KONG® products to Ironclad, but also damaged and weakened the KONG® brand by making it look as though Ironclad was unable to respond to these developments in the market, when in fact they had developed lower cost solutions.

**ORR Fails to Honor Another Agreement with Ironclad Regarding "Quanta" Gloves.**

39.     In the fall of 2013, Ironclad agreed to sell a KONG® glove to ORR, the "KRC5Q," specifically for resale to ORR's customer Quanta. The KRC5Q was a specialty item, and contained a "Quanta" logo.

40.     In a series of emails and oral conversations in late 2013 and early 2014, Ironclad agreed to sell the KRC5Q glove to ORR at a steeply-discounted price, representing a substantial discount from the Parties' agreed-upon pricing for the purchase of the non-Quanta KONG® KRC5 glove, which did not contain the Quanta logo. In exchange for this discounted price, ORR agreed to purchase a minimum of one hundred thousand (100,000) units of the KRC5Q gloves on an annual basis for a multi-year period (the "Quanta Agreement"). The Quanta Agreement was re-affirmed on several occasions both orally and in writing, in late 2013 and in early 2014.

41.     In reliance upon this Quanta Agreement, Ironclad secured the materials and manufactured approximately 122,000 units of the KRC5Q glove. This was a special production run, further evidencing ORR's commitment to purchase at least 100,000 units in one year. There would be no reason for Ironclad to manufacture over 100,000 units of a co-branded product that could not be used with any other customer or reseller in the absence of this agreement.

42.     In correspondence in 2015, ORR repudiated the Quanta Agreement and stated that it was not required to buy a certain amount of KRC5Q gloves. Thus, ORR demanded that Ironclad sell ORR the KRC5Q gloves at the discounted price without ORR having to purchase any minimum amounts.

43.     ORR's repudiation of the Quanta Agreement has caused Ironclad injury because it now has inventory of the KRC5Q glove with a "Quanta" logo, without any means of reselling the gloves that ORR agreed to purchase.

**ORR Has Threatened to Upset Ironclad's Other Business Separate and Apart from the Distributorship Agreement.**

44.     Sec. 2.1 of the Distributorship Agreement and Amended Distributorship Agreement obligates Ironclad to distribute only through ORR gloves that contain the KONG® trademarks or KONG® Trade Dress, as defined in the agreements. There is no obligation by Ironclad to use ORR as the sole distributor for any type of glove that Ironclad markets or sells in the oil and gas industry.

45.     Ironclad has developed and manufactured gloves that do not contain the KONG® trademarks or KONG® Trade Dress, and presently intends to sell them in the oil and gas industry. These lines of gloves include the "Arctic Mitt" sold to Ironclad's customer Ensign, and a line of co-branded gloves with the company Vibram®, which contain proprietary Ironclad Visual Engineering ("IVE") technology.

46.     Beginning as early as June 2013, ORR asserted that Ironclad does not have the right to sell even non-KONG® brand gloves in the oil and gas industry. This includes correspondence from Raymond Aldridge, President and CEO of ORR, on June 4, 2013.

47.     With respect to KONG® Rigger glove discussed above, when ORR initially refused to market or sell the glove as a KONG® brand glove, Ironclad intended to restyle the glove and remarket it as a non-KONG® glove. ORR asserted that this would be a breach of their agreement.

48.     Ironclad also presented the "Arctic Mitt" glove to ORR as a potential KONG® product, but ORR declined to sell this glove as well. Ironclad then restyled and remarketed the "Arctic Mitt" as a non-KONG® glove, which did not contain any KONG® trademarks or KONG® Trade Dress. However, beginning in June 2013 and continuing until the present, ORR has continued to assert that anything initially developed as a KONG® glove, but later sold as a non-KONG® glove, breaches the Distributorship Agreement (i.e., regardless of whether the glove contains KONG® trademarks or KONG® Trade Dress).

49.     The Parties have a live controversy and justiciable dispute regarding Ironclad's rights to market and sell non-KONG® gloves in the oil and gas industry.

**ORR Ignores the Parties' Written Agreements with Impunity when It Suits ORR's Purposes.**

50.     The Distributorship Agreement included specific prices for Products sold to ORR based upon the quantity of Products purchased by ORR. See Distributorship Agreement at Schedule B. These prices represented the agreed upon sales price to ORR based upon both Parties' business and accounting needs. However, in the fourth quarter of 2013, after ORR had shown poor performance in the sale of KONG® products throughout 2013, Ironclad desired to sell more product to ORR, but ORR insisted upon prices for the Products that were substantially lower than the agreed-upon purchase prices in the Distributorship Agreement, or else they would not purchase them. In late 2013, in order to continue the sales of KONG® gloves and hopefully reinvigorate the market for KONG® gloves, Ironclad was forced to sell millions of dollars' worth of Products to ORR at substantially reduced prices. ORR made over half of its KONG® purchases from Ironclad in the fourth quarter of 2013, at prices below the agreed upon amounts in the Distributorship Agreement.

51.     By this petition, Ironclad does not presently seek termination of its agreements with ORR. But this petition constitutes written notice to ORR of Ironclad's intent to terminate all of its agreements with ORR if ORR fails to cure or correct the Events of Default within 30 days of the giving of this notice, all as provided in section 8.2 of the Distributorship Agreement. Further, Ironclad expressly reserves all rights to amend this petition to state additional claims concerning termination as and when appropriate.

## VI.     CONDITIONS PRECEDENT

52.     All conditions precedent to Ironclad's claims for relief have been performed or have occurred.

# VII.   CLAIMS

**Claim 1 – Breach of Contract (Distributorship Agreement, Amended Distributorship Agreement, Sub-Distributorship Agreement, and Amended Sub-Distributorship Agreement)**

53.     Ironclad incorporates herein preceding paragraph numbers 1-38 and 50-51.

54.     The Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement are valid, enforceable contracts.

55.     Ironclad is the proper party to sue to enforce the terms of the Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement, to seek recovery for damages due to ORR's breach of the Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement. Ironclad has performed, or has substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement. Ironclad is, and has been, entitled to ORR's performance of its obligations under the Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement.

56.     ORR has materially breached its contractual obligations to Ironclad, including the express terms set out above and/or implied covenants within the Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement.

57.     Ironclad has suffered significant injury and damages resulting directly from ORR's breach of the Distributorship Agreement, the Amended Distributorship Agreement, the Sub-Distributorship Agreement and Amended Sub-Distributorship Agreement.

**Claim 2 – Breach of Contract (Quanta Agreement)**

58.     Ironclad incorporates herein preceding paragraph numbers 1-7 and 39-43.

59.     The Quanta Agreement is a valid, enforceable contract.

60.     Ironclad is the proper party to sue to enforce the terms of the Quanta Agreement, to seek recovery for damages due to ORR's breach of the Quanta Agreement. Ironclad has performed, or has substantially performed, any and all necessary conditions precedent, dependent obligations, and/or dependent covenants owed under the Quanta Agreement. Ironclad is, and has been, entitled to ORR's performance of its obligations under the Quanta Agreement.

61.     ORR has materially breached its contractual obligations to Ironclad, including the express terms set out above and/or implied covenants within the Quanta Agreement.

62.     Ironclad has suffered significant injury and damages resulting directly from ORR's breach of the Quanta Agreement.

**Claim 3 – Declaratory Relief**

63.     Ironclad incorporates herein preceding paragraph numbers 1-21 and 44-49.

64.     This dispute involves multiple justiciable controversies about the rights and status of the Parties. The controversies are real and substantial, and involve a genuine conflict of tangible interests and are not merely theoretical disputes.

65.     Ironclad therefore seeks a declaration concerning the rights, duties and obligations of the Parties pursuant to the Amended Distributorship Agreement.

66.     Specifically, Ironclad seeks a declaration that:

a.     Ironclad's sale of the "Arctic Mitt" glove does not infringe ORR's rights under the Amended Distributorship Agreement;

      b.      Ironclad's sale of the co-branded glove line with Vibram® incorporating the IVE technology does not infringe upon ORR's rights under the Amended Distributorship Agreement, or otherwise in any other way; and

      c.      Ironclad is permitted to sell any gloves that are not included in the definition of "Products" under the Amended Distributorship Agreement (i.e., do not contain any KONG® trademarks or KONG® Trade Dress) in the petrochemical and offshore exploration markets, without infringing upon ORR's rights under the Amended Distributorship Agreement.

**Claim 4 – Attorneys' Fees**

67.      Ironclad incorporates herein preceding paragraph numbers 1-66.

68.      As a result of ORR's actions and the need to protect its interests, Ironclad has retained the law firms of Burns Charest LLP, and Stubbs, Alderton & Markiles LLP to represent Ironclad in this action. Ironclad has agreed to pay the law firms of Burns Charest LLP and Stubbs, Alderton & Markiles LLP's fees for its services.

69.      Ironclad seeks recovery of all reasonable and necessary attorneys' fees and expenses pursuant to Chapter 37 and/or 38 of the Texas Civil Practices and Remedies Code.

70.      Ironclad further seeks recovery of its attorneys' fees pursuant to Sec. 9.1 of the Distributorship Agreement.

## VIII.   JURY DEMAND

71.      Ironclad demands a jury trial and tenders the appropriate fee with this petition.

## IX.   REQUEST FOR DISCLOSURE

72.      Under Texas Rule of Civil Procedure 194, Ironclad requests that ORR disclose, within 30 days of service of this request, the information or material described in Rule 194.2.

