# Exhibit A-5

FILED
DALLAS COUNTY
10/23/2015 10:51:13 AM
FELICIA PITRE
DISTRICT CLERK

Case 3:15-cv-03453-D   Document 4-1   Filed 10/27/15   Page 2 of 54   PageID 102

Angie Avina

CAUSE NO. DC-15-11878

| | | |
|---|---|---|
| IRONCLAD PERFORMANCE WEAR CORPORATION, | § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | DALLAS COUNTY, TEXAS |
| v. | § § | |
| ORR SAFETY CORPORATION | § § | |
| Defendant | § § | 193rd JUDICIAL DISTRICT |

---

## ANSWER, ADDITIONAL DEFENSES, AND COUNTERCLAIM OF DEFENDANT ORR SAFETY CORPORATION

---

Defendant Orr Safety Corporation ("ORR"), in response to Plaintiff Ironclad Performance Wear Corporation's ("Ironclad") Original Petition, files this Answer thereto.

### GENERAL DENIAL

ORR denies all and singular the allegations contained in Ironclad's Original Petition and demands strict proof thereof.

### FIRST AFFIRMATIVE DEFENSE

Ironclad's Original Petition is barred by the doctrines of estoppel, fraud, misrepresentation, laches, negligence, unjust enrichment, waiver, unclean hands, accord and satisfaction, failure of consideration, payment, release, collateral estoppel, judicial estoppel, ripeness, statute of limitations, indemnity, release, or other matters constituting an avoidance or affirmative defense as may be shown by the evidence.

### SECOND AFFIRMATIVE DEFENSE

ORR expressly reserves its rights to amend this Answer to Original Petition, including the right to assert additional defenses, whether affirmative or otherwise, about which it presently

lacks knowledge or information but which may become available or apparent during the course of this litigation, through discovery or other means.

## THIRD AFFIRMATIVE DEFENSE

Ironclad has failed to mitigate its damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

The damages sought in the Original Petition were not caused by ORR and were the direct and proximate result of conduct of third parties, or were directly and proximately caused by Ironclad, or were caused the operation of external factors, or intervening and superseding causes, all beyond the control of ORR, and not by any act, statement, or omission attributable to ORR.

## FIFTH AFFIRMATIVE DEFENSE

Ironclad's claims are barred, in whole or in part, by the doctrine of proportionate responsibility pursuant to TEX. CIV. PRAC. & REM. CODE § 33.001. If necessary, pursuant to TEX. CIV. PRAC. & REM. CODE § 33.003, ORR requests that the trier of fact determine the percentage of responsibility for Ironclad and ORR, and each responsible third party who has been designated under TEX. CIV. PRAC. & REM. CODE § 33.004.

## SIXTH AFFIRMATIVE DEFENSE

ORR states that Ironclad failed to give proper notice of any alleged breach, or failed to perform or comply with some other required condition precedent for its claims and, therefore, its claims fail in whole or in part.

## SEVENTH AFFIRMATIVE DEFENSE

Ironclad is not entitled to recover attorneys' fees.

## EIGHTH AFFIRMATIVE DEFENSE

The Original Petition fails to state a cause of action against ORR for which relief may be granted and must, therefore, be dismissed.

## NINTH AFFIRMATIVE DEFENSE

Ironclad's claims are barred in whole or in part by the terms, conditions and/or provisions set forth in the agreements between the parties.

## TENTH AFFIRMATIVE DEFENSE

Ironclad's Damages, if any, are barred in whole or in part because they are speculative, and are not allowed under the terms, conditions and/or provisions of the agreements between the parties.

## ELEVENTH AFFIRMATIVE DEFENSE

Ironclad is not entitled to prejudgment interest because the amounts claimed, if any, are unliquidated, and Ironclad is not entitled to post-judgment interest because no amounts are owed.

WHEREFORE, ORR prays that Ironclad take nothing by this suit and that ORR goes hence and recovers costs in its behalf expended, as well as damages and relief set out below in its Counterclaim.

## COUNTERCLAIM

1.      This counterclaim arises out of the unlawful actions of ORR's exclusive manufacturer of the KONG glove: Ironclad. Specifically, and as explained herein, Ironclad has unilaterally and unlawfully terminated ORR's contractual right of exclusive distributorship of the KONG glove by relabeling KONG gloves with a different name, thereby creating KONG counterfeits. This relabeling, Ironclad's transparent attempt at circumventing its contractual obligations, is being done with the intent to sell and distribute these "rebranded" KONG gloves

directly to ORR's customers in violation of ORR's exclusivity rights. What is more, Ironclad notified ORR of its intent to terminate ORR's contractual rights without cause. Finally, Ironclad has engaged in other conduct that has resulted in material breaches of the agreements between the parties and violations of the law, all of which entitle ORR to relief.

## PARTIES

2.     ORR is a Kentucky corporation with its principal place of business in Jefferson County, Kentucky. ORR is in the business of selling and distributing industrial safety equipment and supplies, and providing certain services related to the delivery and use of such equipment and supplies.

3.     Ironclad is a Nevada corporation with its principal place of business in Farmers Branch, Texas. Ironclad is in the business of manufacturing, marketing, and selling gloves and other apparel.

## JURISDICTION AND VENUE

4.     Venue is proper in Dallas County, Texas because Dallas County, Texas is where all or a substantial part of the events or omissions giving rise to the claim occurred. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(l). Dallas County is also proper because it is the county of Ironclad's principal office. TEX. CIV. PRAC. & REM. CODE § 15.002(a)(2), (3).

5.     This Court has personal jurisdiction over Ironclad due to the fact that its principal place of business is the State of Texas and it transacts business in Texas. The Court has subject matter jurisdiction because the amount in controversy is within the Court's jurisdictional limits.

## STATEMENT OF FACTS

### Introduction

6.      ORR is one of the most successful distributors of safety products in the United States and around the world. Part of its success is attributable to its position as the worldwide exclusive distributor of the protective work glove known as KONG.

7.      The KONG work glove and its progeny line offer superior protection to the hand, particularly the back of the hand and fingers, as well as innovative uses of fabrics and materials intended to increase hand protection in various industries.

8.      Since its inception, KONG has expanded its product line from the KONG Original Impact Resistant Glove to include the KONG Oil and Slip Resistant Impact Protection Glove, the KONG Dexterity Super Grip Impact Protection Glove, the KONG Cut Resistant Impact Protection Glove, the KONG Cold Condition Waterproof Impact Protection Glove, the KONG Rigger Grip Cut 5 Impact Protection Glove, the KONG Rigger Impact Protection Glove, the KONG Operator Impact Protection Glove, the KONG Cut 5 Knit Impact Protection Glove, the KONG Deck Crew Impact Protection Glove and the KONG Full Dipped Cut 5 Knit Glove.

9.      The most recognizable component of the KONG glove is the back of hand protection provided by thermoplastic rubber ("TPR") in various shapes over the back of the hand, across the knuckle, and down each finger of the glove. These components, combined with recognizable color patterns, cuff types, labeling and packaging, create a trade dress that is one of the most dominant, recognizable aspects of KONG and the KONG line of gloves.

10.      The KONG glove line, through ORR's development and marketing, has become the gold-standard in hand safety for the industrial context. It is a unique and sought after brand,

and although others have tried to imitate the KONG glove, none have been successful in developing a meaningful substitute.