## X.     PRAYER FOR RELIEF

73.     Ironclad prays that ORR be cited to appear and answer herein and that, upon a final hearing or trial, Ironclad has and recover judgment from ORR as follows:

      a.     Compensatory damages against ORR in an amount to be determined at trial resulting from ORR's breach of contract;

      b.     A declaration as described above;

      c.     Reasonable and necessary attorneys' fees;

      d.     Pre- and post-judgment interest at the maximum rate allowed by law;

      e.     All costs of suit; and

      f.     All such other and further relief, both general and special, at law or in equity, to which Ironclad may show itself justly to be entitled.

Dated: September 28, 2015.

Respectfully submitted,

Daniel H. Charest
State Bar No. 24057803
Warren T. Burns
State Bar No. 24053119
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, Texas 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wburns@burnscharest.com
wthompson@burnscharest.com

Attorneys for Plaintiff

Of Counsel:

Michael A. Sherman (California Bar No. 94783)
*Pro hac vice* admission to follow
Joshua S. Stambaugh (California Bar No. 233834)
*Pro hac vice* admission to follow
STUBBS ALDERTON & MARKILES, LLP
15260 Ventura Boulevard, 20th Floor
Sherman Oaks, California 91403
Telephone: (818) 444-4500
Facsimile: (818) 444-4520
masherman@stubbsalderton.com
jstambaugh@stubbsalderton.com

Attorneys for Plaintiff

# Exhibit A-3

FILED
DALLAS COUNTY
10/19/2015 3:19:24 PM
FELICIA PITRE
DISTRICT CLERK

Dianne Coffey

# FORM NO. 353-3 - CITATION
# THE STATE OF TEXAS

To:    ORR SAFETY CORPORATION
      BY SERVING ITS REGISTERED AGENT CT CORPORATION SYSTEM
      1999 ST BRYAN ST STE 900
      DALLAS TX 75201-3136

**FILED**
15 OCT -8 AM 9: 49
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
DEPUTY

GREETINGS:
You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty  days after you were served this citation and  petition, a default judgment may be taken against you. Your answer should be addressed to the clerk of the **193rd District Court** at 600 Commerce Street, Ste. 101, Dallas, Texas 75202.

Said Plaintiff being **IRONCLAD PERFORMANCE WEAR CORPORATION**

Filed in said Court **28th day of September, 2015** against

**ORR SAFETY CORPORATION**

For Suit, said suit being numbered <u>**DC-15-11878,**</u> the nature of which demand is as follows:
Suit on **OTHER (CIVIL)** etc. as shown on said petition **REQUEST FOR DISCLOSURE**, a copy of which accompanies this citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: FELICIA PITRE, Clerk of the District Courts of Dallas, County Texas.
Given under my hand and the Seal of said Court at office this 29th day of September, 2015.

ATTEST: FELICIA PITRE, Clerk of the District Courts of Dallas, County, Texas

By_____, Deputy
     /s/ Gay Smith
     GAY SMITH



---

<u>**ESERVE**</u>

# CITATION

## DC-15-11878

**IRONCLAD PERFORMANCE WEAR CORPORATION**
vs.
**ORR SAFETY CORPORATION**

ISSUED THIS
**29th day of September, 2015**

FELICIA PITRE
Clerk District Courts,
Dallas County, Texas

By: GAY SMITH, Deputy

---

**Attorney for Plaintiff**
DANIEL H CHAREST
500 NORTH AKARD STREET
SUITE 2810
DALLAS TX 75201
469-904-4550

## DALLAS COUNTY
## SERVICE FEES
## NOT PAID

## OFFICER'S RETURN

Case No. : DC-15-11878

Court No.193rd District Court

Style: IRONCLAD PERFORMANCE WEAR CORPORATION

vs.

ORR SAFETY CORPORATION

Came to hand on the _____ day of _____, 20_____, at _____o'clock_____.M. Executed at _____,

within the County of _____at _____ o'clock _____ .M. on the _____ day of_____,

20_____ **\*\* SEE ATTACHED \*\*** by delivering to the within named

_____ **\*\*\* AFFIDAVIT \*\*\*** _____

_____ **\*\* SEE ATTACHED \*\*** _____

**\*\*\* AFFIDAVIT \*\*\***

each, in person, a true copy of this Citation together with the accompanying copy of this pleading, having first endorsed on same date of delivery.  The distance actually traveled by

me in serving such process was _____miles and my fees are as follows:   To certify which witness my hand.

|  |  |  |  |
|---|---|---|---|
| For serving Citation | $_____ | _____ |  |
| For mileage | $_____ | of_____County,_____ |  |
| For Notary | $_____ | By_____Deputy |  |

(Must be verified if served outside the State of Texas.)

Signed and sworn to by the said_____before me this_____day of _____, 20_____,

to certify which witness my hand and seal of office.

_____

Notary Public_____County_____

## CAUSE NO. <u>DC-15-11878</u>

| | | |
|---|---|---|
| IRONCLAD PERFORMANCE WEAR CORPORATION | § <br> § <br> § | IN THE DISTRICT COURT |
| **Plaintiff(s),** <br> VS. | § <br> § <br> § | 193RD JUDICIAL DISTRICT |
| ORR SAFETY CORPORATION | § <br> § <br> § | |
| **Defendant(s).** | § | DALLAS COUNTY, TEXAS |

## RETURN OF SERVICE

Came to my hand on **Friday, October 2, 2015 at 9:31 AM,**
Executed at: **1999 BRYAN STREET, SUITE 900, DALLAS, TX 75201**
within the county of **DALLAS** at **2:20 PM**, on **Friday, October 2, 2015,**
by individually and personally delivering to the within named:

### ORR SAFETY CORPORATION

By delivering to its' **Registered Agent, CT CORPORATION SYSTEM**
By delivering to its' **Authorized Agent, TERRI THONGSAVAT** a true copy of this

### CITATION, PLAINTIFF'S ORIGINAL PETITION and CIVIL CASE INFORMATION SHEET

having first endorsed thereon the date of the delivery.

BEFORE ME, the undersigned authority, on this day personally appeared **Adil Tadli** who after being duly sworn on oath states: "My name is **Adil Tadli**. I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I have personal knowledge of the facts and statements contained in this affidavit and aver that each is true and correct. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I am familiar with the Texas Rules of Civil Procedure, and the Texas Practice and Remedies Codes as they apply to service of process. I am approved by the Supreme Court of Texas, Misc. Docket No. 05-9122 under Rule 103 and 501.2 of the TRCP to deliver citations and other notices from any District, County and Justice Courts in and for the State of Texas."

**Adil Tadli**
_____

Of:   **Dallas County**
_____

By:   _____
Authorized Person - SCH1206 - Exp 05/31/17

Subscribed and Sworn to by Adil Tadli, Before Me, the undersigned authority, on this 7th day of October, 2015.

CHARITY NATASHA COLEMAN
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-21-2017

_Charity N Coleman_
Notary Public in and for the State of Texas

# Exhibit A-4

CAUSE NO. DC-15-11878

| | | |
|---|---|---|
| IRONCLAD PERFORMANCE WEAR CORPORATION, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| ORR SAFETY CORPORATION | § § § | |
| Defendant | § | 193rd JUDICIAL DISTRICT |

## ANSWER, ADDITIONAL DEFENSES, AND COUNTERCLAIM OF DEFENDANT ORR SAFETY CORPORATION

Defendant Orr Safety Corporation ("ORR"), in response to Plaintiff Ironclad Performance Wear Corporation's ("Ironclad") Original Petition, files this Answer thereto.

## GENERAL DENIAL

ORR denies all and singular the allegations contained in Ironclad's Original Petition and demands strict proof thereof.

## FIRST AFFIRMATIVE DEFENSE

Ironclad's Original Petition is barred by the doctrines of estoppel, fraud, misrepresentation, laches, negligence, unjust enrichment, waiver, unclean hands, accord and satisfaction, failure of consideration, payment, release, collateral estoppel, judicial estoppel, ripeness, statute of limitations, indemnity, release, or other matters constituting an avoidance or affirmative defense as may be shown by the evidence.

## SECOND AFFIRMATIVE DEFENSE

ORR expressly reserves its rights to amend this Answer to Original Petition, including the right to assert additional defenses, whether affirmative or otherwise, about which it presently

lacks knowledge or information but which may become available or apparent during the course of this litigation, through discovery or other means.

### THIRD AFFIRMATIVE DEFENSE

Ironclad has failed to mitigate its damages, if any.

### FOURTH AFFIRMATIVE DEFENSE

The damages sought in the Original Petition were not caused by ORR and were the direct and proximate result of conduct of third parties, or were directly and proximately caused by Ironclad, or were caused the operation of external factors, or intervening and superseding causes, all beyond the control of ORR, and not by any act, statement, or omission attributable to ORR.

### FIFTH AFFIRMATIVE DEFENSE

Ironclad's claims are barred, in whole or in part, by the doctrine of proportionate responsibility pursuant to TEX. CIV. PRAC. & REM. CODE § 33.001. If necessary, pursuant to TEX. CIV. PRAC. & REM. CODE § 33.003, ORR requests that the trier of fact determine the percentage of responsibility for Ironclad and ORR, and each responsible third party who has been designated under TEX. CIV. PRAC. & REM. CODE § 33.004.