11.    The KONG line is continuously expanding. This matter is about the newest KONG glove, which are simply KONG gloves - rebranded, relabeled, and using KONG's research and development - as Ironclad gloves (hereinafter "KONG Vibram Counterfeits"). Ironclad has manufactured what is for all intents and purposes a KONG glove but by naming it something else thinks it can circumvent its legal and contractual obligations to ORR and KONG. It is mistaken.

**ORR and Ironclad's Collaboration on KONG**

12.    ORR has a long history in the safety industry. Founded in 1948, ORR has grown to be one of the most well-recognized and respected safety product distributors in the world. In addition to working with various other industries focused on safety, ORR was always at the forefront of innovation in assisting oil and gas companies to improve worker safety.

13.    In 2007, ORR was invited as the sole safety company to participate in a steering committee that was made up of a collaborative, cross-functional group of safety and operational representatives from the world's leaders in the oil and gas industry, including ExxonMobil, ConocoPhillips, Superior Energy and Chevron (hereinafter "the Steering Committee"). Despite being competitors in the oil and gas industry, these companies would come together with ORR to share "best practices" when it came to safety.

14.    The purpose of this particular Steering Committee was to identify and address the highest level of recordable injuries on oil platforms. At that time, hand injuries accounted for approximately seventy-one percent of all injuries on oil platforms. More specifically, hairline fractures, bruising blows (back of the hand and fingers) and pinched fingers were the leading

types of hand injuries. The Steering Committee set a goal to reduce or eliminate these types of injuries in the oil and gas industry.

15.     These companies turned to ORR, as a distributor of safety products, including hand protection, to find a company that could assist it in manufacturing a product that could meet the Steering Committee's needs.

16.     ORR chose Ironclad to partner with it to manufacture a glove to help remedy the problems posed by the Steering Committee.

17.     At that time, Ironclad was a struggling glove manufacturer, primarily focused on task-specific work gloves for plumbers, masonry workers, electricians and construction workers. Ironclad had just recorded its tenth year of losses and was fighting to find its place in any market, particularly the oil and gas industry.

18.     For example, in 2006, Ironclad operated at a $3,000,000 deficit. In 2007, Ironclad took in $5,001,743 in gross profit, but had $8,832,283 in operating expenses, and was thus operating at an almost $4,000,000 loss. In 2007, Ironclad had an accumulated deficit of more than $11,000,000.

19.     As a company that was not sure if it even could keep its doors open in 2007, Ironclad happily agreed to this cooperative opportunity brought to it by ORR.

20.     Undeterred by Ironclad's poor financial position, ORR, along with Ironclad as its manufacturer, proceeded to meet with the Steering Committee to develop a specification and requirement list for the new glove concept.

21.     The "Concept Glove" was developed based on the input from ORR, Ironclad, the Steering Committee, as well as input from the oil and gas industry safety meetings. Funded completely by ORR, approximately two hundred pairs of the first prototype of the Concept

Glove were manufactured and distributed evenly to all of the committee-member companies for field testing. The first prototype of the Concept Glove was given out to a variety of job types, functions, and environments. All of the workers testing the first prototype of the Concept Gloves were asked to fill out a field survey that allowed them to rank the gloves on a variety of key elements: protection, comfort, fit, grip, dexterity, durability, and overall satisfaction. The Steering Committee reviewed the results and decided that ORR needed to address the lowest scored elements with Ironclad, which were grip and durability.

22.     A second prototype of the Concept Glove – again, completely funded by ORR – was developed based on the feedback and recommendations. A second field trial was arranged and conducted in the same manner as the first trial. The results of the second prototype of the Concept Glove showed improvement in five categories and increase in the overall satisfaction level. During the second field testing, there were 80,000 hours worked without a single hand injury. Based on these results, in June 2008, the Steering Committee approved the final design.

23.     This final design born out of the Steering Committee became the original and first iteration of the KONG glove – the KONG Original Impact Resistant Glove, pictured below as it was originally and currently sold.[1] The KONG brand was born. Ironclad was asked to go into production on the KONG, and the KONG gloves were available on the market in October 2008.

---

[1] Note that initially the KONG Original Impact Resistant Glove's knuckle protection said "Ironclad" because that was the only mold Ironclad had in inventory. However, once the KONG brand took off, and Ironclad could fund manufacturing beyond the original investment by ORR and fulfill the brand's legacy in the marketplace, it invested in additional molds and began labeling the knuckle protection with the KONG name. However, even the first KONG Original Impact Resistant Gloves with "Ironclad" knuckle protection had a KONG hang tag and a KONG cuff identification.

| First Iteration<br>KONG Original Impact Resistant Glove | Current<br>KONG Original Impact Resistant Glove |
|---|---|



**Exclusive License and Distributorship Agreement, First Amendment to the Exclusive License and Distributorship Agreement, Sub-Distributorship Agreement, and First Amendment to Sub-Distributorship Agreement**

24.     To memorialize their relationship and partnership with the KONG brand, ORR and Ironclad negotiated an Exclusive License and Distributorship Agreement on January 6, 2009 (the "Agreement"). [2]

25.     The Agreement designated ORR as the worldwide exclusive distributor of KONG safety gloves. *See* Agreement at Art. 2.

26.     Specifically, the Agreement stated that ORR was the exclusive distributor of all "'KONG' safety gloves (all sizes), together with any inventions or improvements now or hereafter embodied therein (whether or not patented or patentable in any jurisdiction) during the term of [the Agreement.]" *See id.* at Sch A.

27.     The initial term of the Agreement was for a period of five years, with three consecutive and automatic renewal periods of five years, for a total of twenty years. *See id.* ¶ 4.1. Stated plainly, for twenty years starting on January 6, 2009, Ironclad could only sell KONG gloves, and any derivative of KONG gloves that it and ORR developed, to ORR.

28.     In exchange for this twenty-year exclusivity, Ironclad retained the intellectual property rights, including the KONG trademark and a patent pending for the KONG design (specifically, the back of hand protection previously described, *supra*, ¶ 9). *Id.* ¶ 7.1-7.2.

29.     To protect its investment in KONG, in the event that Ironclad terminated the Agreement for any reason other than ORR's material breach, ORR would be entitled to full

---

[2] Because of the confidential and proprietary nature of the Agreement, ORR has not attached it to the Complaint However, ORR will make it available to the Court and other parties upon request, under seal and/or pursuant to a protective order.

assignment of the KONG trademark, its registrations, applications and goodwill and a license to any patent granted on KONG. *Id.* ¶¶ 7.2(A), 7.3.

30.     The parties set pricing terms and minimum purchases throughout the term of the Agreement. *Id.* at Sch. B. Specifically, after the Initial Term (*i.e.*, the first five-year term of the Agreement) ORR was required to purchase no less than $3,000,000 worth of KONG gloves from Ironclad per year in order for ORR to maintain its twenty-year exclusivity. *Id.*

31.     After months of discussions and negotiations, and in an effort to accommodate Ironclad, the parties amended the Agreement to change certain aspects of their relationship. The First Amendment to the Exclusive License and Distributorship Agreement (the "Amendment")[3] was effectuated on January 1, 2015.

32.     Among other things, the Amendment gave Ironclad expanded retail and co-branding opportunities, which ORR agreed to in an effort to help Ironclad succeed in the industry. However, to date, Ironclad has done little in capitalizing on these expanded contractual rights.