### SIXTH AFFIRMATIVE DEFENSE

ORR states that Ironclad failed to give proper notice of any alleged breach, or failed to perform or comply with some other required condition precedent for its claims and, therefore, its claims fail in whole or in part.

### SEVENTH AFFIRMATIVE DEFENSE

Ironclad is not entitled to recover attorneys' fees.

## EIGHTH AFFIRMATIVE DEFENSE

The Original Petition fails to state a cause of action against ORR for which relief may be granted and must, therefore, be dismissed.

## NINTH AFFIRMATIVE DEFENSE

Ironclad's claims are barred in whole or in part by the terms, conditions and/or provisions set forth in the agreements between the parties.

## TENTH AFFIRMATIVE DEFENSE

Ironclad's Damages, if any, are barred in whole or in part because they are speculative, and are not allowed under the terms, conditions and/or provisions of the agreements between the parties.

## ELEVENTH AFFIRMATIVE DEFENSE

Ironclad is not entitled to prejudgment interest because the amounts claimed, if any, are unliquidated, and Ironclad is not entitled to post-judgment interest because no amounts are owed.

WHEREFORE, ORR prays that Ironclad take nothing by this suit and that ORR goes hence and recovers costs in its behalf expended, as well as damages and relief set out below in its Counterclaim.

## COUNTERCLAIM

1.      This counterclaim arises out of the unlawful actions of ORR's exclusive manufacturer of the KONG glove: Ironclad. Specifically, and as explained herein, Ironclad has unilaterally and unlawfully terminated ORR's contractual right of exclusive distributorship of the KONG glove by relabeling KONG gloves with a different name, thereby creating KONG counterfeits. This relabeling, Ironclad's transparent attempt at circumventing its contractual obligations, is being done with the intent to sell and distribute these "rebranded" KONG gloves

directly to ORR's customers in violation of ORR's exclusivity rights. What is more, Ironclad

notified ORR of its intent to terminate ORR's contractual rights without cause. Finally, Ironclad

has engaged in other conduct that has resulted in material breaches of the agreements between

the parties and violations of the law, all of which entitle ORR to relief.

PARTIES

2.      ORR is a Kentucky corporation with its principal place of business in Jefferson

County, Kentucky. ORR is in the business of selling and distributing industrial safety equipment

and supplies, and providing certain services related to the delivery and use of such equipment

and supplies.

3.      Ironclad is a Nevada corporation with its principal place of business in Farmers

Branch, Texas. Ironclad is in the business of manufacturing, marketing, and selling gloves and

other apparel.

JURISDICTION AND VENUE

4.      Venue is proper in Dallas County, Texas because Dallas County, Texas is where

all or a substantial part of the events or omissions giving rise to the claim occurred. TEX. CIV.

PRAC. & REM. CODE § 15.002(a)(l). Dallas County is also proper because it is the county of

Ironclad's principal office. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(2), (3).

5.      This Court has personal jurisdiction over Ironclad due to the fact that its principal

place of business is the State of Texas and it transacts business in Texas. The Court has subject

matter jurisdiction because the amount in controversy is within the Court's jurisdictional limits.

<u>STATEMENT OF FACTS</u>

**Introduction**

6.      ORR is one of the most successful distributors of safety products in the United States and around the world. Part of its success is attributable to its position as the worldwide exclusive distributor of the protective work glove known as KONG.

7.      The KONG work glove and its progeny line offer superior protection to the hand, particularly the back of the hand and fingers, as well as innovative uses of fabrics and materials intended to increase hand protection in various industries.

8.      Since its inception, KONG has expanded its product line from the KONG Original Impact Resistant Glove to include the KONG Oil and Slip Resistant Impact Protection Glove, the KONG Dexterity Super Grip Impact Protection Glove, the KONG Cut Resistant Impact Protection Glove, the KONG Cold Condition Waterproof Impact Protection Glove, the KONG Rigger Grip Cut 5 Impact Protection Glove, the KONG Rigger Impact Protection Glove, the KONG Operator Impact Protection Glove, the KONG Cut 5 Knit Impact Protection Glove, the KONG Deck Crew Impact Protection Glove and the KONG Full Dipped Cut 5 Knit Glove.

9.      The most recognizable component of the KONG glove is the back of hand protection provided by thermoplastic rubber ("TPR") in various shapes over the back of the hand, across the knuckle, and down each finger of the glove. These components, combined with recognizable color patterns, cuff types, labeling and packaging, create a trade dress that is one of the most dominant, recognizable aspects of KONG and the KONG line of gloves.

10.      The KONG glove line, through ORR's development and marketing, has become the gold-standard in hand safety for the industrial context. It is a unique and sought after brand,

and although others have tried to imitate the KONG glove, none have been successful in developing a meaningful substitute.

11.     The KONG line is continuously expanding. This matter is about the newest KONG glove, which are simply KONG gloves - rebranded, relabeled, and using KONG's research and development - as Ironclad gloves (hereinafter "KONG Vibram Counterfeits"). Ironclad has manufactured what is for all intents and purposes a KONG glove but by naming it something else thinks it can circumvent its legal and contractual obligations to ORR and KONG. It is mistaken.

**ORR and Ironclad's Collaboration on KONG**

12.     ORR has a long history in the safety industry. Founded in 1948, ORR has grown to be one of the most well-recognized and respected safety product distributors in the world. In addition to working with various other industries focused on safety, ORR was always at the forefront of innovation in assisting oil and gas companies to improve worker safety.

13.     In 2007, ORR was invited as the sole safety company to participate in a steering committee that was made up of a collaborative, cross-functional group of safety and operational representatives from the world's leaders in the oil and gas industry, including ExxonMobil, ConocoPhillips, Superior Energy and Chevron (hereinafter "the Steering Committee"). Despite being competitors in the oil and gas industry, these companies would come together with ORR to share "best practices" when it came to safety.

14.     The purpose of this particular Steering Committee was to identify and address the highest level of recordable injuries on oil platforms. At that time, hand injuries accounted for approximately seventy-one percent of all injuries on oil platforms. More specifically, hairline fractures, bruising blows (back of the hand and fingers) and pinched fingers were the leading

types of hand injuries. The Steering Committee set a goal to reduce or eliminate these types of injuries in the oil and gas industry.

15.     These companies turned to ORR, as a distributor of safety products, including hand protection, to find a company that could assist it in manufacturing a product that could meet the Steering Committee's needs.

16.     ORR chose Ironclad to partner with it to manufacture a glove to help remedy the problems posed by the Steering Committee.

17.     At that time, Ironclad was a struggling glove manufacturer, primarily focused on task-specific work gloves for plumbers, masonry workers, electricians and construction workers. Ironclad had just recorded its tenth year of losses and was fighting to find its place in any market, particularly the oil and gas industry.

18.     For example, in 2006, Ironclad operated at a $3,000,000 deficit. In 2007, Ironclad took in $5,001,743 in gross profit, but had $8,832,283 in operating expenses, and was thus operating at an almost $4,000,000 loss. In 2007, Ironclad had an accumulated deficit of more than $11,000,000.

19.     As a company that was not sure if it even could keep its doors open in 2007, Ironclad happily agreed to this cooperative opportunity brought to it by ORR.

20.     Undeterred by Ironclad's poor financial position, ORR, along with Ironclad as its manufacturer, proceeded to meet with the Steering Committee to develop a specification and requirement list for the new glove concept.

21.     The "Concept Glove" was developed based on the input from ORR, Ironclad, the Steering Committee, as well as input from the oil and gas industry safety meetings. Funded completely by ORR, approximately two hundred pairs of the first prototype of the Concept

Glove were manufactured and distributed evenly to all of the committee-member companies for field testing. The first prototype of the Concept Glove was given out to a variety of job types, functions, and environments. All of the workers testing the first prototype of the Concept Gloves were asked to fill out a field survey that allowed them to rank the gloves on a variety of key elements: protection, comfort, fit, grip, dexterity, durability, and overall satisfaction. The Steering Committee reviewed the results and decided that ORR needed to address the lowest scored elements with Ironclad, which were grip and durability.

22.    A second prototype of the Concept Glove – again, completely funded by ORR – was developed based on the feedback and recommendations. A second field trial was arranged and conducted in the same manner as the first trial. The results of the second prototype of the Concept Glove showed improvement in five categories and increase in the overall satisfaction level. During the second field testing, there were 80,000 hours worked without a single hand injury. Based on these results, in June 2008, the Steering Committee approved the final design.

23.    This final design born out of the Steering Committee became the original and first iteration of the KONG glove – the KONG Original Impact Resistant Glove, pictured below as it was originally and currently sold.[1] The KONG brand was born. Ironclad was asked to go into production on the KONG, and the KONG gloves were available on the market in October 2008.