33.     In addition to the Agreement, ORR and Ironclad are also parties to the July 22, 2010 Sub-Distributorship Agreement (the "Sub-Distributorship Agreement").[4] The Sub-Distributorship Agreement was amended on January 27, 2015 (the "Amendment to Sub-Distributorship Agreement").

---

[3] As with the Agreement, because of the confidential and proprietary nature of the Amendment, ORR has not attached it to the Complaint. However, ORR will make it available to the Court and other parties upon request, under seal and/or pursuant to a protective order.

[4] Because of the confidential and proprietary nature of the Sub-Distributorship Agreement and the Amendment to Sub-Distributorship Agreement, ORR has not attached them to the Complaint. However, ORR will make them available to the Court and other parties upon request, under seal and/or pursuant to a protective order.

34.     Among other rights, the Sub-Distributorship Agreement and the Amendment to the Sub-Distributorship Agreement provide that Ironclad was to pay ORR royalties for any KONG gloves that it sold.

### ORR's Marketing and Funding of the KONG Brand

35.     Due in part to the weak financial position of Ironclad, ORR carried the responsibility of building the KONG brand through advertising campaigns and tradeshow activities.

36.     Although ORR can quantify the annual cost of these efforts, the effect of ORR's marketing on the KONG brand is incalculable.

37.     As stated, ORR is one of the oldest and most respected safety distributors in the industry, and given this longevity and its customer and business relationships, as well as its proven marketing strategies, ORR made the KONG brand what it is today.

38.     ORR also fronted significant sums of money to Ironclad to manufacture KONG gloves ordered by ORR's customers, effectively cash flowing Ironclad's business.

39.     For example, under the Agreement, KONG glove orders over 60,000 pairs required a forty percent cash deposit at the time of order. Therefore, at a minimum, ORR outlaid over $360,000 to Ironclad for a 60,000-pair order before a single glove was delivered, and in some cases, even made.

40.     These up-front expenditures by ORR allowed Ironclad to reap significant margins on the KONG product and, in turn, invest in development of its own corporate infrastructure and product lines.

41.     In other words, from 2007 to the present, Ironclad's financial position, which has dramatically improved, can be traced directly to ORR.

42.     Ironclad's former president and CEO, Scott Jarus, confirmed that, but for ORR, there would be no Ironclad and no KONG: "We [Ironclad] recognize that we would not have KONG or the associated business without ORR Safety and your personal involvement. For all of this, we are very grateful and remain committed to a long and very successful future with ORR Safety." *See* June 27, 2010 Corr. from Jarus to Orr (attached as Exhibit A).

### ORR's Success in Selling KONG

43.     With KONG to market, Ironclad in production, and ORR filling worldwide distribution channels, KONG flourished.

44.     Since its inception in 2007, KONG gloves have become the worldwide standard in the oil and gas industry. There have been more than two million pairs of KONG gloves sold worldwide.

45.     The KONG glove was selected for the 2010 Offshore Leadership Award, and it also received the 2010 Occupational Health and Safety New Product of the Year Award.

46.     In addition to its success in the oil and gas context where it originated, KONG gloves have been an industry-leading brand for impact resistant gloves, penetrating and evolving into other industry markets beyond just oil and gas.

### Ironclad Breaches the Agreement and Amendment by Making and Distributing KONG Vibram Counterfeit Gloves

47.     Under the Agreement and the Amendment, ORR is the exclusive distributor of KONG gloves.

48.     KONG gloves include the current styles and types on the market and "all gloves bearing at least one KONG Mark, any service mark, trade name or brand name containing the term "KONG" or the KONG Trade Dress…." The KONG Trade Dress is defined as "**collectively, the characteristics of the visual appearance of [KONG gloves]** or packaging

associated therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not." *See* Amendment at Schedule A (emphasis added).

49.     Despite this clear grant of exclusivity, Ironclad informed ORR on the same day it filed this lawsuit, that it would begin creating KONG Vibram Counterfeits – gloves without KONG branding and instead branded as "Ironclad" – to omit ORR from the supply chain.

50.     But the KONG Vibram Counterfeit is, and was always intended to be, what it is: a KONG glove manufactured and sold pursuant to the parties' agreements. In fact, the communications of Scott McCown, Director of Sales for National Accounts of Ironclad, prove the depth of Ironclad's unlawful scheme and that even Ironclad, itself, believes that the KONG Vibram Counterfeits are truly KONG gloves.  McCown states in communications to ORR on July 15, 2015:



51.     But in blatant attempt to convert KONG business to Ironclad business, thus cutting ORR from the supply chain and its contractual rights, Ironclad simply decided to "rebrand" these KONG gloves by removing the KONG designation to create the KONG Vibram Counterfeit. As explained below, this ruse is transparent and should not be allowed.

52.     Ironclad's scheme is/was simple: to sell direct, cutting ORR out despite its rights, to customers requiring and requesting KONG gloves.

53.     Amazingly, on September 28, 2015, Ironclad's President and CEO, Jeff Cordes ("Cordes"), met with the President of ORR, Jeffrey Sweedler ("Sweedler") to explain Ironclad's plan. The meeting was held at a trade show where both companies were present. The stated

intention of the meeting was to work through any issues the parties currently had so that both could move the business forward and continue their relationship. Instead, Cordes presented Sweedler with samples of the KONG Vibram Counterfeit, along with an explanation that Ironclad fully intended to sell the gloves in competition with other KONG gloves.

54.     In addition to violating the clear terms of the Agreement as it relates to ORR's exclusive right to distribute all KONG gloves, by inundating and diluting KONG's market with these KONG Vibram Counterfeits, Ironclad is reducing the value of the intellectual property that Ironclad was contractually required to protect. This negatively affects the goodwill of KONG and puts ORR in an intractable position of competition against the KONG Vibram Counterfeit that will likely be sold by Ironclad at a price below KONG.

55.     For example, during the September 28, 2015 meeting between Cordes and Sweedler, Cordes stated that Ironclad had tested the KONG Vibram Counterfeit with ORR's known distribution network customers, Halliburton and Schlumberger, further solidifying ORR's concern that Ironclad was, in fact, seeking to abandon ORR and KONG in favor of its scheme.

56.     This meeting was followed by a demand by Cordes that ORR immediately execute a "standstill agreement" that would postpone litigation threatened by Ironclad to be filed that morning. Ironclad's proposed "standstill" was a transparent attempt to hold ORR in a contractual position where it could not file litigation against Ironclad for its many breaches while giving Ironclad more time to bring its KONG Vibram Counterfeits to market. In short, under the threat of litigation, Cordes demanded that ORR abandon its contractual right to defend itself and KONG from Ironclad's actions.

57.     When asked by ORR why Ironclad would develop, make, and distribute KONG Vibram Counterfeit gloves, Ironclad has said, without hesitation, that it is doing this to avoid

paying ORR any royalties owed under the parties' agreements. Upon information and belief, Ironclad's scheme is also aimed at directing all profits from the sale of the KONG Vibram Counterfeit gloves to Ironclad, despite its agreements with ORR.