---

[1] Note that initially the KONG Original Impact Resistant Glove's knuckle protection said "Ironclad" because that was the only mold Ironclad had in inventory. However, once the KONG brand took off, and Ironclad could fund manufacturing beyond the original investment by ORR and fulfill the brand's legacy in the marketplace, it invested in additional molds and began labeling the knuckle protection with the KONG name. However, even the first KONG Original Impact Resistant Gloves with "Ironclad" knuckle protection had a KONG hang tag and a KONG cuff identification.

| First Iteration<br>KONG Original Impact Resistant Glove | Current<br>KONG Original Impact Resistant Glove |
| --- | --- |



**Exclusive License and Distributorship Agreement, First Amendment to the Exclusive License and Distributorship Agreement, Sub-Distributorship Agreement, and First Amendment to Sub-Distributorship Agreement**

24.     To memorialize their relationship and partnership with the KONG brand, ORR and Ironclad negotiated an Exclusive License and Distributorship Agreement on January 6, 2009 (the "Agreement"). [2]

25.     The Agreement designated ORR as the worldwide exclusive distributor of KONG safety gloves. *See* Agreement at Art. 2.

26.     Specifically, the Agreement stated that ORR was the exclusive distributor of all "'KONG' safety gloves (all sizes), together with any inventions or improvements now or hereafter embodied therein (whether or not patented or patentable in any jurisdiction) during the term of [the Agreement.]" *See id.* at Sch A.

27.     The initial term of the Agreement was for a period of five years, with three consecutive and automatic renewal periods of five years, for a total of twenty years. *See id.* ¶ 4.1. Stated plainly, for twenty years starting on January 6, 2009, Ironclad could only sell KONG gloves, and any derivative of KONG gloves that it and ORR developed, to ORR.

28.     In exchange for this twenty-year exclusivity, Ironclad retained the intellectual property rights, including the KONG trademark and a patent pending for the KONG design (specifically, the back of hand protection previously described, *supra*, ¶ 9). *Id.* ¶ 7.1-7.2.

29.     To protect its investment in KONG, in the event that Ironclad terminated the Agreement for any reason other than ORR's material breach, ORR would be entitled to full

---

[2] Because of the confidential and proprietary nature of the Agreement, ORR has not attached it to the Complaint However, ORR will make it available to the Court and other parties upon request, under seal and/or pursuant to a protective order.

assignment of the KONG trademark, its registrations, applications and goodwill and a license to any patent granted on KONG. *Id.* ¶¶ 7.2(A), 7.3.

30.     The parties set pricing terms and minimum purchases throughout the term of the Agreement. *Id.* at Sch. B. Specifically, after the Initial Term (*i.e.*, the first five-year term of the Agreement) ORR was required to purchase no less than $3,000,000 worth of KONG gloves from Ironclad per year in order for ORR to maintain its twenty-year exclusivity. *Id.*

31.     After months of discussions and negotiations, and in an effort to accommodate Ironclad, the parties amended the Agreement to change certain aspects of their relationship. The First Amendment to the Exclusive License and Distributorship Agreement (the "Amendment")[3] was effectuated on January 1, 2015.

32.     Among other things, the Amendment gave Ironclad expanded retail and co-branding opportunities, which ORR agreed to in an effort to help Ironclad succeed in the industry. However, to date, Ironclad has done little in capitalizing on these expanded contractual rights.

33.     In addition to the Agreement, ORR and Ironclad are also parties to the July 22, 2010 Sub-Distributorship Agreement (the "Sub-Distributorship Agreement").[4] The Sub-Distributorship Agreement was amended on January 27, 2015 (the "Amendment to Sub-Distributorship Agreement").

---

[3] As with the Agreement, because of the confidential and proprietary nature of the Amendment, ORR has not attached it to the Complaint. However, ORR will make it available to the Court and other parties upon request, under seal and/or pursuant to a protective order.

[4] Because of the confidential and proprietary nature of the Sub-Distributorship Agreement and the Amendment to Sub-Distributorship Agreement, ORR has not attached them to the Complaint. However, ORR will make them available to the Court and other parties upon request, under seal and/or pursuant to a protective order.

34.     Among other rights, the Sub-Distributorship Agreement and the Amendment to the Sub-Distributorship Agreement provide that Ironclad was to pay ORR royalties for any KONG gloves that it sold.

## ORR's Marketing and Funding of the KONG Brand

35.     Due in part to the weak financial position of Ironclad, ORR carried the responsibility of building the KONG brand through advertising campaigns and tradeshow activities.

36.     Although ORR can quantify the annual cost of these efforts, the effect of ORR's marketing on the KONG brand is incalculable.

37.     As stated, ORR is one of the oldest and most respected safety distributors in the industry, and given this longevity and its customer and business relationships, as well as its proven marketing strategies, ORR made the KONG brand what it is today.

38.     ORR also fronted significant sums of money to Ironclad to manufacture KONG gloves ordered by ORR's customers, effectively cash flowing Ironclad's business.

39.     For example, under the Agreement, KONG glove orders over 60,000 pairs required a forty percent cash deposit at the time of order. Therefore, at a minimum, ORR outlaid over $360,000 to Ironclad for a 60,000-pair order before a single glove was delivered, and in some cases, even made.

40.     These up-front expenditures by ORR allowed Ironclad to reap significant margins on the KONG product and, in turn, invest in development of its own corporate infrastructure and product lines.

41.     In other words, from 2007 to the present, Ironclad's financial position, which has dramatically improved, can be traced directly to ORR.

42.     Ironclad's former president and CEO, Scott Jarus, confirmed that, but for ORR, there would be no Ironclad and no KONG: "We [Ironclad] recognize that we would not have KONG or the associated business without ORR Safety and your personal involvement. For all of this, we are very grateful and remain committed to a long and very successful future with ORR Safety." *See* June 27, 2010 Corr. from Jarus to Orr (attached as Exhibit A).

### ORR's Success in Selling KONG

43.     With KONG to market, Ironclad in production, and ORR filling worldwide distribution channels, KONG flourished.

44.     Since its inception in 2007, KONG gloves have become the worldwide standard in the oil and gas industry. There have been more than two million pairs of KONG gloves sold worldwide.

45.     The KONG glove was selected for the 2010 Offshore Leadership Award, and it also received the 2010 Occupational Health and Safety New Product of the Year Award.

46.     In addition to its success in the oil and gas context where it originated, KONG gloves have been an industry-leading brand for impact resistant gloves, penetrating and evolving into other industry markets beyond just oil and gas.

### Ironclad Breaches the Agreement and Amendment by Making and Distributing KONG Vibram Counterfeit Gloves

47.     Under the Agreement and the Amendment, ORR is the exclusive distributor of KONG gloves.

48.     KONG gloves include the current styles and types on the market and "all gloves bearing at least one KONG Mark, any service mark, trade name or brand name containing the term "KONG" or the KONG Trade Dress…." The KONG Trade Dress is defined as "**collectively, the characteristics of the visual appearance of [KONG gloves]** or packaging

associated therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not." *See* Amendment at Schedule A (emphasis added).

49.     Despite this clear grant of exclusivity, Ironclad informed ORR on the same day it filed this lawsuit, that it would begin creating KONG Vibram Counterfeits – gloves without KONG branding and instead branded as "Ironclad" – to omit ORR from the supply chain.

50.     But the KONG Vibram Counterfeit is, and was always intended to be, what it is: a KONG glove manufactured and sold pursuant to the parties' agreements. In fact, the communications of Scott McCown, Director of Sales for National Accounts of Ironclad, prove the depth of Ironclad's unlawful scheme and that even Ironclad, itself, believes that the KONG Vibram Counterfeits are truly KONG gloves.  McCown states in communications to ORR on July 15, 2015:



51.     But in blatant attempt to convert KONG business to Ironclad business, thus cutting ORR from the supply chain and its contractual rights, Ironclad simply decided to "rebrand" these KONG gloves by removing the KONG designation to create the KONG Vibram Counterfeit. As explained below, this ruse is transparent and should not be allowed.

52.     Ironclad's scheme is/was simple: to sell direct, cutting ORR out despite its rights, to customers requiring and requesting KONG gloves.

53.     Amazingly, on September 28, 2015, Ironclad's President and CEO, Jeff Cordes ("Cordes"), met with the President of ORR, Jeffrey Sweedler ("Sweedler") to explain Ironclad's plan. The meeting was held at a trade show where both companies were present. The stated

intention of the meeting was to work through any issues the parties currently had so that both could move the business forward and continue their relationship. Instead, Cordes presented Sweedler with samples of the KONG Vibram Counterfeit, along with an explanation that Ironclad fully intended to sell the gloves in competition with other KONG gloves.

54.    In addition to violating the clear terms of the Agreement as it relates to ORR's exclusive right to distribute all KONG gloves, by inundating and diluting KONG's market with these KONG Vibram Counterfeits, Ironclad is reducing the value of the intellectual property that Ironclad was contractually required to protect. This negatively affects the goodwill of KONG and puts ORR in an intractable position of competition against the KONG Vibram Counterfeit that will likely be sold by Ironclad at a price below KONG.

55.    For example, during the September 28, 2015 meeting between Cordes and Sweedler, Cordes stated that Ironclad had tested the KONG Vibram Counterfeit with ORR's known distribution network customers, Halliburton and Schlumberger, further solidifying ORR's concern that Ironclad was, in fact, seeking to abandon ORR and KONG in favor of its scheme.

56.    This meeting was followed by a demand by Cordes that ORR immediately execute a "standstill agreement" that would postpone litigation threatened by Ironclad to be filed that morning. Ironclad's proposed "standstill" was a transparent attempt to hold ORR in a contractual position where it could not file litigation against Ironclad for its many breaches while giving Ironclad more time to bring its KONG Vibram Counterfeits to market. In short, under the threat of litigation, Cordes demanded that ORR abandon its contractual right to defend itself and KONG from Ironclad's actions.