### The KONG Vibram Counterfeits

58.   True to its threat, Ironclad introduced an entire line of KONG Vibram Counterfeits at the end of September 2015, calling it the "Industrial Impact Glove Collection with Vibram Technology," *i.e.,* the KONG Vibram Counterfeit. As evidenced by the two companies' marketing materials, the KONG Vibram Counterfeit is nothing more than a slightly restyled and remarketed KONG glove. *Compare* http://www.konggloves.com/gloves.php (last visited Oct. 20, 2015) *to* http://ironcladexo.com/ive-lookbook/ (last visited Oct. 20, 2015). The chart below demonstrates the blatant misuse of the KONG Trade Dress as defined in the Agreement and Amendment to develop this KONG Vibram Counterfeit line of gloves.[5]

---

[5] ORR notes that the blatant replication of the KONG gloves by Ironclad in creating the KONG Vibram Counterfeit is more obvious when shown in color. ORR has filed this pleading as a colored PDF to aid in the comparison.











59.   Upon information and belief, the KONG Vibram Counterfeit gloves appear to have been conceived from input, research, and development from ORR.

60.   Since it first developed KONG, ORR has been involved in providing feedback, input, field information and design change requests to Ironclad. Much of this research and development was maintained by Ironclad and ORR as the "KONG Action Tracker & Overview," which has grown over time as ORR expanded its market and customer base.

61.   Many of the aspects of the KONG Vibram Counterfeits are from the KONG Action Tracker & Overview or from information provided by ORR to Ironclad.

62.   For example, since its original development, ORR has been providing feedback and input regarding improved grip and palm material. When Ironclad informed ORR that it was exploring partnering with Vibram for glove materials, ORR's representatives specifically requested that those materials be considered for KONG. That request was rebuffed by Ironclad.

63.   Furthermore, the thumb protection design of the KONG Vibram Counterfeit glove comes directly from ORR research into field use of KONG gloves. Users complained of

vulnerability in the glove at that area, and ORR asked Ironclad to incorporate designs to add additional protection into KONG gloves. Ironclad did not do this, but instead seized that design element for the KONG Vibram Counterfeit.

64.     Likewise, the fire-resistant KONG Vibram Counterfeit is a glove specifically requested by ORR to be added to the KONG line. Ironclad failed to act on ORR's request, which has been pending for many months, and, instead, channeled its development efforts into a fire-resistant glove for the KONG Vibram Counterfeit line.

65.     Ironclad's promotional marketing for the KONG Vibram Counterfeit line (available at https://www.youtube.com/watch?v=LQy5XjZt3ho) includes a prominent video of an actual KONG glove, *i.e.*, Ironclad did not even bother using a KONG Vibram Counterfeit glove in its marketing videos because the two gloves are so similar.

66.     The video also shows Ironclad using the KONG glove as its research and development tool for this new KONG Vibram Counterfeit glove. In fact, the first generation KONG Original Impact Resistant Glove is so prominently featured that it is difficult to discern whether that glove is KONG or the KONG Vibram Counterfeit. Below are screenshots from Ironclad's promotional marketing for the KONG Vibram Counterfeit, demonstrating the similarities in visual characteristics of KONG and the KONG Vibram Counterfeit.

| KONG | KONG Vibram Counterfeit |
|------|-------------------------|



67.     Notably, the very features that make the KONG glove a KONG – a finger and thumb nail protection; full length finger and thumb protection; cuff and opening; color of back portion; colors of finger and thumb protection; back of hand ribs; knuckle protection; colors of knuckle protection, to name a few – are also features of the KONG Vibram Counterfeit.

68.     Ironclad is acutely aware that these features are unique to KONG and part of the KONG Trade Dress. In fact, Ironclad has specifically demanded that other manufacturers cease from doing exactly what it is doing – creating a counterfeit KONG. *See, e.g.,* May 26, 2009 Corr. from Ironclad's counsel to West Chester Holdings, Inc. (attached as Exhibit B).

69.     On information and belief, Ironclad will sell the KONG Vibram Counterfeit directly to ORR's known and prospective customers throughout the world, thus harming ORR and the KONG brand.

70.     This is not Ironclad's first attempt to circumvent ORR and skirt its legal obligations. In early March 2013, a potential customer contacted ORR expressing interest in KONG gloves. The customer requested samples of all KONG styles. The customer stated that it intended to test the KONG gloves to determine if they could be utilized to reduce hand injuries affecting its employees. It was clear that the new customer had a strong affinity for the KONG glove, remarking several times in no uncertain terms that, "We want KONG."

71.     Exactly as it did in 2007 with the Steering Committee, ORR again reached out to Ironclad to discuss how ORR could provide KONG gloves to the new customer to meet its demands for the field test. ORR, through its marketing efforts and general recognition as a leader in safety equipment distribution, was again bringing Ironclad into a new industry to partner and further develop the KONG brand.

72.     A KONG glove was selected by the new customer as one of the gloves it would test in its upcoming field test. But instead of following its obligations to ORR to promote and sell KONG gloves, Ironclad unilaterally relabeled the KONG glove chosen for the field test as the "Ironclad Oil & Gas" glove. Similar to its current rogue strategy, at this time, Ironclad erroneously believed by simply changing what was a KONG glove to say "IRONCLAD" instead

of "KONG," the glove would not fall within the definition of "KONG" as set out in the parties' agreements.

73.     Ironclad's then chief executive officer and president admitted Ironclad's plan (relabeling the KONG Cut Resistant Rigger glove as "Ironclad Oil & Gas") and its specific reasoning for doing so (because ORR would not renegotiate its exclusive rights). Ironclad did this with the specific intent to undercut ORR's exclusive arrangement for all future customers of KONG and to harm the KONG glove product brand. Photographs of the 2013 KONG counterfeits are below:



74.     When the customer received the Ironclad-branded counterfeits – which it recognized as KONG – it immediately contacted ORR expressing confusion as to why the KONG glove said Ironclad and not KONG. The specifications that new customer had approved specifically said KONG, and the new customer again reiterated that it wanted KONG on the final product.

75.     Ultimately, ORR was able to resolve this by convincing Ironclad of its error. Not only was Ironclad's position unsupported by the Agreement, but its actions would have created

competition for the KONG brand that would ultimately degrade KONG's market position to the detriment of both parties. The new customer glove was properly developed as a KONG glove.

76.    Now, yet again in violation of the Agreement and Amendment, Ironclad is attempting to cut ORR out of the marketplace by labeling a KONG counterfeit – the KONG Vibram Counterfeit – as an Ironclad glove.

77.    ORR has been and will be injured as a result of Ironclad's actions.

## The KONG Arctic Mitt Counterfeit

78.    In addition to the KONG Vibram Counterfeit line described above, Ironclad has also created another specific KONG counterfeit with the Arctic Mitt.

79.    ORR brought the Arctic Mitt opportunity to Ironclad. The idea of the glove was to bring a very robust impact and cut-resistant cold condition glove to the North American market. ORR identified two customers willing to test the new design starting in November 2015, but neither would commit to a specific volume until the glove was fully tested in their environment, which is a standard practice for glove design.

**The KONG Arctic Mitt**



**Ironclad Arctic Mitt**



80.     Ironclad rejected this proposal, and instead decided to "rebrand" the KONG Arctic Mitt, so it could sell directly and in competition with ORR in these markets. Upon information and belief, Ironclad is in the process of making 10,000 pairs of the rebranded KONG Arctic Counterfeit glove.

81.     When Ironclad suggested the potential for splitting the order with a KONG and an Ironclad version, *i.e.*, the same glove but with different markings, ORR reminded Ironclad of its obligations to promote the KONG brand.