57.    When asked by ORR why Ironclad would develop, make, and distribute KONG Vibram Counterfeit gloves, Ironclad has said, without hesitation, that it is doing this to avoid

paying ORR any royalties owed under the parties' agreements. Upon information and belief, Ironclad's scheme is also aimed at directing all profits from the sale of the KONG Vibram Counterfeit gloves to Ironclad, despite its agreements with ORR.

### The KONG Vibram Counterfeits

58.     True to its threat, Ironclad introduced an entire line of KONG Vibram Counterfeits at the end of September 2015, calling it the "Industrial Impact Glove Collection with Vibram Technology," *i.e.,* the KONG Vibram Counterfeit. As evidenced by the two companies' marketing materials, the KONG Vibram Counterfeit is nothing more than a slightly restyled and remarketed KONG glove. *Compare* http://www.konggloves.com/gloves.php (last visited Oct. 20, 2015) *to* http://ironcladexo.com/ive-lookbook/ (last visited Oct. 20, 2015). The chart below demonstrates the blatant misuse of the KONG Trade Dress as defined in the Agreement and Amendment to develop this KONG Vibram Counterfeit line of gloves.[5]

---

[5] ORR notes that the blatant replication of the KONG gloves by Ironclad in creating the KONG Vibram Counterfeit is more obvious when shown in color. ORR has filed this pleading as a colored PDF to aid in the comparison.

| KONG | KONG Vibram Counterfeit |











59.     Upon information and belief, the KONG Vibram Counterfeit gloves appear to have been conceived from input, research, and development from ORR.

60.     Since it first developed KONG, ORR has been involved in providing feedback, input, field information and design change requests to Ironclad. Much of this research and development was maintained by Ironclad and ORR as the "KONG Action Tracker & Overview," which has grown over time as ORR expanded its market and customer base.

61.     Many of the aspects of the KONG Vibram Counterfeits are from the KONG Action Tracker & Overview or from information provided by ORR to Ironclad.

62.     For example, since its original development, ORR has been providing feedback and input regarding improved grip and palm material. When Ironclad informed ORR that it was exploring partnering with Vibram for glove materials, ORR's representatives specifically requested that those materials be considered for KONG. That request was rebuffed by Ironclad.

63.     Furthermore, the thumb protection design of the KONG Vibram Counterfeit glove comes directly from ORR research into field use of KONG gloves. Users complained of

vulnerability in the glove at that area, and ORR asked Ironclad to incorporate designs to add additional protection into KONG gloves. Ironclad did not do this, but instead seized that design element for the KONG Vibram Counterfeit.

64.     Likewise, the fire-resistant KONG Vibram Counterfeit is a glove specifically requested by ORR to be added to the KONG line. Ironclad failed to act on ORR's request, which has been pending for many months, and, instead, channeled its development efforts into a fire-resistant glove for the KONG Vibram Counterfeit line.

65.     Ironclad's promotional marketing for the KONG Vibram Counterfeit line (available at https://www.youtube.com/watch?v=LQy5XjZt3ho) includes a prominent video of an actual KONG glove, *i.e.*, Ironclad did not even bother using a KONG Vibram Counterfeit glove in its marketing videos because the two gloves are so similar.

66.     The video also shows Ironclad using the KONG glove as its research and development tool for this new KONG Vibram Counterfeit glove. In fact, the first generation KONG Original Impact Resistant Glove is so prominently featured that it is difficult to discern whether that glove is KONG or the KONG Vibram Counterfeit. Below are screenshots from Ironclad's promotional marketing for the KONG Vibram Counterfeit, demonstrating the similarities in visual characteristics of KONG and the KONG Vibram Counterfeit.

| KONG | KONG Vibram Counterfeit |
|------|--------------------------|



67.     Notably, the very features that make the KONG glove a KONG – a finger and thumb nail protection; full length finger and thumb protection; cuff and opening; color of back portion; colors of finger and thumb protection; back of hand ribs; knuckle protection; colors of knuckle protection, to name a few – are also features of the KONG Vibram Counterfeit.

68.     Ironclad is acutely aware that these features are unique to KONG and part of the KONG Trade Dress. In fact, Ironclad has specifically demanded that other manufacturers cease from doing exactly what it is doing – creating a counterfeit KONG. *See, e.g.,* May 26, 2009 Corr. from Ironclad's counsel to West Chester Holdings, Inc. (attached as Exhibit B).

69.     On information and belief, Ironclad will sell the KONG Vibram Counterfeit directly to ORR's known and prospective customers throughout the world, thus harming ORR and the KONG brand.

70.     This is not Ironclad's first attempt to circumvent ORR and skirt its legal obligations. In early March 2013, a potential customer contacted ORR expressing interest in KONG gloves. The customer requested samples of all KONG styles. The customer stated that it intended to test the KONG gloves to determine if they could be utilized to reduce hand injuries affecting its employees. It was clear that the new customer had a strong affinity for the KONG glove, remarking several times in no uncertain terms that, "We want KONG."

71.     Exactly as it did in 2007 with the Steering Committee, ORR again reached out to Ironclad to discuss how ORR could provide KONG gloves to the new customer to meet its demands for the field test. ORR, through its marketing efforts and general recognition as a leader in safety equipment distribution, was again bringing Ironclad into a new industry to partner and further develop the KONG brand.

72.     A KONG glove was selected by the new customer as one of the gloves it would test in its upcoming field test. But instead of following its obligations to ORR to promote and sell KONG gloves, Ironclad unilaterally relabeled the KONG glove chosen for the field test as the "Ironclad Oil & Gas" glove. Similar to its current rogue strategy, at this time, Ironclad erroneously believed by simply changing what was a KONG glove to say "IRONCLAD" instead

of "KONG," the glove would not fall within the definition of "KONG" as set out in the parties' agreements.

73.     Ironclad's then chief executive officer and president admitted Ironclad's plan (relabeling the KONG Cut Resistant Rigger glove as "Ironclad Oil & Gas") and its specific reasoning for doing so (because ORR would not renegotiate its exclusive rights). Ironclad did this with the specific intent to undercut ORR's exclusive arrangement for all future customers of KONG and to harm the KONG glove product brand. Photographs of the 2013 KONG counterfeits are below:



74.     When the customer received the Ironclad-branded counterfeits – which it recognized as KONG – it immediately contacted ORR expressing confusion as to why the KONG glove said Ironclad and not KONG. The specifications that new customer had approved specifically said KONG, and the new customer again reiterated that it wanted KONG on the final product.

75.     Ultimately, ORR was able to resolve this by convincing Ironclad of its error. Not only was Ironclad's position unsupported by the Agreement, but its actions would have created

competition for the KONG brand that would ultimately degrade KONG's market position to the detriment of both parties. The new customer glove was properly developed as a KONG glove.

76.     Now, yet again in violation of the Agreement and Amendment, Ironclad is attempting to cut ORR out of the marketplace by labeling a KONG counterfeit – the KONG Vibram Counterfeit – as an Ironclad glove.

77.     ORR has been and will be injured as a result of Ironclad's actions.

### The KONG Arctic Mitt Counterfeit

78.     In addition to the KONG Vibram Counterfeit line described above, Ironclad has also created another specific KONG counterfeit with the Arctic Mitt.

79.     ORR brought the Arctic Mitt opportunity to Ironclad. The idea of the glove was to bring a very robust impact and cut-resistant cold condition glove to the North American market. ORR identified two customers willing to test the new design starting in November 2015, but neither would commit to a specific volume until the glove was fully tested in their environment, which is a standard practice for glove design.

**The KONG Arctic Mitt**



**Ironclad Arctic Mitt**



80.     Ironclad rejected this proposal, and instead decided to "rebrand" the KONG Arctic Mitt, so it could sell directly and in competition with ORR in these markets. Upon information and belief, Ironclad is in the process of making 10,000 pairs of the rebranded KONG Arctic Counterfeit glove.

81.     When Ironclad suggested the potential for splitting the order with a KONG and an Ironclad version, *i.e.*, the same glove but with different markings, ORR reminded Ironclad of its obligations to promote the KONG brand.

82.     Ignoring ORR's pleas and its contractual obligation, Ironclad willingly created competition amongst its brands, thus engaging in acts that are counterproductive to its relationship with ORR, counterproductive to the KONG brand, and essentially allow Ironclad to sell a KONG glove while branding it as Ironclad.

83.     When asked by ORR why Ironclad was not promoting the Acrtic Mitt as a KONG glove, Ironclad's representative, Scott McCown, was transparent: he said that by rebranding the glove as something other than KONG, Ironclad would have no obligation to pay ORR sub-distribution royalties under the Sub-Distributorship Agreement or allow ORR to sell the glove. Mr. McCown of Ironclad further explained that Ironclad intended to use an unapproved sub-distributor to sell the gloves in direct competition to ORR's already designated master sub-distributor.

84.     Incredibly, Ironclad admits in its Original Petition that it is merely taking a KONG glove and selling it as a counterfeit KONG glove: "Ironclad [] restyled and remarketed the [KONG] "Arctic Mitt" as a non-KONG glove." *See* Original Petition ¶48.