82.     Ignoring ORR's pleas and its contractual obligation, Ironclad willingly created competition amongst its brands, thus engaging in acts that are counterproductive to its relationship with ORR, counterproductive to the KONG brand, and essentially allow Ironclad to sell a KONG glove while branding it as Ironclad.

83.     When asked by ORR why Ironclad was not promoting the Acrtic Mitt as a KONG glove, Ironclad's representative, Scott McCown, was transparent: he said that by rebranding the glove as something other than KONG, Ironclad would have no obligation to pay ORR sub-distribution royalties under the Sub-Distributorship Agreement or allow ORR to sell the glove. Mr. McCown of Ironclad further explained that Ironclad intended to use an unapproved sub-distributor to sell the gloves in direct competition to ORR's already designated master sub-distributor.

84.     Incredibly, Ironclad admits in its Original Petition that it is merely taking a KONG glove and selling it as a counterfeit KONG glove: "Ironclad [] restyled and remarketed the [KONG] "Arctic Mitt" as a non-KONG glove." *See* Original Petition ¶48.

85.     Ironclad forgets that the KONG Trade Dress is defined as "the characteristics of the visual appearance of the Products. . .". *See* Amendment at Schedule A. Ironclad is correct

that ORR takes issue with Ironclad restyling (*i.e.*, renaming the glove "Ironclad" and removing "KONG"), remarketing and selling it as a KONG counterfeit, as this is exactly what the Agreement and Amendment contractually prevent Ironclad from doing.

86.     Further, Ironclad admits that it has sold Ironclad Arctic Mitt to ORR customers. *See* Original Petition at ¶ 45 ("These lines of gloves include the "Arctic Mitt" sold to . . . Ensign"). Ironclad is specifically aware that the customer identified in its Original Petition purchases KONG gloves from ORR and/or its distributor network. Incredibly, the customer identified in Ironclad's Original Petition is the customer that ORR brought to Ironclad to justify the further development of the KONG Arctic Mitt. Instead, Ironclad unlawfully converted that business with the KONG counterfeit. Ironclad's intent is clear: to convert KONG business to Ironclad business.

87.     Ironclad's actions are in violation of both the Agreement (and Amendment) and the Sub-Distributorship Agreement (and Amendment) in that they are manufacturing and attempting to sell counterfeit Arctic Mitts to interfere with ORR's exclusive rights and it is trying to sell them through channels unapproved by ORR and/or in competition with ORR's network.

**Ironclad Has Failed to Support ORR's Efforts to Market and Sell Kong**

88.     Consistent with its obligations, ORR has continued to market, sell, and develop the KONG brand. Part of this includes identification of new customers and markets for KONG. Over the course of their relationship, Ironclad has failed to match ORR's efforts.

89.     In fact, and to this day, Ironclad has consistently failed to provide appropriate technical support, often delaying responses to opportunities for new business by days or weeks. Further, Ironclad has been unable to provide consistent sales support, as evidenced by the fact

that Ironclad has cycled through at least three Vice Presidents of Sales in the last three years, and at least as many sales support members over time.

90.     In short, ORR has dragged Ironclad along every step of the way to make KONG what it is. Ironclad's failures to live up to its obligations, now along with its blatant breaches, have caused and continue to cause injury to ORR.

### Ironclad Failed to Timely Deliver Products, Failed to Deliver Products Pursuant to ORR's Orders, and Failed to Deliver Product Pursuant to the Terms of the Parties' Agreements

91.     Through the course of the relationship between ORR and Ironclad, Ironclad has been unable for the majority of the time to deliver product on a timely basis.

92.     For example, in 2012, Ironclad's past due delivery averaged nearly eighty percent for all orders.

93.     Pursuant to Section 3.4 of the Agreement, for products that are delivered to ORR more than thirty days following the specified delivery date, ORR is entitled to a three-percent rebate on that order.

94.     In addition, Ironclad owes ORR certain duties as a manufacturer. One of those duties is to ensure accurate and timely delivery of products. Yet, in addition to the problems identified above, Ironclad has consistently failed to deliver the correct products or the correct number of products in response to ORR's purchase orders.

95.     For example, ORR recently placed a large order for KONG gloves destined for a customer developed by ORR. Despite very particular ordering instructions, Ironclad failed to deliver the correct product. Moreover, Ironclad's delivery of the incorrect product appears to be intended to off-load older product that did not conform to the request of ORR or the customer.

96.     Ironclad has consistently and knowingly shipped orders without the right number of product to both ORR, for delivery to its customers, and via drop-shipment (a method of

shipping directly to a customer of ORR). Only when ORR is notified by its unsatisfied customer does ORR become aware of these issues. Yet, Ironclad is fully aware of the shortages, and fails to inform ORR.

97.     Ironclad also refuses to honor its promises to credit ORR and its customers for mislabeled products. It was recently discovered that Ironclad issued marketing material that mis-identified the overall rating of certain of its cut-resistant gloves. ORR was notified by its customer of Ironclad's error. ORR accepted return of the product, as is customary and expected. Ironclad initially stated that it would issue a credit to ORR for these gloves, but recently refused to do so, to the detriment of ORR.

**Ironclad Failed to Remit Royalties for Sub-Distributor Sales from December 2013 to January 2015**

98.     As described above, the Sub-Distributorship Agreement between Ironclad and ORR entitles ORR to a royalty amount for each KONG glove sold by Ironclad.

99.     Upon execution of Amendment to Sub-Distributorship Agreement on January 27, 2015, the calculation method was changed.

100.     Prior to the execution of the Amendment to Sub-Distributorship Agreement on January 27, 2015, from December 2013 to January of 2015, Ironclad improperly utilized the calculation method set out in the Amendment to Sub-Distributorship Agreement, as opposed to the calculation in the then enforceable Sub-Distributorship Agreement. This resulted in a significant underpayment of royalties to ORR (approximately $435,698.96).

101.     Despite demand for payment of this amount, Ironclad has failed to do so in breach of the parties Sub-Distributorship Agreement.

## Ironclad Breached Its Agreements with ORR by Engaging in Direct Competition Prohibited by the Agreements

102.    Ironclad has engaged in sales of KONG through sales channels prohibited by the Amendment.

103.    Upon information and belief, Ironclad has developed a customer website that allows it to process orders for any customer type, which is a material breach of the Amendment.

104.    Section 6.1 of the Amendment describes the website that Ironclad is to host for KONG. Among other things, it must identify ORR as the exclusive distributor, which it does not. Furthermore, Ironclad is not authorized to make direct industrial sales from this website, but upon information and belief, has done so.

105.    Ironclad is also an authorized sub-distributor and can sell to authorized specified customers, approved pursuant to Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement, through a website. But for each such sale, Ironclad owes ORR a royalty equal to fifteen percent of the sale. In the event the sales are retail, ORR would be entitled to two percent of the sale as a royalty. A retail customer is a person whose primary business is purchasing products for resale to individuals and non-industrial business. Therefore, retail requires that the transaction have a resale component and only resale to individuals and non-industrial businesses.

106.    Upon information and belief, Ironclad's website sales are to customers outside of its authorized scope, which is a breach of the Sub-Distributorship Agreement and the Amendment to the Sub-Distributorship Agreement. ORR has been injured by Ironclad's direct sales in an amount to be determined at trial.

107.    Further, Ironclad has the ability to name retail sub-distributors, but cannot name sub-distributors without approval from ORR to sell to industrial customers, as defined in the

Agreement and Amendment. Despite this, Ironclad has allowed and, upon information and belief, directed retail sub-distributors to engage in direct sales to industrial customers. ORR has been injured by Ironclad's direct sales and its appointment of distributors in violation of the Agreement and Amendment in an amount to be determined at trial.