85.     Ironclad forgets that the KONG Trade Dress is defined as "the characteristics of the visual appearance of the Products. . .". *See* Amendment at Schedule A. Ironclad is correct

that ORR takes issue with Ironclad restyling (*i.e.*, renaming the glove "Ironclad" and removing "KONG"), remarketing and selling it as a KONG counterfeit, as this is exactly what the Agreement and Amendment contractually prevent Ironclad from doing.

86.     Further, Ironclad admits that it has sold Ironclad Arctic Mitt to ORR customers. *See* Original Petition at ¶ 45 ("These lines of gloves include the "Arctic Mitt" sold to . . . Ensign"). Ironclad is specifically aware that the customer identified in its Original Petition purchases KONG gloves from ORR and/or its distributor network. Incredibly, the customer identified in Ironclad's Original Petition is the customer that ORR brought to Ironclad to justify the further development of the KONG Arctic Mitt. Instead, Ironclad unlawfully converted that business with the KONG counterfeit. Ironclad's intent is clear: to convert KONG business to Ironclad business.

87.     Ironclad's actions are in violation of both the Agreement (and Amendment) and the Sub-Distributorship Agreement (and Amendment) in that they are manufacturing and attempting to sell counterfeit Arctic Mitts to interfere with ORR's exclusive rights and it is trying to sell them through channels unapproved by ORR and/or in competition with ORR's network.

**Ironclad Has Failed to Support ORR's Efforts to Market and Sell Kong**

88.     Consistent with its obligations, ORR has continued to market, sell, and develop the KONG brand. Part of this includes identification of new customers and markets for KONG. Over the course of their relationship, Ironclad has failed to match ORR's efforts.

89.     In fact, and to this day, Ironclad has consistently failed to provide appropriate technical support, often delaying responses to opportunities for new business by days or weeks. Further, Ironclad has been unable to provide consistent sales support, as evidenced by the fact

that Ironclad has cycled through at least three Vice Presidents of Sales in the last three years, and

at least as many sales support members over time.

90.     In short, ORR has dragged Ironclad along every step of the way to make KONG

what it is. Ironclad's failures to live up to its obligations, now along with its blatant breaches,

have caused and continue to cause injury to ORR.

**Ironclad Failed to Timely Deliver Products, Failed to Deliver Products Pursuant to ORR's
Orders, and Failed to Deliver Product Pursuant to the Terms of the Parties' Agreements**

91.     Through the course of the relationship between ORR and Ironclad, Ironclad has

been unable for the majority of the time to deliver product on a timely basis.

92.     For example, in 2012, Ironclad's past due delivery averaged nearly eighty percent

for all orders.

93.     Pursuant to Section 3.4 of the Agreement, for products that are delivered to ORR

more than thirty days following the specified delivery date, ORR is entitled to a three-percent

rebate on that order.

94.     In addition, Ironclad owes ORR certain duties as a manufacturer. One of those

duties is to ensure accurate and timely delivery of products. Yet, in addition to the problems

identified above, Ironclad has consistently failed to deliver the correct products or the correct

number of products in response to ORR's purchase orders.

95.     For example, ORR recently placed a large order for KONG gloves destined for a

customer developed by ORR. Despite very particular ordering instructions, Ironclad failed to

deliver the correct product. Moreover, Ironclad's delivery of the incorrect product appears to be

intended to off-load older product that did not conform to the request of ORR or the customer.

96.     Ironclad has consistently and knowingly shipped orders without the right number

of product to both ORR, for delivery to its customers, and via drop-shipment (a method of

shipping directly to a customer of ORR). Only when ORR is notified by its unsatisfied customer does ORR become aware of these issues. Yet, Ironclad is fully aware of the shortages, and fails to inform ORR.

97.    Ironclad also refuses to honor its promises to credit ORR and its customers for mislabeled products. It was recently discovered that Ironclad issued marketing material that mis-identified the overall rating of certain of its cut-resistant gloves. ORR was notified by its customer of Ironclad's error. ORR accepted return of the product, as is customary and expected. Ironclad initially stated that it would issue a credit to ORR for these gloves, but recently refused to do so, to the detriment of ORR.

**Ironclad Failed to Remit Royalties for Sub-Distributor Sales from December 2013 to January 2015**

98.    As described above, the Sub-Distributorship Agreement between Ironclad and ORR entitles ORR to a royalty amount for each KONG glove sold by Ironclad.

99.    Upon execution of Amendment to Sub-Distributorship Agreement on January 27, 2015, the calculation method was changed.

100.    Prior to the execution of the Amendment to Sub-Distributorship Agreement on January 27, 2015, from December 2013 to January of 2015, Ironclad improperly utilized the calculation method set out in the Amendment to Sub-Distributorship Agreement, as opposed to the calculation in the then enforceable Sub-Distributorship Agreement. This resulted in a significant underpayment of royalties to ORR (approximately $435,698.96).

101.    Despite demand for payment of this amount, Ironclad has failed to do so in breach of the parties Sub-Distributorship Agreement.

### Ironclad Breached Its Agreements with ORR by Engaging in Direct Competition Prohibited by the Agreements

102.   Ironclad has engaged in sales of KONG through sales channels prohibited by the Amendment.

103.   Upon information and belief, Ironclad has developed a customer website that allows it to process orders for any customer type, which is a material breach of the Amendment.

104.   Section 6.1 of the Amendment describes the website that Ironclad is to host for KONG. Among other things, it must identify ORR as the exclusive distributor, which it does not. Furthermore, Ironclad is not authorized to make direct industrial sales from this website, but upon information and belief, has done so.

105.   Ironclad is also an authorized sub-distributor and can sell to authorized specified customers, approved pursuant to Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement, through a website. But for each such sale, Ironclad owes ORR a royalty equal to fifteen percent of the sale. In the event the sales are retail, ORR would be entitled to two percent of the sale as a royalty. A retail customer is a person whose primary business is purchasing products for resale to individuals and non-industrial business. Therefore, retail requires that the transaction have a resale component and only resale to individuals and non-industrial businesses.

106.   Upon information and belief, Ironclad's website sales are to customers outside of its authorized scope, which is a breach of the Sub-Distributorship Agreement and the Amendment to the Sub-Distributorship Agreement. ORR has been injured by Ironclad's direct sales in an amount to be determined at trial.

107.   Further, Ironclad has the ability to name retail sub-distributors, but cannot name sub-distributors without approval from ORR to sell to industrial customers, as defined in the

Agreement and Amendment. Despite this, Ironclad has allowed and, upon information and belief, directed retail sub-distributors to engage in direct sales to industrial customers. ORR has been injured by Ironclad's direct sales and its appointment of distributors in violation of the Agreement and Amendment in an amount to be determined at trial.

### Termination without Cause

108.    On or about October 7, 2015, Ironclad sent ORR a letter claiming that it was terminating the parties' Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement due to ORR's unspecified, alleged material breaches of the same.

109.    In response, on or about October 12, 2015, ORR requested that Ironclad specify what the alleged material breaches were so that ORR could have an opportunity to cure as set out in Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement. To date, Ironclad has failed to do so.

110.    Because the termination by Ironclad of the Agreements is without cause, Ironclad must assign to ORR the "KONG Marks and the goodwill associated therewith, including any and all trademark registrations and trademark applications throughout the world" pursuant to Section 7.2(A) of the Agreement and must license "any patents in the United States or elsewhere that have issued for the [KONG gloves] . . together with any inventions or improvements now or hereafter embodied in the [KONG gloves]" pursuant to Section 7.3 of the Agreement.

### <u>CLAIMS</u>

### Count I – Breach of Contract (ORR's Exclusive Distribution Rights under the Agreement) (Under New York Law pursuant to the Agreement)

111.    ORR incorporates by reference all allegations set forth above.

112.     ORR and Ironclad entered into the Agreement and Amendment which provide, among other things, that ORR is to be the exclusive worldwide distributor (with certain narrowly-defined exceptions as set forth in the Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement) of "'KONG' safety gloves (all sizes), together with any inventions or improvements now or hereafter embodied therein (whether or not patented or patentable in any jurisdiction) during the term of [the Agreement.]"

113.     The Agreement and Amendment provide that references to KONG gloves include the current styles and types on the market and "all gloves bearing at least one KONG Mark, any service mark, trade name or brand name containing the term "KONG" or the KONG Trade Dress…." The KONG Trade Dress is defined as "collectively, the characteristics of the visual appearance of [KONG gloves] or packaging associated therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not."

114.     Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

115.     ORR performed all of its obligations under the Agreement and Amendment.

116.     Ironclad materially breached the Agreement with ORR by manufacturing, marketing, and distributing KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits, using the KONG trade dress but lacking KONG Marks, directly to buyers or through other distributors in violation of the exclusivity provisions of the Agreement.

117.     As a direct and proximate result of Ironclad's breaches of the Agreement, ORR has suffered damages.

118.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count II – Breach of Contract (Rebate Payments under the Agreement) (Under New York Law pursuant to the Agreement)

119.    ORR incorporates by reference all allegations set forth above.

120.    ORR and Ironclad entered into the Agreement and Amendment which provide, among other things, that Ironclad is to pay rebate amounts for late deliveries to ORR.

121.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

122.    ORR performed all of its obligations under the Agreement and Amendments; in particular, ORR timely paid Ironclad for all products ordered pursuant to the Agreement and Amendment.