### Termination without Cause

108.    On or about October 7, 2015, Ironclad sent ORR a letter claiming that it was terminating the parties' Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement due to ORR's unspecified, alleged material breaches of the same.

109.    In response, on or about October 12, 2015, ORR requested that Ironclad specify what the alleged material breaches were so that ORR could have an opportunity to cure as set out in Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement. To date, Ironclad has failed to do so.

110.    Because the termination by Ironclad of the Agreements is without cause, Ironclad must assign to ORR the "KONG Marks and the goodwill associated therewith, including any and all trademark registrations and trademark applications throughout the world" pursuant to Section 7.2(A) of the Agreement and must license "any patents in the United States or elsewhere that have issued for the [KONG gloves] . . together with any inventions or improvements now or hereafter embodied in the [KONG gloves]" pursuant to Section 7.3 of the Agreement.

### CLAIMS

### Count I – Breach of Contract (ORR's Exclusive Distribution Rights under the Agreement) (Under New York Law pursuant to the Agreement)

111.    ORR incorporates by reference all allegations set forth above.

112.    ORR and Ironclad entered into the Agreement and Amendment which provide, among other things, that ORR is to be the exclusive worldwide distributor (with certain narrowly-defined exceptions as set forth in the Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement) of "'KONG' safety gloves (all sizes), together with any inventions or improvements now or hereafter embodied therein (whether or not patented or patentable in any jurisdiction) during the term of [the Agreement.]"

113.    The Agreement and Amendment provide that references to KONG gloves include the current styles and types on the market and "all gloves bearing at least one KONG Mark, any service mark, trade name or brand name containing the term "KONG" or the KONG Trade Dress…." The KONG Trade Dress is defined as "collectively, the characteristics of the visual appearance of [KONG gloves] or packaging associated therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not."

114.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

115.    ORR performed all of its obligations under the Agreement and Amendment.

116.    Ironclad materially breached the Agreement with ORR by manufacturing, marketing, and distributing KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits, using the KONG trade dress but lacking KONG Marks, directly to buyers or through other distributors in violation of the exclusivity provisions of the Agreement.

117.    As a direct and proximate result of Ironclad's breaches of the Agreement, ORR has suffered damages.

118.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count II – Breach of Contract (Rebate Payments under the Agreement)<br>(Under New York Law pursuant to the Agreement)

119.    ORR incorporates by reference all allegations set forth above.

120.    ORR and Ironclad entered into the Agreement and Amendment which provide, among other things, that Ironclad is to pay rebate amounts for late deliveries to ORR.

121.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

122.    ORR performed all of its obligations under the Agreement and Amendments; in particular, ORR timely paid Ironclad for all products ordered pursuant to the Agreement and Amendment.

123.    Throughout the life of the Agreement and Amendment, Ironclad has repeatedly failed to timely deliver products, failed to deliver products specified in ORR's orders, and failed to deliver productions pursuant to the terms of the Agreement and Amendment to ORR and its customers.

124.    Ironclad has materially breached the Agreement with ORR by failing to pay rebate amounts for late or otherwise improper deliveries to ORR pursuant to Section 3.4 of the Agreement.

125.    As a direct and proximate result of Ironclad's breaches of the Agreement, ORR has suffered damages.

126.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count III – Breach of Contract (Failure to Protect Intellectual Property under the Agreement)
### (Under New York Law pursuant to the Agreement)

127.     ORR incorporates by reference all allegations set forth above.

128.     Per Section 6.1 of the Agreement, Ironclad is obligated to "us[e] commercially reasonable efforts to preserve the goodwill of its customers."

129.     Per Sections 7.2 and 7.3 of the Agreement, ORR possesses the exclusive license to use the intellectual property, including trademarks, trade names, and patent rights that are subject to the Agreement, including among other things the KONG Marks, trade dress, and KONG-related patents.

130.     Per Sections 7.2(A) and 7.3 of the Agreement, ORR is a potential successor-in-interest to the intellectual property that is subject to the Agreement, including among other things the KONG Marks, trade dress, and KONG-related patents.

131.     Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

132.     ORR performed all of its obligations under the Agreement and Amendment.

133.     Ironclad has materially breached the Agreement with ORR by failing to protect the intellectual property that is subject to the Agreement pursuant to Sections 6.1, 7.2, 7.2(A), 7.3, and 7.4 of the Agreement by, among other things, producing KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits featuring the trade dress of KONG gloves, but lacking KONG Marks, under its own competing brand.

134.     As a direct and proximate result of Ironclad's breaches of the Agreement, ORR has suffered damages.

135.     ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

## Count IV – Breach of Contract (Failure to Remit Royalties under the Sub-Distributorship Agreement)
## (Under New York Law pursuant to the Agreement)

136.     ORR incorporates by reference all allegations set forth above.

137.     The Sub-Distributorship Agreement between ORR and Ironclad entitles ORR to a royalty amount for each KONG glove sold by Ironclad. Upon execution of Amendment to Sub-Distributorship Agreement on January 27, 2015, the calculation method was changed.

138.     Prior to the execution of the Amendment on January 27, 2015, from December 2013 to January of 2015, Ironclad improperly utilized the calculation method set out in the Amendment to Sub-Distributorship Agreement, as opposed to the calculation in the then-enforceable Sub-Distributorship Agreement. This resulted in a significant underpayment of royalties to ORR.

139.     Section 6.6 of the Sub-Distributorship Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

140.     ORR performed all of its obligations under the Sub-Distribution Agreement and Amendment to Sub-Distribution Agreement.

141.     Despite demand for payment of royalties due and owing under the Sub-Distribution Agreement, Ironclad has breached the Sub-Distribution Agreement by failing to pay such outstanding royalties.

142.     As a direct and proximate result of Ironclad's breaches of the Sub-Distribution Agreement, ORR has suffered damages.

143.     ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

## Count V – Breach of Contract (Direct Website Sales)
### (Under New York Law pursuant to the Agreement and Sub-Distributorship Agreement)

144.     ORR incorporates by reference all allegations set forth above.

145.     Section 6.1 of the Amendment describes the website that Ironclad was to create to market KONG products as a "KONG website for the Products that primarily contains information related to Distributor [ORR], Licensor and the Products, including, without limitation, the contact information of Distributor and identification of Distributor as the exclusive distributor of the Products."

146.     Ironclad is an authorized sub-distributor and can sell to authorized specific customers (approved pursuant to the Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement) through a website.

147.     Ironclad is also permitted, pursuant to Section 2.4 of the Agreement as amended by the Amendment, to make certain retail sales; however, such sales are strictly limited pursuant to Section 1.9 to persons "whose primary business is purchasing Products for resale to individuals and non-industrial businesses."

148.     Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

149.     Section 6.6 of the Sub-Distributorship Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

150.    Through its website, Ironclad permits any visitor to its website to purchase KONG Products directly, in quantities as small as one pair of gloves. The Ironclad website does not require a purchaser to be a "retail" seller as that term is defined in the Agreement and Amendment.

151.    ORR performed all of its obligations under the Agreement and Sub-Distribution Agreement.

152.    Further, Ironclad has the ability to name retail sub-distributors, but cannot name sub-distributors without approval from ORR to sell to industrial customers, as defined in the Agreement and Amendment.