123.    Throughout the life of the Agreement and Amendment, Ironclad has repeatedly failed to timely deliver products, failed to deliver products specified in ORR's orders, and failed to deliver productions pursuant to the terms of the Agreement and Amendment to ORR and its customers.

124.    Ironclad has materially breached the Agreement with ORR by failing to pay rebate amounts for late or otherwise improper deliveries to ORR pursuant to Section 3.4 of the Agreement.

125.    As a direct and proximate result of Ironclad's breaches of the Agreement, ORR has suffered damages.

126.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

**Count III – Breach of Contract (Failure to Protect Intellectual Property under the Agreement)**
**(Under New York Law pursuant to the Agreement)**

127.    ORR incorporates by reference all allegations set forth above.

128.    Per Section 6.1 of the Agreement, Ironclad is obligated to "us[e] commercially reasonable efforts to preserve the goodwill of its customers."

129.    Per Sections 7.2 and 7.3 of the Agreement, ORR possesses the exclusive license to use the intellectual property, including trademarks, trade names, and patent rights that are subject to the Agreement, including among other things the KONG Marks, trade dress, and KONG-related patents.

130.    Per Sections 7.2(A) and 7.3 of the Agreement, ORR is a potential successor-in-interest to the intellectual property that is subject to the Agreement, including among other things the KONG Marks, trade dress, and KONG-related patents.

131.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

132.    ORR performed all of its obligations under the Agreement and Amendment.

133.    Ironclad has materially breached the Agreement with ORR by failing to protect the intellectual property that is subject to the Agreement pursuant to Sections 6.1, 7.2, 7.2(A), 7.3, and 7.4 of the Agreement by, among other things, producing KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits featuring the trade dress of KONG gloves, but lacking KONG Marks, under its own competing brand.

134.    As a direct and proximate result of Ironclad's breaches of the Agreement, ORR has suffered damages.

135.     ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count IV – Breach of Contract (Failure to Remit Royalties under the Sub-Distributorship Agreement)
### (Under New York Law pursuant to the Agreement)

136.     ORR incorporates by reference all allegations set forth above.

137.     The Sub-Distributorship Agreement between ORR and Ironclad entitles ORR to a royalty amount for each KONG glove sold by Ironclad. Upon execution of Amendment to Sub-Distributorship Agreement on January 27, 2015, the calculation method was changed.

138.     Prior to the execution of the Amendment on January 27, 2015, from December 2013 to January of 2015, Ironclad improperly utilized the calculation method set out in the Amendment to Sub-Distributorship Agreement, as opposed to the calculation in the then-enforceable Sub-Distributorship Agreement. This resulted in a significant underpayment of royalties to ORR.

139.     Section 6.6 of the Sub-Distributorship Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

140.     ORR performed all of its obligations under the Sub-Distribution Agreement and Amendment to Sub-Distribution Agreement.

141.     Despite demand for payment of royalties due and owing under the Sub-Distribution Agreement, Ironclad has breached the Sub-Distribution Agreement by failing to pay such outstanding royalties.

142.     As a direct and proximate result of Ironclad's breaches of the Sub-Distribution Agreement, ORR has suffered damages.

143.   ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

**Count V – Breach of Contract (Direct Website Sales)**
**(Under New York Law pursuant to the Agreement and Sub-Distributorship Agreement)**

144.   ORR incorporates by reference all allegations set forth above.

145.   Section 6.1 of the Amendment describes the website that Ironclad was to create to market KONG products as a "KONG website for the Products that primarily contains information related to Distributor [ORR], Licensor and the Products, including, without limitation, the contact information of Distributor and identification of Distributor as the exclusive distributor of the Products."

146.   Ironclad is an authorized sub-distributor and can sell to authorized specific customers (approved pursuant to the Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement) through a website.

147.   Ironclad is also permitted, pursuant to Section 2.4 of the Agreement as amended by the Amendment, to make certain retail sales; however, such sales are strictly limited pursuant to Section 1.9 to persons "whose primary business is purchasing Products for resale to individuals and non-industrial businesses."

148.   Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

149.   Section 6.6 of the Sub-Distributorship Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

150.    Through its website, Ironclad permits any visitor to its website to purchase KONG Products directly, in quantities as small as one pair of gloves. The Ironclad website does not require a purchaser to be a "retail" seller as that term is defined in the Agreement and Amendment.

151.    ORR performed all of its obligations under the Agreement and Sub-Distribution Agreement.

152.    Further, Ironclad has the ability to name retail sub-distributors, but cannot name sub-distributors without approval from ORR to sell to industrial customers, as defined in the Agreement and Amendment.

153.    Ironclad has breached the Agreement and Sub-Distribution Agreement by selling KONG Products directly to consumers and other unapproved third parties through its website and other channels.

154.    As a direct and proximate result of Ironclad's breaches of the Agreement and Sub-Distribution Agreement, ORR has suffered damages.

155.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count VI – Breach of Implied Duty of Good Faith and Fair Dealing
### (Under New York Law pursuant to the Agreement)

156.    ORR incorporates by reference all allegations set forth above.

157.    ORR and Ironclad entered into the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement to clearly delineate each party's rights and obligations regarding the KONG brand and the intellectual property and products associated with the KONG brand.

158.    Those agreements are clear in providing that ORR is to be the exclusive distributor of KONG gloves, with certain narrow exceptions.

159.    Ironclad's stated and explicit intent in producing KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits and attempting to sell them to current and prospective KONG customers is to avoid the exclusivity provisions in those agreements.

160.    Ironclad's actions in producing and attempting to sell KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits are taken in bad faith for the illegitimate purpose of depriving ORR of the benefits of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement.

161.    As a direct and proximate result of Ironclad's breaches of the implied duty of good faith and fair dealing in the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement, ORR has suffered damages.

162.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

## Count VII - Declaration of Rights
### (Under New York Law pursuant to the Agreement)

163.    ORR incorporates by reference all allegations set forth above.

164.    Pursuant to Section 7.2(A) of the Agreement, in the event that Ironclad terminates the Agreement without cause, Ironclad is to assign to ORR "all of its rights to the KONG Marks and the goodwill associated therewith, including any and all trademark registrations and trademark applications throughout the world," and is also to "cease-and-desist all use of the KONG Marks and any confusingly similar marks."

165.    Pursuant to Section 7.3 of the Agreement, in the event that Ironclad terminates the Agreement without cause, Ironclad is to grant ORR a license "to any patents in the United States

**ANSWER, ADDITIONAL DEFENSES, AND COUNTERCLAIM OF DEFENDANT ORR SAFETY CORPORATION -**                **Page 41**

or elsewhere that have issued for the [KONG gloves] . . . together with any inventions or improvements now or hereafter embodied in the [KONG gloves]."

166.    On or about October 7, 2015, Ironclad sent ORR a letter claiming that it was terminating the parties' Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement due to ORR's unspecified alleged material breaches of the same.

167.    In response, on or about October 12, 2015, ORR requested that Ironclad specify what the alleged material breaches were so that ORR could have an opportunity to cure as set out in the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement. To date, Ironclad has failed to do so.

168.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

169.    A bona fide justiciable and substantial controversy exists between ORR and Ironclad, parties with adverse legal interests, as to whether Ironclad's termination of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement is without cause, requiring Ironclad to assign its rights in the KONG brand intellectual property to ORR as specified in Section 7.2(A) and 7.3 of the Agreement.

170.    A declaratory judgment would serve a useful purpose in settling this legal issue, and would finalize the controversy and offer relief from uncertainty.

171.    Accordingly, ORR is entitled to a declaration pursuant to N.Y. C.L.S. C.P.L.R. § 3001 that Ironclad's termination of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement is without cause.

172.    Furthermore, ORR is also entitled to recover its attorneys' fees related to the declaratory judgment pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

### Count VIII – Specific Performance
### (Under New York Law pursuant to the Agreement)

173.    To the extent not inconsistent with the claims in this Count, ORR incorporates by reference all allegations set forth above.

174.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

175.    KONG and KONG-derivative safety gloves are unique goods that do not have suitable substitutes in the marketplace.

176.    ORR and Ironclad are each uniquely situated to perform the obligations necessary to perform under the Agreement.

177.    Ironclad is the only existing manufacturer that is equipped to produce KONG and KONG-derivative safety gloves because it owns all of the intellectual property rights relating to the KONG and KONG-derivative safety gloves.

178.    ORR has existing business relationships and supply contracts with third parties that rely upon Ironclad's manufacturing of KONG and KONG-derivative gloves for distribution by ORR under the terms of the Agreement.

179.    There exists no other entity that is a reasonable substitute for Ironclad in the context of the Agreement.

### Count IX - False Advertising and Unfair Competition Pursuant to 15 U.S.C. § 1125(a)

180.    ORR incorporates by reference all allegations set forth above.

181.   Ironclad makes false or misleading descriptions and representations of fact in connection with Ironclad's promotion of the KONG Vibram Counterfeits and the KONG Artic Counterfeit Glove.

182.   Ironclad's false and misleading representations are made in in connection with the promotion of goods in interstate commerce.

183.   By using KONG Vibram Counterfeits and KONG gloves interchangeably in promotions, Ironclad misrepresents the nature, characteristics, and qualities of the KONG Vibram Counterfeits and KONG gloves.

184.   Ironclad's promotion of the KONG Vibram Counterfeits misrepresents the commercial activities of both Ironclad and ORR.