153.    Ironclad has breached the Agreement and Sub-Distribution Agreement by selling KONG Products directly to consumers and other unapproved third parties through its website and other channels.

154.    As a direct and proximate result of Ironclad's breaches of the Agreement and Sub-Distribution Agreement, ORR has suffered damages.

155.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count VI – Breach of Implied Duty of Good Faith and Fair Dealing
### (Under New York Law pursuant to the Agreement)

156.    ORR incorporates by reference all allegations set forth above.

157.    ORR and Ironclad entered into the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement to clearly delineate each party's rights and obligations regarding the KONG brand and the intellectual property and products associated with the KONG brand.

158.    Those agreements are clear in providing that ORR is to be the exclusive distributor of KONG gloves, with certain narrow exceptions.

159.    Ironclad's stated and explicit intent in producing KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits and attempting to sell them to current and prospective KONG customers is to avoid the exclusivity provisions in those agreements.

160.    Ironclad's actions in producing and attempting to sell KONG Vibram Counterfeits and KONG Arctic Mitt Counterfeits are taken in bad faith for the illegitimate purpose of depriving ORR of the benefits of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement.

161.    As a direct and proximate result of Ironclad's breaches of the implied duty of good faith and fair dealing in the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement, ORR has suffered damages.

162.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

### Count VII - Declaration of Rights
### (Under New York Law pursuant to the Agreement)

163.    ORR incorporates by reference all allegations set forth above.

164.    Pursuant to Section 7.2(A) of the Agreement, in the event that Ironclad terminates the Agreement without cause, Ironclad is to assign to ORR "all of its rights to the KONG Marks and the goodwill associated therewith, including any and all trademark registrations and trademark applications throughout the world," and is also to "cease-and-desist all use of the KONG Marks and any confusingly similar marks."

165.    Pursuant to Section 7.3 of the Agreement, in the event that Ironclad terminates the Agreement without cause, Ironclad is to grant ORR a license "to any patents in the United States

**ANSWER, ADDITIONAL DEFENSES, AND COUNTERCLAIM OF DEFENDANT ORR SAFETY CORPORATION -**          **Page 41**

or elsewhere that have issued for the [KONG gloves] . . . together with any inventions or improvements now or hereafter embodied in the [KONG gloves]."

166.    On or about October 7, 2015, Ironclad sent ORR a letter claiming that it was terminating the parties' Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement due to ORR's unspecified alleged material breaches of the same.

167.    In response, on or about October 12, 2015, ORR requested that Ironclad specify what the alleged material breaches were so that ORR could have an opportunity to cure as set out in the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement. To date, Ironclad has failed to do so.

168.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

169.    A bona fide justiciable and substantial controversy exists between ORR and Ironclad, parties with adverse legal interests, as to whether Ironclad's termination of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement is without cause, requiring Ironclad to assign its rights in the KONG brand intellectual property to ORR as specified in Section 7.2(A) and 7.3 of the Agreement.

170.    A declaratory judgment would serve a useful purpose in settling this legal issue, and would finalize the controversy and offer relief from uncertainty.

171.    Accordingly, ORR is entitled to a declaration pursuant to N.Y. C.L.S. C.P.L.R. § 3001 that Ironclad's termination of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement is without cause.

172.    Furthermore, ORR is also entitled to recover its attorneys' fees related to the declaratory judgment pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

### Count VIII – Specific Performance
### (Under New York Law pursuant to the Agreement)

173.    To the extent not inconsistent with the claims in this Count, ORR incorporates by reference all allegations set forth above.

174.    Section 10.6 of the Agreement provides that "the rights and obligations of the parties shall be governed by and construed in accordance with the laws of the State of New York . . . ."

175.    KONG and KONG-derivative safety gloves are unique goods that do not have suitable substitutes in the marketplace.

176.    ORR and Ironclad are each uniquely situated to perform the obligations necessary to perform under the Agreement.

177.    Ironclad is the only existing manufacturer that is equipped to produce KONG and KONG-derivative safety gloves because it owns all of the intellectual property rights relating to the KONG and KONG-derivative safety gloves.

178.    ORR has existing business relationships and supply contracts with third parties that rely upon Ironclad's manufacturing of KONG and KONG-derivative gloves for distribution by ORR under the terms of the Agreement.

179.    There exists no other entity that is a reasonable substitute for Ironclad in the context of the Agreement.

### Count IX - False Advertising and Unfair Competition Pursuant to 15 U.S.C. § 1125(a)

180.    ORR incorporates by reference all allegations set forth above.

181.    Ironclad makes false or misleading descriptions and representations of fact in connection with Ironclad's promotion of the KONG Vibram Counterfeits and the KONG Artic Counterfeit Glove.

182.    Ironclad's false and misleading representations are made in in connection with the promotion of goods in interstate commerce.

183.    By using KONG Vibram Counterfeits and KONG gloves interchangeably in promotions, Ironclad misrepresents the nature, characteristics, and qualities of the KONG Vibram Counterfeits and KONG gloves.

184.    Ironclad's promotion of the KONG Vibram Counterfeits misrepresents the commercial activities of both Ironclad and ORR.

185.    Ironclad's false and misleading descriptions and representations regarding the products are material.

186.    As a direct result of Ironclad's misrepresentations of the nature, characteristics, and qualities of the KONG Vibram Counterfeits and KONG gloves and the misrepresentations of the commercial activities of Ironclad and those of ORR, ORR has suffered and is continuing to suffer damages.

187.    ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

## Count X – Tortious Interference with Contract
### (Under Texas Law)

188.    To the extent not inconsistent with the claims in this Count, ORR incorporates by reference all allegations set forth above.

189.     ORR has multiple existing contracts in place with customers for the purchase of KONG safety gloves, of which it is the exclusive distributor. Such customers include, but are not limited to, Halliburton and Schlumberger.

190.     Ironclad is aware of the existence of ORR's contracts and the identities of its customers.

191.     Ironclad has, willfully and with intent to a) circumvent without breaching the exclusivity provisions of its Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement with ORR; and b) disrupt ORR's contractual relationships with ORR's customers, approached ORR's customers, including Halliburton and Schlumberger, to attempt to sell those customers KONG counterfeit products.

192.     Ironclad's actions have interfered with ORR's contractual relationships with its customers.

193.     As a direct and proximate result of Ironclad's tortious acts, ORR has suffered damages.

194.     ORR is entitled to recover damages from Ironclad in an amount to be proven at trial.

## Count XI – Exemplary Damages
### (Under Texas Law)

195.     ORR incorporates by reference all allegations set forth above.

196.     Ironclad's intentional interference with ORR's existing contractual relations was intended to cause direct injury to ORR in contravention of the Agreement and partnership between the parties.

197.     Ironclad, in intentionally interfering with ORR's existing contractual relations, acted with malice toward ORR.

198.    As a direct and proximate result of Ironclad's intentional malicious acts, ORR has suffered damages.

199.    ORR is entitled to an award of exemplary damages against Ironclad pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 41.003.

## Count XII – Attorneys' Fees
### (Under New York law pursuant to the Agreement)

200.    ORR incorporates by reference all allegations set forth above.

201.    Section 9.2 of the Agreement provides that Ironclad is responsible to indemnify ORR for all "Losses," including attorneys' fees, arising from its breach or violation of any of its representations, warranties, covenants or obligations in the Agreement, as well as for its negligent acts or omissions, willful misconduct, or other wrongdoing.