185.   Ironclad's false and misleading descriptions and representations regarding the products are material.

186.   As a direct result of Ironclad's misrepresentations of the nature, characteristics, and qualities of the KONG Vibram Counterfeits and KONG gloves and the misrepresentations of the commercial activities of Ironclad and those of ORR, ORR has suffered and is continuing to suffer damages.

187.   ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

## Count X – Tortious Interference with Contract
## (Under Texas Law)

188.   To the extent not inconsistent with the claims in this Count, ORR incorporates by reference all allegations set forth above.

189.    ORR has multiple existing contracts in place with customers for the purchase of KONG safety gloves, of which it is the exclusive distributor. Such customers include, but are not limited to, Halliburton and Schlumberger.

190.    Ironclad is aware of the existence of ORR's contracts and the identities of its customers.

191.    Ironclad has, willfully and with intent to a) circumvent without breaching the exclusivity provisions of its Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement with ORR; and b) disrupt ORR's contractual relationships with ORR's customers, approached ORR's customers, including Halliburton and Schlumberger, to attempt to sell those customers KONG counterfeit products.

192.    Ironclad's actions have interfered with ORR's contractual relationships with its customers.

193.    As a direct and proximate result of Ironclad's tortious acts, ORR has suffered damages.

194.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count XI – Exemplary Damages
### (Under Texas Law)

195.    ORR incorporates by reference all allegations set forth above.

196.    Ironclad's intentional interference with ORR's existing contractual relations was intended to cause direct injury to ORR in contravention of the Agreement and partnership between the parties.

197.    Ironclad, in intentionally interfering with ORR's existing contractual relations, acted with malice toward ORR.

198.    As a direct and proximate result of Ironclad's intentional malicious acts, ORR has suffered damages.

199.    ORR is entitled to an award of exemplary damages against Ironclad pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 41.003.

### Count XII – Attorneys' Fees
### (Under New York law pursuant to the Agreement)

200.    ORR incorporates by reference all allegations set forth above.

201.    Section 9.2 of the Agreement provides that Ironclad is responsible to indemnify ORR for all "Losses," including attorneys' fees, arising from its breach or violation of any of its representations, warranties, covenants or obligations in the Agreement, as well as for its negligent acts or omissions, willful misconduct, or other wrongdoing.

202.    ORR has engaged the undersigned counsel to protect its interests in light of Ironclad's multiple breaches of the Agreement and its tortious acts.

203.    ORR is entitled to recover its attorneys' fees in this action pursuant to Section 9.2 of the Agreement and Tex. Civ. Prac. & Rem. Code Ann. § 38.001.

### PRAYER FOR RELIEF

WHEREFORE, ORR requests judgment against Ironclad as follows:

A.    An award of damages in an amount to be proven at trial;

B.    A demand for jury;

C.    A declaratory judgment that Ironclad's termination of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement is without cause;

D.    An award of all intellectual property rights related to the KONG brand per the terms of the Agreement;

ANSWER, ADDITIONAL DEFENSES, AND COUNTERCLAIM OF DEFENDANT ORR SAFETY CORPORATION -                    **Page 46**

E.      Specific performance;

F.      Punitive damages;

G.      Attorneys' fees and costs; and

H.      All other relief to which ORR may be entitled.

Respectfully submitted,

*/s/ Gregory M. Sudbury*
Gregory M. Sudbury
State Bar No. 24033367
Rachel Lee Hytken
State Bar No. 24072163
QUILLING, SELANDER, LOWNDS, WINSLETT &
MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Main)
(214) 871-2111 (Fax)
gsudbury@qslwm.com
rhytken@qslwm.com

-and-

Of counsel:
Benjamin C. Fultz (to be admitted *pro hac vice*)
Jennifer Metzger Stinnett (to be admitted *pro hac
vice*)
Daniel Hancock (to be admitted *pro hac vice*)
Fultz Maddox Dickens PLC
2700 National City Tower
Louisville, Kentucky 40202
Telephone: (502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmdlegal.com
jstinnett@fmdlegal.com
dhancock@fmdlegal.com

*Counsel for Defendant and Counterclaim Plaintiff
Orr Safety Corporation*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing document has been served upon the following counsel electronically and via certified mail in accordance with the Texas Rules of Civil Procedure on the 23rd day of October, to the following:

Daniel H. Charest
Warren T. Burns
Will Thompson
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, Texas 75201
*Counsel for Plaintiff*


*/s/ Gregory M. Sudbury*
Gregory M. Sudbury


4822-7470-1865, v. 1

# Exhibit A

**Clark Orr**

| | |
|---|---|
| **From:** | Scott Jarus [scottj@ironclad.com] |
| **Sent:** | Sunday, June 27, 2010 11:18 PM |
| **To:** | Clark Orr |
| **Subject:** | RE: Ironclad - Orr Safety Sub-Distributor Agreement |
| **Attachments:** | Orr Safety Sub-Distributorship Agreement with Ironclad Performance Wear Corp (v3).doc |

Clark,

I want to preface this email with a couple of comments. First, Ironclad Performance Wear very much values our business relationship with Orr Safety and truly appreciates all of the business that you have given us for the KONG line of gloves. We recognize that we would not have KONG or the associated business without Orr Safety and your personal involvement. For all of this, we are very grateful and remain committed to a long and very successful future with Orr Safety.

All that being said, I have become very uncomfortable with the tone or direction our relationship is taking. There is an implication in your email that Ironclad is out to deceive or defraud Orr Safety, or, at the very least, play some sort of game whereby Ironclad would take advantage of the distributor agreement between our two companies to the exclusive advantage of Ironclad. Nothing could be further from the truth and I am offended by the implication.

Ironclad's sole mission is to support the growth of a very profitable KONG business. We can do this in one of two ways: (1) We can simply live to the letter and spirit of the exclusive distribution agreement whereby we continue to support Orr Safety's efforts in growing and expanding the KONG brand and distribution; or (2) we can assist in the building of the KONG brand and distribution by augmenting Orr Safety's efforts by selling and distributing KONG gloves to customers who, for whatever reason, do not wish to do business directly with Orr Safety. It seems to me that the most logical and rational course is to choose option (2) above. This course of action helps grow the brand and distribution with customers Orr Safety can't sell into, it will preclude competitors from being successful, it is very lucrative for Orr Safety (as it never touches the gloves sold directly by Ironclad); and it is profitable to Ironclad. It is a win/win/win for both our companies and the market. 3) Improve the performance of the glove

So, the decision is now up to you. You can either trust in the integrity of Ironclad and believe that we are acting in good-faith, in which case you should have no problem executing the sub-distributor agreement; or you can (continue) to believe that Ironclad is untrustworthy and must be watched like a hawk, in which case, we'll continue to do business to the letter and spirit of the exclusive distributor agreement and nothing more. Obviously, choosing the latter of these two will absolutely change the nature and tone of the relationship between Ironclad and Orr Safety. The choice is yours, but we absolutely hope that you'll choose the former.

By the way, with regard to the unfortunate event you describe in your email *which happened two years ago* and for which an explanation and apology was already provided to you and Orr Safety, let me reiterate our position on this matter. The collateral piece was created without management authorization by two lower-level members of Ironclad's sales and marketing team. Once it was brought to the attention of management, it was immediately discontinued, all copies were destroyed and the two employees were reprimanded (which ultimately led to the departure of one of the individuals). Since that event, to the best of my knowledge, there have been no other inappropriate actions taken by Ironclad or its employees. To the contrary, I believe that we have gone above and beyond the terms of the exclusive distributor agreement to help grow the KONG brand, distribution and Orr Safety's business in this market.

The attached sub-distributor agreement has been reviewed by our lawyers. We have accepted the majority of the revisions proposed by your lawyer, but have made a few changes to what your lawyer proposed. I look forward to hearing from you soon on the sub-distributor agreement and on how you would like for the Orr Safety-Ironclad relationship to proceed.

Scott

# Exhibit B

Certified Mail

May 26, 2009

West Chester Holdings, Inc.
100 Corridor Park Drive
Monroe, Ohio 45050

Re:    West Chester Rugged Rigger Glove

Gentlemen:

This office represents Ironclad Performance Wear Corp. ("Ironclad") with respect to its claim that West Chester Holdings, Inc. ("West Chester") is infringing Ironclad's proprietary rights with respect to its KONG glove.

Ironclad has been selling its KONG glove in commerce since October, 2007 (a photograph of the palm and back sides for the glove is enclosed herewith). The Rugged Rigger glove offered for sale by West Chester is confusingly similar to Ironclad's glove in the following respects:

1.    Finger and thumb nail protection;
2.    Full length finger and thumb protection;
3.    Cuff and opening;
4.    Color of back portion;
5.    Colors of finger and thumb protection
6.    Back of hand ribs
7.    Knuckle protection
8.    Colors of knuckle protection; and
9.    ID tag

In addition, Ironclad has been advised by the exclusive distributor of KONG gloves that end users have requested quotes for both the KONG and West Chester gloves notwithstanding that the distributor does not carry the latter, evidence that relevant purchasers are confused to the source of the KONG gloves.

In summary it is believed that the West Chester glove infringes Ironclad's trade dress rights under Section 43(a) of the Lanham Act and under various state laws relating to trade dress infringement and unfair competition.

It is thus demanded that Westchester cease and desist its infringing activities

Defendant's Answer, Additional Defenses & Counterclaim - Page 053