202.    ORR has engaged the undersigned counsel to protect its interests in light of Ironclad's multiple breaches of the Agreement and its tortious acts.

203.    ORR is entitled to recover its attorneys' fees in this action pursuant to Section 9.2 of the Agreement and Tex. Civ. Prac. & Rem. Code Ann. § 38.001.

## PRAYER FOR RELIEF

WHEREFORE, ORR requests judgment against Ironclad as follows:

A.    An award of damages in an amount to be proven at trial;

B.    A demand for jury;

C.    A declaratory judgment that Ironclad's termination of the Agreement, Amendment, Sub-Distributorship Agreement and Amendment to Sub-Distributorship Agreement is without cause;

D.    An award of all intellectual property rights related to the KONG brand per the terms of the Agreement;

E.      Specific performance;

F.      Punitive damages;

G.      Attorneys' fees and costs; and

H.      All other relief to which ORR may be entitled.

Respectfully submitted,

 */s/ Gregory M. Sudbury*
Gregory M. Sudbury
State Bar No. 24033367
Rachel Lee Hytken
State Bar No. 24072163
QUILLING, SELANDER, LOWNDS, WINSLETT &
MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Main)
(214) 871-2111 (Fax)
gsudbury@qslwm.com
rhytken@qslwm.com

-and-

Of counsel:
Benjamin C. Fultz (to be admitted *pro hac vice*)
Jennifer Metzger Stinnett (to be admitted *pro hac vice*)
Daniel Hancock (to be admitted *pro hac vice*)
Fultz Maddox Dickens PLC
2700 National City Tower
Louisville, Kentucky 40202
Telephone: (502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmdlegal.com
jstinnett@fmdlegal.com
dhancock@fmdlegal.com

*Counsel for Defendant and Counterclaim Plaintiff Orr Safety Corporation*

## <u>CERTIFICATE OF SERVICE</u>

      This is to certify that a true and correct copy of the foregoing document has been served upon the following counsel electronically and via certified mail in accordance with the Texas Rules of Civil Procedure on the 23rd day of October, to the following:

    Daniel H. Charest
    Warren T. Burns
    Will Thompson
    BURNS CHAREST LLP
    500 North Akard Street, Suite 2810
    Dallas, Texas 75201
    *Counsel for Plaintiff*

                    */s/ Gregory M. Sudbury*
                    Gregory M. Sudbury

4822-7470-1865, v. 1

# Exhibit A

**Clark Orr**

| | |
|---|---|
| **From:** | Scott Jarus [scottj@ironclad.com] |
| **Sent:** | Sunday, June 27, 2010 11:18 PM |
| **To:** | Clark Orr |
| **Subject:** | RE: Ironclad - Orr Safety Sub-Distributor Agreement |
| **Attachments:** | Orr Safety Sub-Distributorship Agreement with Ironclad Performance Wear Corp  (v3).doc |

Clark,

I want to preface this email with a couple of comments.  First, Ironclad Performance Wear very much values our business relationship with Orr Safety and truly appreciates all of the business that you have given us for the KONG line of gloves. We recognize that we would not have KONG or the associated business without Orr Safety and your personal involvement.  For all of this, we are very grateful and remain committed to a long and very successful future with Orr Safety.

All that being said, I have become very uncomfortable with the tone or direction our relationship is taking.  There is an implication in your email that Ironclad is out to deceive or defraud Orr Safety, or, at the very least, play some sort of game whereby Ironclad would take advantage of the distributor agreement between our two companies to the exclusive advantage of Ironclad.  Nothing could be further from the truth and I am offended by the implication.

Ironclad's sole mission is to support the growth of a very profitable KONG business.  We can do this in one of two ways: (1) We can simply live to the letter and spirit of the exclusive distribution agreement whereby we continue to support Orr Safety's efforts in growing and expanding the KONG brand and distribution; or (2) we can assist in the building of the KONG brand and distribution by augmenting Orr Safety's efforts by selling and distributing KONG gloves to customers who, for whatever reason, do not wish to do business directly with Orr Safety.  It seems to me that the most logical and rational course is to choose option (2) above.  This course of action helps grow the brand and distribution with customers Orr Safety can't sell into, it will preclude competitors from being successful, it is very lucrative for Orr Safety (as it never touches the gloves sold directly by Ironclad); and it is profitable to Ironclad.  It is a win/win/win for both our companies and the market.  3) Improve the performance of the glove

So, the decision is now up to you.  You can either trust in the integrity of Ironclad and believe that we are acting in good-faith, in which case you should have no problem executing the sub-distributor agreement; or you can (continue) to believe that Ironclad is untrustworthy and must be watched like a hawk, in which case, we'll continue to do business to the letter and spirit of the exclusive distributor agreement and nothing more.  Obviously, choosing the latter of these two will absolutely change the nature and tone of the relationship between Ironclad and Orr Safety.  The choice is yours, but we absolutely hope that you'll choose the former.

By the way, with regard to the unfortunate event you describe in your email *which happened two years ago* and for which an explanation and apology was already provided to you and Orr Safety, let me reiterate our position on this matter.  The collateral piece was created without management authorization by two lower-level members of Ironclad's sales and marketing team.  Once it was brought to the attention of management, it was immediately discontinued, all copies were destroyed and the two employees were reprimanded (which ultimately led to the departure of one of the individuals). Since that event, to the best of my knowledge, there have been no other inappropriate actions taken by Ironclad or its employees.  To the contrary, I believe that we have gone above and beyond the terms of the exclusive distributor agreement to help grow the KONG brand, distribution and Orr Safety's business in this market.

The attached sub-distributor agreement has been reviewed by our lawyers.  We have accepted the majority of the revisions proposed by your lawyer, but have made a few changes to what your lawyer proposed.  I look forward to hearing from you soon on the sub-distributor agreement and on how you would like for the Orr Safety-Ironclad relationship to proceed.

Scott

# Exhibit B

Certified Mail

May 26, 2009

West Chester Holdings, Inc.
100 Corridor Park Drive
Monroe, Ohio 45050

Re:    West Chester Rugged Rigger Glove

Gentlemen:

This office represents Ironclad Performance Wear Corp. ("Ironclad") with respect to its claim that West Chester Holdings, Inc. ("West Chester") is infringing Ironclad's proprietary rights with respect to its KONG glove.

Ironclad has been selling its KONG glove in commerce since October, 2007 (a photograph of the palm and back sides for the glove is enclosed herewith). The Rugged Rigger glove offered for sale by West Chester is confusingly similar to Ironclad's glove in the following respects:

1.    Finger and thumb nail protection;
2.    Full length finger and thumb protection;
3.    Cuff and opening;
4.    Color of back portion;
5.    Colors of finger and thumb protection
6.    Back of hand ribs
7.    Knuckle protection
8.    Colors of knuckle protection; and
9.    ID tag

In addition, Ironclad has been advised by the exclusive distributor of KONG gloves that end users have requested quotes for both the KONG and West Chester gloves notwithstanding that the distributor does not carry the latter, evidence that relevant purchasers are confused to the source of the KONG gloves.

In summary it is believed that the West Chester glove infringes Ironclad's trade dress rights under Section 43(a) of the Lanham Act and under various state laws relating to trade dress infringement and unfair competition.

It is thus demanded that Westchester cease and desist its infringing activities