# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

**IRONCLAD PERFORMANCE WEAR CORPORATION,**

      **Plaintiff,**

**v.**

**ORR SAFETY CORPORATION,**

      **Defendant**

**Case No. 3:15-cv-03453-D**

---

## BRIEF IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION AND MOTION FOR EXPEDITED EVIDENTIARY HEARING

## I.  TABLE OF CONTENTS

TABLE OF CONTENTS……………………………………………………..i

TABLE OF AUTHORITIES……………………………………………....iii

INTRODUCTION……………………………………………………1

FACTUAL BACKGROUND……………………………………………...2

      The Development of the KONG……………………………………2

      Marketing and Manufacturing the KONG……………………………3

      ORR Safety's Distributor Network……………………………….....4

      The Parties' Agreements……………………………………………...7

      Ironclad's Breaches and the Litigation……………………………….9

      The Immediate Harm:  Ironclad's Distributor Letter…………………13

      The Imminent Necessity of Injunctive Relief…………………………16

ARGUMENT………………………………………………………17

I.     ORR SAFETY IS LIKELY TO SUCCEED ON THE MERITS……………18

      A.  Breach of Confidentiality Provision…………………………………18

      B.  Misappropriation of Trade Secret……………………………..................22

      C.  Trade Dress, Unfair Competition, and Dilution…………………………26

II.    ORR SAFETY WILL SUFFER IRREPARABLE HARM
      ABSENT AN INJUNCTION……………………………………...................38

      A.  Damages cannot be quantified…………………………………………38

      B.  Damages cannot be calculated when determining………………..................39

      C.  Likelihood of confusion constitutes irreparable injury…………………..40

      D.  Ironclad's questionable financial position makes it unlikely
          ORR Safety will be able to collect upon any judgment even
          if it could quantify damages………………………………………………..40

i

**III.    INJUNCTIVE RELIEF WILL NOT CAUSE SUBSTANTIAL HARM TO OTHERS**.........................................................................**42**

**VI.    PUBLIC INTEREST WILL BE SERVED BY INJUNCTIVE RELIEF**.....................................................................................**42**

**CONCLUSION**.............................................................................................**43**

**CERTIFICATE OF SERVICE**...................................................................**44**

## II. TABLE OF AUTHORITIES

### <u>Cases</u>

*Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*
2011 WL 6091807, at *6 (S.D. Tex. Dec. 7, 2011)……………………………………………..41

*Am. Express Fin. Advisors, Inc. v. Scott*
955 F. Supp. 688, 693 (N.D.Tex.1996)…………………………………………………….40

*AmeriSpec, Inc. v. Metro Inspection Servs., Inc.*
2001 WL 770999, at *6 (N.D. Tex. July 3, 2001) (Fitzwater, J.)
(citing Tex. Bus. & Comm. Code Ann. § 15.51(a))………………………………………...42

*Blue Bell Bio-Medical v. Cin-Bad, Inc.*
864 F.2d 1253, 1256 (5th Cir. 1989)……………………………………………………….27

*Cardoni v. Prosperity Bank,* 805 F.3d 573, 580-81 (5th Cir. 2015)............................................19

*Center for Economic Justice v. Am. Ins. Assoc.*
39 S.W.3d 337, 346 (Tex. App. 2001—Austin, no pet.)...…………………………………23

*E. & J. Gallo Winery*, 129 F.Supp.2d at 1038
(citing *Lois Sportswear, U.S.A., Inc.*, 799 F.2d at 871)…………………………………........37

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*
762 F.2d 464, 472–73 (5th Cir.1985)……………………………………………………….38

*Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899
(Tex.App.-Dallas 2001, no pet.)
(citing *Exxon Corp. v. Oxford Clothes, Inc*., 109 F.3d 1070, 1081
(5th Cir.1997))…………………………………………………………………………...37

*Falcon Rice Mill, Inc. v. Community Rice Mill, Inc*.
725 F.2d 336, 346 (5th Cir.
1984)……………………………………………………………………………………...27

*Flake v. EGL Eagle Global Logistics,*
No. 14–01–01069–CV, 2002 WL 31008136, at *4
(Tex. App.—Houston [14[th] Dist.], no pet. 2002)…………………………………...……23

*Gaal v. BASF Wyandotte Corp.*, 533 S.W.2d 152, 155
(Tex. App. 1976—Houston [14[th] Dist.], no writ)...………………………………………23

*Gibson, et al. v. Canfield*
No. 05-00-00753-CV, 2001 WL 21491, at *1 (Tex.App.2001—
Dallas, no pet.)……………………………………………………………………...…...23

*Glob. Telesystems, Inc. v. KPNQwest, N.V.*
151 F. Supp. 2d 478 (S.D.N.Y. 2001)……………………………………………...…21

*Guy Carpenter & Co., Inc. v. Provenzale*
334 F.3d 459, 467 (5th Cir. 2003)
(citing *Phillips v. Frey,* 20 F.3d 623, 627 (5th Cir.1994)…………………………………...…22

*Hassani v. Napolitano,* No. 3:09–CV–1201–D
2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) ……………………………………....17

*Howe v. Polunsky Unit,* No. 9:08-CV-142, 2010 WL 1268186, at *2
(E.D. Tex. Feb. 3, 2010) report and recommendation adopted, 2010 WL 1268185
(E.D. Tex. Mar. 25, 2010)……………………………………………………………………18

*Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 766 (1958)…………………………22, 23

*Interfirst Bank Clifton v. Fernandez*, 853 F.2d 292, 294 (5th Cir. 1988)…………………………19

*Jones v. Bush,* 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) ……………………………………18

*Johnson Service Group, Inc. v. Olivia France*
763 F. Supp. 2d 819, 831 (N.D. Tex. 2011)…………………………………………………..42

*Joy Mfg. Co. v. CGM Valve & Gauge Co.*
730 F. Supp. 1387, 1394 (S.D.Tex.1989)……………………………………………………40

*Keystone Life Ins. Co. v. Marketing Mgmt. Inc.*
687 S.W.2d 89, 91 (Tex. App. 1985—
Dallas, no writ)……………………………………………………..………………23

*Lason Services, Inc. v. Rathe*, CIV.A.3:02CV2110-D
2003 WL 21728184, at *7 (N.D. Tex. Mar. 14, 2003) …………………………………...24, 42

*Lee v. Bickell*, 292 U.S. 415, 421, 54 S.Ct. 727, 78 L.Ed. 1337 (1934)…………………………40

*Marcone APW, LLC v. Servall Co.*, 85 A.D.3d 1693, 925 N.Y.S.2d 752 (2011)………………..21

*Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Wright*
No. Civ.A.3:93CV01101–D, 1993 WL 13036199, at *5
(N.D. Tex. July 2, 1993)……………………………………………………………………42

*Merrill Lynch, Pierce, Fenner & Smith*
658 F.2d 1098, 1102 n. 8 (5th Cir.1981)……………………………………………...39

*Pebble Beach Co. v. Tour 18 I Ltd*, 155 F.3d 526, 540 (5th Cir. 1998)…………………………27

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co*.
621 F.2d 683, 686–87 (5th Cir.1980)……………………………………………………41

*Propath Services, L.L.P. v. Ameripath, Inc*.
No. Civ.A.3:04–CV–1912–P, 2004 WL 2389214
(N.D. Tex. Oct. 21, 2004)
(*citing Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir.1994))……………………......……18, 25, 38

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165,
115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)
(*quoting Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 850 n. 10,
102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)……………………………………………………28

*Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd*.,
5 Misc. 3d 285, 295-96, 783 N.Y.S.2d 758, 769-70 (Sup. Ct. 2004)
(citing *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 320 N.Y.S.2d 1,
268 N.E.2d 751 (1971); *Doe v. Roe,* 93 Misc.2d 201, 210–11,
400 N.Y.S.2d 668 (Sup. Ct., N.Y. County 1977))………...…………………………19, 20

*Sunbeam Products, Inc. v. West Bend Co*.
123 F.3d 246, 260 (5th Cir. 1997)……………………………………………...27, 43

*Texas v. Wellington Resources Corp*.
706 F.2d 533, 537 (5th Cir.1983)……………………………………………………..18

*Two Pesos, Inc. v. Taco Cabana, Inc*.
505 U.S. 763, 764 n. 1 (1992)……………………………………………………27

*Urgent Gear, Inc. v. Savoia*, 3:01-CV-2190-D
2001 WL 1577395, at *4 (N.D. Tex. Dec. 10, 2001) …………………………………...40

## Rules and Statutes

Tex. Bus. & Com. Code Ann. § 16.29…………………………………….……..…………37

15 U.S.C. § 1125(a)………………………………………………………...............27

Fed. R. Civ. Proc. 65…………………………………………………………..1, 17

## **Other Authorities**

11A Wright & Miller, Federal Practice & Procedure: Civil 3d § 2951
(database updated      Apr.    2015)………………………………………………………………..17

Pursuant to Fed. R. Civ. Proc. 65(a) and (b), Defendant ORR Safety Corporation ("ORR Safety") moves for the immediate entry of a temporary restraining order, and thereafter, preliminary injunction, against Plaintiff Ironclad Performance Wear Corporation ("Ironclad"), enjoining it from: (1) contacting or soliciting ORR Safety's confidential distributor network in order to sell them KONG gloves or the Ironclad Vibram Line, and additional gloves that are derivatives or that share the visual characteristics of KONG (the "KONG Vibram Counterfeit"); and (2) utilizing advertisements in which the KONG Vibram Counterfeit and the KONG gloves are presented together.   ORR Safety further requests that an expedited evidentiary hearing be held within fourteen (14) days of the entry of the temporary restraining order, or twenty-eight (28) days for good cause, so that the Court can then enter an identical preliminary injunction for the pendency of this case.[1]

## INTRODUCTION

This case is about ORR Safety, the exclusive world-wide distributor of KONG, a protective work glove that prevents hand injury, and the improper attempts by KONG's manufacturer, Ironclad, to cut out ORR Safety from the supply chain that it single-handedly and specifically developed for KONG.   Ironclad is also now manufacturing a new glove, which is simply a counterfeit version of a KONG glove using KONG's research and development, but which has been rebranded and relabeled as an Ironclad glove (hereinafter "KONG Vibram Counterfeits").   *See* Counterclaim ¶ 11.   By calling a KONG glove something else, Ironclad believes it can circumvent its contractual and financial obligations to ORR Safety related to

---

[1] Concurrent with this Motion for Temporary Restraining Order, ORR Safety is filing a motion for expedited discovery, which details evidence ORR Safety believes will further support the issuance of a preliminary injunction.

KONG.  *Id.*  Simply stated, Ironclad is trying to bypass ORR Safety and steal the distribution network that ORR Safety created for KONG.

Orr Safety now seeks injunctive relief because Ironclad has recently attempted to misappropriate ORR Safety's confidential distributor network and directly sell KONG gloves and the KONG Vibram Counterfeit gloves to these "customers" of ORR Safety.  This is a blatant violation of the confidentiality provision in the distributorship agreement between ORR Safety and Ironclad and causes immediate and irreparable harm to ORR Safety by destroying the goodwill associated with its distributor network and diluting the KONG brand and trade dress. *See* January 27, 2016 letter from J. Cordes to Members of ORR Safety's Distributor Network for KONG ("Distributor Letter"), Appendix p. 1.  ORR Safety must therefore take affirmative steps to maintain the status quo during the pendency of the litigation.  The status quo is twofold: (1) Ironclad not soliciting ORR Safety's distributor network to purchase KONG or the KONG Counterfeit, and (2) Ironclad not advertising the KONG glove together with the KONG Vibram Counterfeit, which due to their visual similarities, causes marketplace confusion.  If injunctive relief is not granted, even when successful at the end of the litigation, ORR Safety will be left with an irreparably damaged distributor network, a lack of goodwill, a permanently tarnished reputation, and a KONG brand that has suffered permanent market cannibalization due to the breaches and tortious acts of Ironclad.  Injunctive relief is therefore well warranted.

## FACTUAL BACKGROUND

### *The Development of the KONG*

Founded in 1948, ORR Safety is a family owned and operated business that has grown to be one of the most recognized and respected safety product distributors in the world.  *See id.* ¶12.  In addition to working with various other industries focused on safety, ORR Safety was always

at the forefront of innovation in assisting oil and gas companies to improve worker safety.  *See id.*  ORR Safety's development of KONG began in 2007, when ORR Safety was invited as the sole safety company to participate in a steering committee that was made up of a collaborative, cross-functional group of safety and operational representatives from the world's leaders in the oil and gas industry, including ExxonMobil, ConocoPhillips, Superior Energy and Chevron (hereinafter "the Steering Committee").  *See* Counterclaim ¶ 13.

The purpose of this particular Steering Committee was to identify and address the highest level of recordable injuries on oil platforms.  *Id.* ¶ 14.  These companies turned to ORR Safety, as a distributor of safety products, including hand protection, to help develop and then identify a company that could assist it in manufacturing a product that could meet the Steering Committee's needs.  *Id.* ¶ 15.

ORR Safety chose Ironclad to partner with it to design and manufacture a glove to help remedy the problems identified by the Steering Committee. *Id.*¶ 16.  ORR Safety, along with Ironclad as its manufacturer, proceeded to meet with the Steering Committee to develop a specification and requirement list for the new glove concept.  *Id.* ¶ 20.  After multiple concept gloves and field trials the Steering Committee approved a final design in June 2008. *Id.* This final design became the original and first iteration of the KONG glove – the KONG Original Impact Resistant Glove – and the KONG brand was born.  *Id.* ¶ 23.  Ironclad was asked to go into production on the KONG, and the KONG gloves were available on the market in October 2008.  *Id.*

*Marketing and Manufacturing the KONG*

Due in part to the weak financial position of Ironclad, ORR Safety carried the responsibility of building the KONG brand through advertising campaigns and tradeshow

activities.  *Id.* ¶ 35.  Although ORR Safety can quantify the annual cost of these efforts, the effect of ORR Safety's marketing on the KONG brand is incalculable.  *Id.* ¶ 36. ORR Safety also fronted significant sums of money to Ironclad to manufacture KONG gloves ordered by ORR Safety's customers, effectively cash flowing Ironclad's business.  *Id.* ¶ 38.  These up-front expenditures by ORR Safety allowed Ironclad to reap significant margins on the KONG product and, in turn, invest in development of its own corporate infrastructure and product lines.  *Id.* ¶ 40.

With KONG to market, Ironclad in production, and ORR Safety filling worldwide distribution channels and continuously developing new ones, KONG flourished.  *Id.* ¶ 43.  The most recognizable component of the KONG glove is the back of hand protection provided by thermoplastic rubber ("TPR") in various shapes over the back of the hand, across the knuckle, and down each finger of the glove.  *Id.* ¶ 9.  These components, combined with recognizable color patterns, cuff types, labeling and packaging, create a trade dress that is one of the most dominant, recognizable aspects of KONG and the KONG line of gloves. *Id.*

### ORR Safety's Distributor Network

One of the primary functions of ORR Safety as the exclusive distributor of KONG was to find, develop, and maintain qualified distributors, sometimes referred to as "customers", to distribute KONG in domestic and international markets – ORR Safety's KONG distributor network.  *See* Declaration of Mark Wiktorski ¶ 5, Appendix p. 3.  ORR Safety grew the KONG glove line through its promotion, marketing, and sales efforts, and a substantial portion of this growth came from ORR Safety's organically developed distributor network.  *Id.* ¶ 12, Appendix p. 8.  The distributor network at issue was created by ORR exclusively for KONG and KONG alone; the vast majority of the members of the distributor network purchase KONG gloves from ORR Safety and nothing else.  *Id.* Appendix p. 8.

4

Currently, ORR Safety has thirty-three (33) international members of its distributor network covering the following geographic regions and countries:  the United Kingdom, Singapore, Nigeria, Ivory Coast, Ghana, Cameroon, South Africa, United Arab Emeries, Yemen, Kuwait, Oman, Algeria, Russia, Kazakhstan, Turkmenistan, Qatar, Saudi Arabia, Tunisia, Bahrain, Uzbekistan, Iraq, Azerbaijan, Egypt, Libya, India, Indonesia, Bahrain, Brazil, Columbia, Chile, Canada, Malaysia, Thailand, Denmark, Switzerland, Netherlands (Holland), Austria, Liechtenstein, Norway, Korea, China, Brunei, Qatar, Vietnam, India, Trinidad, South America, Argentina, Netherlands and Azerbaijan.  *Id.* ¶ 6, Appendix p. 4.  ORR Safety maintains over two hundred (200) North American members of its distributor network serving the United States and Canada.  Furthermore, seventeen (17) of these members of the distributor network are designated by ORR Safety as Master Distributors.  *Id.* Appendix p. 4. Master Distributors are unique in that they sell to other distributors, thus further expanding KONG's promotion, marketing, and sales channels.  Master Distributors also maintain KONG inventory, participate in trade show activity and engage in active marketing and promotion of KONG in their territory.  *Id.* Appendix p. 4. As a result of ORR Safety's efforts, KONG is (currently) sold to approximately 234 separate business entities around the globe, which does not even take into account for the thousands of end-users who purchase from these members of ORR Safety's distributor network.  *Id.* Appendix p. 4.

Each of ORR Safety's members of its distributor network employed its own sales force and marketing arm.  *Id.* ¶ 13, Appendix pp. 8-9.  This allowed ORR Safety to leverage an existing business's infrastructure, which sped delivery of KONG to the market.  *Id.* Appendix pp. 8-9.  This increased ORR Safety's KONG reach across the world by more people with credentials, training, reputation, and ability than could have been created through an organically

grown sales force. *Id.* Appendix pp. 8-9. ORR Safety fostered and developed these relationships, which often required unique financing arrangements, terms, order requirements, and delivery requirements. *Id.* Appendix pp. 8-9. Importantly, ORR Safety took substantial inventory positions of KONG gloves to ensure the distributor network was adequately served. This allowed Ironclad to reap the benefit of immediate sales, while ORR Safety maintained inventory – to its detriment from a cash flow perspective – so the KONG sales pipeline could be fulfilled. *Id.* Appendix pp. 8-9.

Importantly, Ironclad had no involvement directly with ORR Safety's distributor network, other than to fulfill ORR Safety's KONG glove orders (something that Ironclad had difficulty with throughout the relationship as detailed in the Counterclaim), and only reaped the benefits of ORR Safety's development of this distributor network. *Id.* Appendix pp. 8-9. In fact, Ironclad often requested the full list of names and contact information of ORR Safety's distributor network, and ORR Safety never collectively provided this information because of its proprietary nature. *Id.* ¶ 9, Appendix p. 6. Rather, ORR Safety provided Ironclad information regarding ORR Safety's distributor network only to help in strategy and other issues to further develop KONG. *Id.* ¶ 10, Appendix pp. 6-7.

By engaging in the strategy ORR Safety chose for its distributor network, which includes in many instances implicit exclusivity in that customer's region, ORR Safety ensured value chain continuity for KONG. *Id.* ¶ 7, Appendix pp. 4-5. Each member of the distributor network represented the best qualified local option for supply of KONG gloves into the vertical markets in their geographies. *Id.* Appendix pp. 4-5. Furthermore, because of their local presence and general reputation, these members of the distributor network developed and maintained relationships with end-users that cannot be re-created. *Id.* Appendix pp. 4-5.

### *The Parties' Agreements*

To memorialize their relationship and partnership with the KONG brand, ORR Safety and Ironclad negotiated an Exclusive License and Distributorship Agreement. *See* January 6, 2009 Exclusive License and Distributorship Agreement ("Distributorship Agreement"), Appendix p. 90-108. The Agreement designated ORR Safety as the worldwide exclusive distributor of KONG safety gloves. *See* Distributorship Agreement at Art. 2, Appendix p. 91. Specifically, the Distributorship Agreement stated that ORR Safety was the exclusive distributor of all "'KONG' safety gloves (all sizes), together with any inventions or improvements now or hereafter embodied therein (whether or not patented or patentable in any jurisdiction) during the term of [the Agreement.]" *See id.* at Sch. A, Appendix p. 105. For twenty years starting on January 6, 2009, Ironclad could only sell KONG gloves, and any derivative of KONG gloves that it and ORR Safety developed, to ORR Safety. *See id.* § 4.1, Appendix p. 94; Counterclaim ¶ 27. In exchange for this twenty-year exclusivity, Ironclad retained the intellectual property rights, including the KONG trademark and a patent pending for the KONG design (specifically, the back of hand protection previously described). Distributorship Agreement §§ 7.1-7.2, Appendix p. 95-96. To protect its investment in KONG, in the event that Ironclad terminated the Agreement for any reason other than ORR Safety's material breach, ORR Safety would be entitled to full assignment of the KONG trademark, its registrations, applications and goodwill and a license to any patent granted on KONG. *Id.* §§ 7.2(A), 7.3, Appendix p. 96-97.

The First Amendment to the Exclusive License and Distributorship Agreement was effectuated on January 1, 2015. *See* January 1, 2015 First Amendment to the Exclusive License and Distributorship Agreement ("Amendment"), Appendix p. 109-125 (collectively the

Distributorship Agreement and the Amendment are referred to as the "Agreements").[2]  Under the Amendment, ORR Safety is still the exclusive distributor of KONG gloves, which include the current styles and types on the market and "all gloves bearing at least one KONG Mark, any service mark, trade name or brand name containing the term 'KONG' or the 'KONG Trade Dress'…[.]"  *See* Amendment at Sch. A, Appendix p. 122.  The KONG Trade Dress is defined as "**collectively, the characteristics of the visual appearance of [KONG gloves]** or packaging associated therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not." *See id,* Appendix p. 122 (emphasis added).

The same Agreements that designated ORR Safety as the worldwide exclusive distributor of KONG safety gloves, *see* Agreements at Art. 2, Appendix p. 91, also protected ORR Safety's confidential customer information and supply chain – its distributor network.  Sections 1.3[3] and 7.6 of the parties' Distributorship Agreement, Appendix pp. 91, 97-98, designated ORR Safety's customer information, *i.e.*, its distributor network, as confidential.  Not only was Ironclad expected to protect this information, but it could only use it "as required in the performance of the Distributorship Agreement."  *See* Distributorship Agreement §7.6(A), Appendix 97.  This duty of confidentiality extends for a period of five (5) years after the Agreements' termination. Confidential information was defined as follows:

> "Confidential Information" means and includes (but is not limited to) all prices, costs, sale volumes, trademark information, product formulation, know-how, technical knowledge, technical bulletins, service manuals, software (including source and object codes), drawings, specifications, data sheets, sales and marketing techniques and information, photographs, artwork, designs,

---

[2] Because of the confidential and proprietary nature of the Agreements, ORR Safety has filed these with the Court under seal, consistent with the parties' Agreed Protective Order (DN-25).

[3] Note that Confidentiality Provision was originally Section 1.1 in the Distributorship Agreement, but was renumbered as Section 1.3 in the Amendment.  *See* Amendment § 2.3, Appendix p. 119.  But the substance was not changed in the Amendment.

instructions, **and all other information whether or not reduced to writing,
relating to the** manufacture, sale, marketing, distribution, and servicing of the
[KONG gloves] or **customers of the [KONG gloves], and any other information
and trade secrets that might adversely affect either party's ability to compete in
the market, as well as any other information relating to the business of either
party** to this Distributorship Agreement that may be disclosed or communicated to
either party to this Distributorship Agreement at any time during the Term of this
Distributorship Agreement which is not generally known in the trade or is not
information which is in the public domain through no fault or breach of this
Distributorship Agreement by the receiving party.

*See* Distributorship Agreement § 1.1, Appendix p. 90 (emphasis added).  And the Agreements go

on to say that:

During the Term of this Distributorship Agreement and for a period of five (5)
years after its termination, each party (the "Receiving Party") shall not disclose to
any third party, or use for any purpose other than as required in the performance
of this Distributorship Agreement, any Confidential Information of the other party
(the "Disclosing Party").

*See id.* § 7.6 (A), Appendix p. 97.

### *Ironclad's Breaches and the Litigation*

Despite this clear grant of exclusivity, on the same day that it filed this lawsuit Ironclad

informed ORR Safety that it would begin creating KONG Vibram Counterfeits – gloves without

KONG branding and instead branded as "Ironclad" – to omit ORR Safety from the supply chain.

*See* Counterclaim ¶¶ 52-57.  But the KONG Vibram Counterfeit is, and was always intended to

be, what it is: a KONG glove.  But in blatant attempt to convert KONG business to Ironclad

business, thus cutting out ORR Safety from the supply chain and its contractual and financial

rights, Ironclad simply decided to "rebrand" these KONG gloves by removing the KONG

designation to create the KONG Vibram Counterfeit.  The problem is that the KONG Vibram

Counterfeit gloves look virtually identical to their KONG counterparts, thereby falling within the

definition of KONG Trade Dress and within ORR Safety's exclusivity.

Furthermore, many of the aspects of the KONG Vibram Counterfeits are from the KONG Action Tracker & Overview or from information provided by ORR Safety to Ironclad.  *Id.* ¶ 61. For example, since its original development, ORR Safety has been providing feedback and input regarding improved grip and palm material.  *Id.* ¶ 62.  When Ironclad informed ORR Safety that it was exploring partnering with Vibram for glove materials, ORR Safety's representatives specifically requested that those materials be considered for KONG.  *Id.* That request was rebuffed by Ironclad.  *Id.*  To make matters worse, the thumb protection design of the KONG Vibram Counterfeit glove comes directly from ORR Safety research into field use of KONG gloves.  *Id.* ¶ 63.  Users complained of vulnerability in the glove at that area, and ORR Safety asked Ironclad to incorporate designs to add additional protection into KONG gloves.  *Id.* Ironclad did not do this, but instead seized that design element for the KONG Vibram Counterfeit.  *Id.*  Likewise, the fire-resistant KONG Vibram Counterfeit is a glove specifically requested by ORR Safety to be added to the KONG line.  *Id.* ¶ 64.  Ironclad failed to act on ORR Safety's request, which has been pending for many months, and, instead, channeled its development efforts into a fire-resistant glove for the KONG Vibram Counterfeit line.  *Id.*

Ironclad attempts to justify its cynical and malicious scheme by fabricating an alleged "breach," but ORR Safety did not breach the parties' Agreements.  *See* Appendix p. 15.  Ironclad advances two bogus contentions:  (1) ORR Safety failed to fulfill the Agreement's requirements for promoting, marketing, and selling KONG gloves; and (2) ORR Safety sold gloves that Ironclad asserts are "specifically designed and/or marketed for the petrochemical and offshore exploration markets that are substantially similar to, or competitive with, [KONG gloves]."  *See* Distributorship Agreement § 2.1, Appendix p. 91.  As explained above, ORR Safety developed and maintained a substantial and highly confidential domestic and international sales force that

allowed for promotion, marketing, and sale of KONG gloves.  Declaration of Mark Wiktorski *¶16,* Appendix p. 15.  The fact that Ironclad is now attempting to usurp ORR Safety's distributor network is an admission that ORR Safety's years of effort to develop and maintain that network met (or exceeded) its obligations under the Agreements.  *Id.* Appendix p. 15.  This alone is sufficient to defeat Ironclad's dubious breach argument.

Moreover, Ironclad's position regarding ORR Safety's sales of other gloves fails to pass muster as a breach.  Take, for example, the gloves that Ironclad asserts are ***"specifically designed and/or marketed for the petrochemical and offshore exploration markets that are substantially similar to, or competitive with, [KONG gloves]."***  *See* Distributorship Agreement § 2.1, Appendix p. 91 (emphasis added); Original Petition ¶ 23.  But a side by side comparison and a cursory visual review of the gloves side by side proves that Ironclad is grasping at straws to justify its breach position.  *See* Declaration of Mark Wiktorski ¶ 17, Appendix pp. 16-19.  Three of the gloves Ironclad asserts meet the test under the Agreements have no fingers (with one being a glove liner meant to be worn under another glove).  *Id.* Appendix pp. 16-19.  Two of the gloves have no impact resistance on the back of the hand – a key feature of KONG.  *Id.* Appendix pp. 16-19.  In fact, the only similarity that could be offered between the KONG glove and these gloves is that each is merely "a glove."  One could hardly conclude that any of these gloves are "**substantially** similar to, or competitive with, [KONG gloves]."  The differences are too great.

Ignoring the fact that the gloves Ironclad asserts are substantially similar to KONG are not even to a lay person's eye, these gloves still do not pass the test under the Agreements, which is whether a glove was or is "**specifically** designed and/or marketed for the **petrochemical and offshore exploration markets**."  *See* Distributorship Agreement § 2.1, Appendix p. 91.  The test under the Agreements is precise.  *See* Declaration of Mark Wiktorski ¶17, Appendix pp. 16-19.

11

The petrochemical market is the market relating to the development of products from hydrocarbons, including plastics, fertilizers and a wide range of industrial chemicals. *Id.* Appendix pp. 16-19. The offshore exploration market is prospecting, seismic and drilling activities in the water off of land. *Id.* Appendix pp. 16-19. Ironclad cannot show that any of these gloves is **specifically** designed and/or marketed for these precise applications, and, therefore, cannot show that ORR Safety breached the Agreements by selling these gloves.

Ironclad's position with the HexArmor Chrome 4026 glove fares no better. *Id.* ¶ 18, Appendix pp. 19-21. Like the other gloves shown above, the HexArmor Chrome 4026 does not meet the substantially similar/competitive with KONG test under the Agreements. First, Ironclad itself established this when it produced the attached analysis of the HexArmor Chrome. *See* HexArmor Chrome document, Appendix p. 126. By Ironclad's own admission, the HexArmor Chrome 4026 has numerous safety issues that render it unable to compete with KONG. *See id,* Appendix p. 126.

Second, the HexArmor Chrome 4026 gloves are seen by industry end-users as wholly different gloves from KONG for different applications. For example, ExxonMobil – one of the original KONG Steering Committee members – classifies the HexArmor Chrome 4026 as a light duty glove intended to be used in "light duty job tasks, cleaning accommodations, visitors touring the rigs, supervising, etc." *See* ExxonMobil EMDC Drilling Safety, Security, Health and Environmental Management Program (SMP), EMDC Drilling Leadership Expectations: Personal Protective Equipment (Issued: Revision 1.1 May 2015) at 22, Appendix pp. 149. The KONG glove is deemed a Medium-Heavy Duty glove for use as "general purpose gloves for medium-heavy duty tasks; handling pipe, hand tools, and materials with rough sharp surfaces." *See id,* Appendix pp. 149. In its USP Glove Guidelines, ExxonMobil USP designates the

HexArmor Chrome glove as a "Partial finger/dorsal TPR impact protection" glove, while the KONG glove is designated a "Full finger/dorsal TPR impact protection glove." *See* USP Glove Guidelines, Appendix pp. 178-189. This establishes the differences and lack of competition between the two products. *See* Declaration of Mark Wiktorski ¶ 19, Appendix p. 22. And like the other gloves Ironclad has presented, the HexArmor Chrome 4026 is not "specifically designed and/or marketed for the petrochemical and offshore exploration markets." *Id.* Appendix p. 22. But even more revealing as to baselessness of Ironclad's claim relating to HexArmor Chrome 4026, Ironclad specifically gave ORR Safety permission to sell the HexArmor Chrome 4026 since KONG did not offer a cut-resistant product. *See* February 24, 2012 corr. from Scott Jarus (former CEO of Ironclad Performance Wear) to Jeffrey Sweedler, Appendix p. 190.

In sum, all of Ironclad's allegations were manufactured so that Ironclad could assert that it terminated the parties' Agreements with cause, and, therefore, ORR Safety would not be entitled to the KONG Mark, KONG Trade Dress, or related KONG intellectual property. ORR Safety answered Ironclad's Complaint with its own Counterclaim, asserting actual breaches of the parties' Agreements, along with trade dress violations, false advertising claims, and other equitable causes of action due to Ironclad's obvious lack of good faith and fair dealing in its actions as they relate to ORR Safety.

### *The Immediate Harm:  Ironclad's Distributor Letter*

On or about February 9, 2016, ORR Safety first became aware that Ironclad contacted at least four members of its confidential distributor network:  (1) Future Concerns Group; (2) Safar Oil Services; (3) Project Sales Corp.; and (4) Durasafe Pte Ltd. *See* Declaration of Mark Wiktorski ¶ 10, Appendix pp. 6-7; *see also* February 9, 2016 Email corr. from Oguike to

Wiktorski and Coddington, Appendix pp. 191-193; February 9, 2016 email corr. from Agrawal to Coddington, Appendix pp. 194-195.  ORR Safety believes that many other members of the distribution network received the Distribution Letter but they have simply not made ORR Safety aware of the same.  These members of the distributor network cover the following geographies for KONG on ORR Safety's behalf:  Nigeria, Ivory Coast, Cameroon, India, Bahrain, Saudi Arabia, Qatar, Oman, Kuwait, Iraq, Uzbekistan, Turkmenistan, Yemen, and the U.A.E. Ironclad's Distributor Letter to ORR Safety's distributor network acknowledges that ORR Safety was the "exclusive" distributor of KONG gloves, states that Ironclad terminated its Agreements with ORR Safety,[4] and then goes on to tell these customers that they are "are no longer required to purchase KONG products through ORR Safety."  *See* Distributor Letter, Appendix p. 1.

In the same letter in which Ironclad tell ORR Safety's distributor network to buy KONG directly from Ironclad, Ironclad also blatantly encourages the recipients to purchase the KONG Vibram Counterfeit as opposed to a KONG glove.  The letter states (with emphasis in the original):

*Ironclad also wants to introduce you to the*

*"Industrial Impact Collection®" featuring, exclusive Vibram polymer palm technology:*

*With performance, durability, and safety never seen before in industrial hand wear.*

Soon to be the hand tool of choice for industrial athletes everywhere, this product offers:

✓ Complete impermeable palm with amazing dexterity and flexibility in all weathers and climates.
✓ Proven durability, nearly 9 x times better than other leading gloves on the market.
✓ Proven grip, nearly 9 times better in oil and mud than any other glove on the market.

---

[4] ORR Safety does not dispute that the Agreements were terminated by Ironclad.  However, ORR Safety believes the Agreements were terminated by Ironclad **without cause**, as opposed to due to any material breach by ORR Safety, and, therefore, ORR Safety is entitled to full assignment of the KONG trademark, its registrations, applications and goodwill and a license to any patent granted on KONG.  *See* Distributorship Agreement §§ 7.2(A), 7.3, Appendix p. 96-97. This is why Ironclad's most recent attempt at diluting the KONG brand is so problematic. If Ironclad is allowed to continue, ORR Safety will own a worthless brand even at the end of successful litigation.

This technology reduces end-user costs and drive both user performance and safety.  Please watch the video - Industrial Impact at https://www.youtube.com/watch?v=T7MpEuRskhY.

*See id,* Appendix p. 1.

Each of these members of distributor network received the Distributor Letter from Ironclad, and in each of the discussions ORR Safety has had with these distributor partners, they have expressed concern over Ironclad's actions.  Declaration of Mark Wiktorski ¶ 10, Appendix pp. 6-7.  First, none is familiar with Ironclad, other than as a manufacturer, and is concerned about the future of their status as a KONG distributor.  There is particular concern that Ironclad will add additional distributor partners in their respective geographies, thereby creating competition for the members of the KONG distributor network, which will invariably decrease sales and profitability of KONG.  *Id.* Appendix pp. 6-7.  Second, there is concern amongst these members of the KONG distributor network regarding Ironclad's KONG Vibram Counterfeit.  *Id.* Appendix pp. 6-7.

Ironclad is doing two things with the Distributor Letter. First, it is offering the KONG Vibram Counterfeit as the newest and latest version of the KONG – using the KONG trade dress and the good will associated with the same in hopes that confused customers will allow the KONG goodwill to flow over into the KONG Vibram Counterfeit.  *See* February 9, 2016 Email corr. from Oguike to Wiktorski, Appendix 191-193 (where the member of ORR Safety's distributor network stated the letter made relationships "mirky").  Second, Ironclad is pushing the KONG Vibram Counterfeit as a direct competitor glove to KONG to ORR Safety's supply chain – in hopes that it will dilute KONG's market presence, erode its goodwill, and degrade the value chain.

### The Imminent Necessity of Injunctive Relief

Ironclad's latest actions warrant injunctive relief.  First, an injunction is appropriate because Ironclad has misappropriated ORR Safety's confidential distributor network, which represents a substantial customer base for ORR Safety's sale of KONG gloves.  Declaration of Mark Wiktorski ¶¶ 6-8, Appendix pp. 4-6.  ORR Safety has just learned that Ironclad has contacted four members of its distributor network, but has no way of knowing how many additional members of ORR Safety's distributor network Ironclad has contacted.  ORR Safety's distributor network is confidential information protected by the parties' Agreements, as well as a trade secret protected under law.  *See* Declaration of Mark Wiktorski ¶ 8, Appendix pp. 5-6; *see* Agreements §§ 1.3 and 7.6, Appendix pp. 97-98 (designating ORR Safety's customer information, *i.e.*, its distributor network, as confidential).  To the extent this information was disclosed to Ironclad in the course of business, Ironclad was expected to protect this information and use it *only* "as required in the performance of the Distributorship Agreement."  *See* Distributorship Agreement §7.6(A), Appendix p. 97.  Ironclad's actions are a breach of the parties' Agreements in that it is using ORR Safety's Confidential Information for its own benefit and unequivocally *not* in furtherance of its duties under the Agreements.  Ironclad's actions will permanently and irreparably injure the very brand and business relationships that ORR Safety's Counterclaim seeks to protect.

Second, by advertising the KONG and the KONG Vibram Counterfeit together, Ironclad's Distributor Letter is causing trade dress confusion, is irreparably harming the goodwill associated with the KONG brand, and is diluting the KONG brand.  Ironclad has now followed through on its threat of putting the KONG Vibram Counterfeit on the market.  But what Ironclad is not entitled to do is to use ORR Safety's confidential distributor network for KONG to sell the

KONG Vibram Counterfeit.  It is also not entitled to use KONG's goodwill, and the obvious confusion as to what is a KONG versus a KONG Vibram Counterfeit, in order to sell the KONG Vibram Counterfeit.  If Ironclad is allowed to continue, it will not only permanently alienate ORR Safety's customer base, but it will also permanently dilute the very brand that ORR Safety has developed – KONG.  *See* Declaration of Mark Wiktorski ¶ 10, Appendix pp. 6-7.  Although ORR Safety is confident it will ultimately win on all claims at trial, if Ironclad is allowed to continue, ORR Safety will be permanently cut out of the market that it has developed, will be left with a significantly reduced distributor network to sell KONG, and the KONG brand will be permanently cannibalized by the KONG Vibram Counterfeit.  *Id.* Appendix pp. 6-7.  The scenario is one in which injunctive relief maintaining the status quo is the only way to prevent irreparable and unmeasurable harm to ORR Safety and the KONG brand.

## ARGUMENT

A temporary restraining order ("TRO") is necessary and appropriate here. The purpose of a TRO under Rule 65 is to preserve the status quo so that a reasoned resolution of a dispute may be had.  A TRO is "simply a highly accelerated and temporary form of preliminary injunctive relief." *Hassani v. Napolitano,* No. 3:09–CV–1201–D, 2009 WL 2044596, at *1 (N.D. Tex. July 15, 2009) (Fitzwater, J.) *see also* 11A Wright & Miller, Federal Practice & Procedure: Civil 3d § 2951 (database updated Apr. 2015) ("The order is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction[.]").

A TRO requires the party seeking relief to establish the same four elements for obtaining a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm to it if the TRO is not granted, (3) that the threatened harm outweighs any damage that the TRO might cause the opposing party, and (4) that the TRO will not disserve

the public interest. *See, e.g., Jones v. Bush,* 122 F.Supp.2d 713, 718 (N.D. Tex. 2000) (Fitzwater, J.) (addressing preliminary injunction standard) (internal citations omitted).  Although it believes that it can, ORR Safety is not required to prove that it will prevail at trial but must establish the right to preserve the status quo pending trial on the merits by proving all of the four elements. *Propath Services, L.L.P. v. Ameripath, Inc.*, No. 3:04-CV-1912-P, 2004 WL 2389214, at *2 (N.D. Tex. Oct. 21, 2004) (Solis, J.) (internal citations omitted); *see also Texas v. Wellington Resources Corp.*, 706 F.2d 533, 537 (5th Cir.1983) ("Hearings on these nonpermanent injunctions do not serve the same purpose as a hearing on the merits; they only preserve the status quo awaiting resolution of the merits.").  ORR Safety can easily meet each and every one of these elements.

## I.     ORR SAFETY IS LIKELY TO SUCCEED ON THE MERITS.[5]

### A. Breach of Confidentiality Provision.

ORR Safety seeks injunctive relief for breach of a confidentiality agreement between ORR Safety and Ironclad.[6] To establish a breach of contract claim, ORR Safety must allege the

---

[5] ORR Safety notes that in its Counterclaim it has various breach of contract claims (Counts I-V), as well as claims based on trade dress (Count III) and unfair competition (Count IX).  Ironclad's breach of the Agreements' confidentiality provision, trade secret misappropriation, and violation of the Texas Anti-Dilution statute fall within the broad pleadings and create the appropriate relationship between the injury claimed in ORR Safety's motion for TRO and the conduct asserted in the Counterclaim.  *Howe v. Polunsky Unit*, No. 9:08-CV-142, 2010 WL 1268186, at *2 (E.D. Tex. Feb. 3, 2010) report and recommendation adopted, 2010 WL 1268185 (E.D. Tex. Mar. 25, 2010) (Clark, J.).  In other words, the relief sought in the motion for injunctive relief must be "closely related to the conduct made the subject of the underlying complaint." *Id.*  ORR Safety clearly shows a connection between the facts forming the basis of his lawsuit and the allegations of his request for injunctive relief.  However, to the extent the Court believes it to be necessary, ORR Safety will supplement its Counterclaim to specifically address these most recent additional breaches by, and claims against, Ironclad.

[6] Under Texas choice-of-law analysis, the contractual choice-of-law clause selecting New York law in the Agreements will be honored unless (a) New York "has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (b) application of New York law "would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which … would be the state of the applicable law in the absence of an effective choice of law by the parties."  While the Court should apply Fifth Circuit case law to address the issue of irreparable harm, New York law will apply to the determination of whether there was a breach of the confidentiality provision of the Agreements.  Once the Court determines that ORR Safety has shown a substantial likelihood that it will prevail on the merits, whether the harm flowing from that breach meets the irreparability standard will be determined under

specific terms of the agreement, the consideration, ORR Safety's performance, and Ironclad's breach of the agreement. *Sylmark Holdings Ltd. v. Silicone Zone Intern. Ltd*., 5 Misc. 3d 285, 295-96, 783 N.Y.S.2d 758, 769-70 (Sup. Ct. 2004) (internal citations omitted).   A contract to retain the confidentiality of certain matters which should be kept in confidence will be enforced by injunction.  *See id.* (citing *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971); *Doe v. Roe,* 93 Misc.2d 201, 210–11, 400 N.Y.S.2d 668 (Sup. Ct., N.Y. County 1977)).

The facts of the *Sylmark* are strikingly similar to the case at hand, in that it was an action to enjoin and recover damages for defendants' alleged unlawful misappropriation of plaintiffs' confidential information relating to oven mitts.   The parties had entered a confidentiality agreement in which they acknowledged that in the course of their negotiations, each party may disclose confidential information, including business, product and technical information relating to its business, to the other.  *See Sylmark*, 783 N.Y.S.2d at 763.  They agreed that the recipient of such information was obligated to keep it confidential and restrict its use during the three-year term of the agreement, and for a period after termination of 24 months.  *Id.*

Plaintiffs alleged that approximately a year after the confidentiality agreement was entered, it discovered an advertisement placed by defendants for a product, under a different but similar name but that was virtually identical to the gloves subject to the parties' agreements.  Plaintiffs claimed that the pictures in the ad show that these mitts are virtually identical to plaintiffs', that the ad wrongly stated that defendants had a patent pending for them, and that it

---

Fifth Circuit law.  *See Cardoni v. Prosperity Bank,* 805 F.3d 573, 580-81 (5th Cir. 2015); *Interfirst Bank Clifton v. Fernandez*, 853 F.2d 292, 294 (5th Cir. 1988).

wrongly stated that the defendant owned the intellectual property for the gloves and may sell them. *Id.*[7]

Plaintiffs moved for a preliminary injunction, enjoining the defendants from marketing or taking any action with respect to certain molds, sample molds and products (a) for the "Hot Holder" oven mitts that were made in connection with certain agreements between the parties relating to the development of those oven mitts, and (b) … any other products, designs or ideas produced, developed or derived from the trade secrets and/or confidential proprietary information that plaintiffs provided to defendants, or which were developed by defendants for plaintiffs pursuant to the agreements between them, including the molds, sample molds obtained from or produced for plaintiffs, sample products, information, specifications, designs, drawings, models, research and development materials. *See Sylmark*, 783 N.Y.S.2d at 762-763. In its application for injunctive relief the plaintiffs argued success on the merits on their claims for breach of contract because, under the agreements, defendants were obligated to maintain the confidentiality of the information and not to use it for its own benefit. *Id.* at 766. Further, as to irreparable harm, the plaintiffs alleged because it was a motion to protect confidential information, irreparable harm is presumed. *Id.* at 767.

The Court agreed with the plaintiffs, finding that (1) there were unambiguous agreements that specifically acknowledged that certain information was the design for "Hot Holder" oven mitts was confidential information belonging to plaintiffs, and that these agreements required defendants to keep this information confidential, and, impliedly, not to use it for its own benefit or at plaintiffs' expense; (2) plaintiffs presented proof that they performed their obligations under

---

[7] The complaint in *Sylmark* had almost identical causes of actions to ORR Safety's Counterclaim, namely breach of the parties' agreements based on defendants misappropriating and commercially exploiting plaintiffs' proprietary and confidential information. The plaintiff also sued for tortious interference, theft of trade secrets, and unfair competition, among other claims. *Id.* at 766.

these agreements, by providing defendants with their sales projections, marketing plans and channels of distribution, all confidential materials under the agreements; (3) that there was substantial evidence in the record that defendants breached these confidentiality provisions in designing, manufacturing and selling silicone oven mitts with not only the same properties, such as heat resistance, left-hand and right-hand design, and dexterity, but which are nearly identical in appearance to plaintiffs' gloves; and (4) defendants had no knowledge of a design such as plaintiffs' prior to the parties' agreements, which demonstrated that defendants were relying on the confidential information which plaintiffs had provided to it under the agreements.  *Id.*  at 769-770; *see also Marcone APW, LLC v. Servall Co*., 85 A.D.3d 1693, 925 N.Y.S.2d 752 (2011) (holding that distributor was entitled to an injunction against a competitor and a former employee for misappropriation of trade secrets and unfair competition based on use of customer list containing non-public information that was compiled through considerable effort on the part of the distributor); *Glob. Telesystems, Inc. v. KPNQwest, N.V*., 151 F. Supp. 2d 478 (S.D.N.Y. 2001) (granting telecommunications corporation's motion for preliminary injunction to prevent the breach of a confidentiality agreement by not allowing defendant competitor to hire plaintiff's CFO).

ORR Safety has clearly proven that the confidentiality provision of the parties' Agreements was in place, because even if the Agreements terminated, the duty of confidentiality lasted five additional years.  Second, ORR Safety performed under the Agreements, in that it had provided over time various confidential information regarding members of its distributor network to Ironclad in order to fill orders and other responsibilities under the Agreements.  *See* Declaration of Mark Wiktorski ¶ 9, Appendix p. 6.   For example, ORR Safety would regularly meet with Ironclad to discuss strategic opportunities for KONG.   *Id*. Appendix p. 6.   Part of

21

those discussions included identifying ORR Safety's members of its distributor network in various markets. *Id.* Appendix p. 6. Also, some of those discussions included explanation by ORR Safety why its chosen members of its distributor network in certain markets were the most qualified or best positioned to market, sell, and promote the KONG brand as opposed to others. *Id.* Appendix p. 6. Despite ORR Safety's expectation that these discussions were confidential under the parties' Agreements, and the trade secret information would not be used to threaten ORR Safety's business, it appears from Ironclad's actions that ORR Safety was incorrect.

Third, Ironclad has breached the confidentiality provision by utilizing ORR Safety's confidential distributor network in furtherance of itself and not the parties' Agreements. This information was known to Ironclad only through its collaboration with ORR Safety on KONG in furtherance of the parties' Agreements. *See id,* Appendix p. 6. Therefore, ORR Safety is likely to succeed on the breach of contract claim relating to the Agreements' confidentiality provision, and an injunction is appropriate.

### B.  Misappropriation of Trade Secret

To prevail on its claim for misappropriation of trade secrets, ORR Safety must show: (1) the existence of a trade secret; (2) a breach of a confidential relationship or improper discovery of the trade secret; and (3) use of the trade secret without authorization. *See Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (citing *Phillips v. Frey,* 20 F.3d 623, 627 (5th Cir.1994). The Texas Supreme Court defines a trade secret as "any formula, pattern, device, or **compilation of information** which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 766 (1958), (emphasis added).

A customer list may be a trade secret, *Hyde Corp.,* 314 S.W.2d at 766, but not all customer lists are trade secrets under Texas law. The broader rule of trade secrets, that they must be *secret,* applies to customer lists. A customer list of readily ascertainable names and addresses will not be protected as a trade secret. *See Gaal v. BASF Wyandotte Corp.,* 533 S.W.2d 152, 155 (Tex. App. 1976—Houston [14th Dist.], no writ). Thus, Texas courts consistently consider three factors when determining whether a customer list is a trade secret: (1) what steps, if any, the entity asserting it is a trade secret has taken to maintain the confidentiality of a customer list; (2) whether a the entity that disclosed the information acknowledged that the customer list was, in fact, confidential; and (3) whether the content of the list is readily ascertainable. *See Flake v. EGL Eagle Global Logistics,* No. 14–01–01069–CV, 2002 WL 31008136, at \*4 (Tex. App. 2002—Houston [14th Dist.], no pet) (finding trade secret where departing employee admitted information was confidential); *Center for Economic Justice v. Am. Ins. Assoc.,* 39 S.W.3d 337, 346 (Tex. App. 2001—Austin, no pet.) (affirming trade secret status of a quasi-customer list that insurance companies are required to submit to a Texas regulatory agency, even though the insurance companies only took measures to protect the confidentiality of the lists once they became aware of an "open-records request" to disclose the lists); *Gibson, et al. v. Canfield,* No. 05-00-00753-CV, 2001 WL 21491, at \*1 (Tex.App.2001—Dallas, no pet.) (finding district court did not abuse its discretion in granting an injunction in the face of conflicting testimony about the list was kept confidential); *Keystone Life Ins. Co. v. Marketing Mgmt. Inc.,* 687 S.W.2d 89, 91 (Tex. App. 1985—Dallas, no writ) (finding that a list of 900 names and addresses that were not generally available to persons in the business of selling group life insurance was a trade secret).

ORR Safety's distributor network is a confidential trade secret entitled to protection as such under the law.  Declaration of Mark Wiktorski ¶ 8, Appendix pp. 5-6.  First, ORR Safety and only ORR Safety developed the distributor network.  *Id.* Appendix pp. 5-6.  The identity of ORR Safety's distributor network is not known to the public, and ORR Safety has taken safeguards not to share the identity of its distributor network with others.  *Id.* Appendix pp. 5-6.  In fact, very few individuals within ORR Safety have access to or can identify the entire list of ORR Safety's distributor network.  *Id.* Appendix pp. 5-6.  Access to the network list and knowledge of the distributor network is controlled by Director of Business Development for ORR Safety alone.  *Id.* Appendix pp. 5-6.  The distributor network built by ORR Safety contributes to ORR Safety's goodwill and reputation and is an integral part of the goodwill and reputation associated with KONG.  *Id.* Appendix pp. 5-6.  The goodwill fostered by this network enjoys a symbiotic relationship with the goodwill surrounding KONG, which has been built by ORR Safety over the years. *Id.*  Appendix pp. 5-6.

Furthermore, regardless if the law would otherwise deem the identity of ORR Safety's customers a trade secret that is protectable, Ironclad explicitly contracted in the parties' Agreements that they would not use ORR Safety's customer list except in furtherance of the Agreements.   Ironclad acknowledged and agreed that compliance with the covenant of confidentiality was necessary for the protection of ORR Safety's business and its goodwill and other proprietary interests, but then blatantly breached that provision.  Because of this admission, Ironclad simply cannot show that ORR Safety is not entitled to enforce this contractual restriction on the use of its confidential distributor network.  *Lason Services, Inc. v. Rathe*, No. Civ.A.3:02CV2110-D, 2003 WL 21728184, at *6 (N.D. Tex. Mar. 14, 2003) (Fitzwater, J.) (holding that defendant's contention that plaintiff did not properly safeguard its confidential

information and therefore it was not a trade secret was irrelevant in the injunction analysis where the defendant signed an agreement not to disclose the customer list).

Ironclad may take the position that by disclosing information regarding members of ORR Safety's distributor network that it thereby lost trade secret protection through such limited disclosure.  But the Fifth Circuit has held that where disclosures came with a duty "not to disclose or use the secret," they are entitled to protection. *See Propath Services, L.L.P. v. Ameripath, Inc.*, No. Civ.A.3:04–CV–1912–P, 2004 WL 2389214, at *3-4 (N.D. Tex. Oct. 21, 2004) (Solis, J.) (*citing Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir.1994)).  As the Fifth Circuit emphasized:

> [W]hile it is true that outside any confidential relationship, one who voluntarily discloses secret information or who fails to take reasonable precautions to secure its secrecy cannot properly claim that information constitutes a trade secret, creating such a duty upon the disclosee is a reasonable precaution, and a voluntary disclosure made within the periphery of a confidential relationship eliminates the need to take further precautions to secure the trade secret.

*Phillips*, 20 F.3d at 630–31 (emphasis added) (internal citations omitted). As ORR Safety's disclosures regarding its distributor network to Ironclad fall within the "gambit of 'confidential periphery,'" the identity of the members in ORR Safety's distributor network clearly qualifies as a trade secret that deserves protection.  *See Propath Services*, 2004 WL 2389214, at *4.

The second and third elements of misappropriation of a trade secret are easily met here. Obviously the parties' Agreements discussed and acknowledged the fact that confidential information, including information about customers, would be shared between Ironclad and ORR Safety, and that such information warranted protection even after the parties' agreements terminated.  Ironclad using the confidential distributor network for its own benefit, not in furtherance of the Agreements, and to the detriment of ORR Safety, is clearly a breach of a confidential relationship.  Ironclad simply refuses to respect the clear terms of the Agreements.

Finally, ORR Safety never gave Ironclad permission to use the distributor network information in furtherance of selling KONG directly to ORR Safety's distributor network or in order to sell KONG Vibram Counterfeit to ORR Safety's distributor network. *See* Declaration of Mark Wiktorski ¶ 9, Appendix p. 6. Therefore, ORR Safety is likely to succeed on the misappropriation of trade secret claim.

### C. Trade Dress, Unfair Competition, and Dilution.

Based on Ironclad's Distributor Letter to ORR Safety's distributor network, it is obvious that Ironclad is now trying to capitalize on ORR Safety's customer base mistaking the KONG Vibram Counterfeit for a KONG in order to market and sell the KONG Vibram Counterfeit. As already stated in Count I of ORR Safety's Counterclaim, this is a breach of the Agreements with ORR Safety because Ironclad is "using the KONG trade dress but lacking KONG Marks…in violation of the exclusivity provisions of the Agreement." *See* Counterclaim ¶ 112. In addition, Count IX of ORR Safety's Counterclaim states that "Ironclad makes false or misleading descriptions and representations of fact in connection with Ironclad's promotion of the KONG Vibram Counterfeits[.]" The trade dress confusion is also blatantly obvious on Ironclad's new cross-reference list on its website. *See* http://ironclad.com/cross-reference-list/ (last visited Feb. 17, 2016), Appendix pp. 196-216. Ironclad has lined up the KONG Vibram Counterfeit gloves side by side by the original KONG glove on its own website – vividly showing the complete lack of any material differences and the wealth of visual similarities down to the gloves' names. *Id.* Appendix pp. 196-21. ORR Safety now knows that Ironclad is using trade dress confusion to directly try and get ORR Safety's distributor network to purchase the KONG Vibram Counterfeit.

The Lanham Act, 15 U.S.C. § 1125(a), creates a cause of action for trade dress infringement consistent with common law unfair competition, and "trade dress" refers to the total image and overall appearance of a product. *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). The Act prohibits a manufacturer from "passing off" his goods or services as those of another maker by virtue of substantial similarity between the products. *Id.* (internal citations omitted). "Trade dress" may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n. 1 (1992). Accordingly, the inquiry does not focus on isolated elements of the dress, but on whether a combination of features creates a distinctive visual impression, identifying the source of the product. *Falcon Rice Mill, Inc. v. Community Rice Mill, Inc.*, 725 F.2d 336, 346 (5th Cir. 1984). Protection of trade dress serves to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers…and the maintenance of quality by securing to the producer the benefits of a good reputation." *Sunbeam Products, Inc. v. West Bend Co.*, 123 F.3d 246, 251 (5th Cir. 1997) (citations omitted).

To prevail on a claim of unlawful trade dress infringement, ORR Safety must first establish that the trade dress qualifies for trade dress protection. *Sunbeam,* 123 F.3d at 251. In determining whether the trade dress is protectable, courts consider three issues: 1) distinctiveness, 2) secondary meaning, and 3) functionality. *Id.* A trade dress is distinctive and protectable if it serves as an indicator of source, *see Pebble Beach Co. v. Tour 18 I Ltd*, 155 F.3d 526, 540 (5th Cir. 1998), *i.e.,* has KONG become distinctive through acquiring secondary meaning in the minds of the consuming public. *See id.*; *see also Falcon Rice Mill,* 725 F.2d at

336 (stating weight is to be given to various factors, in a suit alleging unfair competition and trade dress infringement, in determining whether there was likelihood of confusion as to source).

Thus, to establish that their trade dress merits trademark protection, ORR Safety must demonstrate that KONG is either inherently distinctive or has acquired secondary meaning, and that the trade dress is not functional. "'[I]n general terms, a product feature is functional ... if it is 'essential to the use or purpose of the article or it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)(*quoting Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).

First, the Agreements between the parties acknowledge the need to protect the KONG Trade Dress, and define it as "collectively, the characteristics of the visual appearance of [KONG gloves] or packaging associated therewith and, to the extent permitted under applicable law, any applications therefor, whether registered or not." *See* Amendment at Sch. A, Appendix p. 122. Second, KONG has a specific meaning in the safety marketplace, KONG is a unique and sought after brand, and is the gold standard in hand safety for the industrial contact. *See* Declaration of Milton Bell ("Bell Dec.") ¶ 2, Appendix p. 217;[8] *see also* Declaration of Desiree Vanderham ("Vanderham Dec.") ¶ 2, Appendix p. 219.  The most recognizable component of the KONG glove is the back of hand protection provided by thermoplastic rubber ("TPR") in various shapes over the back of the hand, across the knuckle, and down each finger of the glove. *See* Counterclaim ¶ 9.  These components, combined with recognizable color patterns, cuff types, labeling and packaging, create a trade dress that is one of the most dominant, recognizable

---

[8] Note that Mr. Bell was a former ExxonMobil customer safety coordinator and an original member of the Steering Committee that created KONG. *See* ¶ 1, Appendix p. 217.

aspects of KONG and the KONG line of gloves. *Id.* Customers in the safety industry know a glove is a KONG glove due to the way it looks, namely by the thermoplastic finger and thumb protection; cuff and opening; color of back portion; colors of finger and thumb protection and the color scheme of the glove; back of hand protection; knuckle protection; the colors of knuckle protection; and the general shape and form of the glove. *See* Declaration of Milton Bell Dec. ¶ 2; Appendix p. 217; *see* Declaration of Desiree Vanderham Dec. ¶2, Appendix p. 219.

Once the court determines that the trade dress is protected, ORR Safety must then establish that it has been infringed. *Id.* "Infringement occurs only when there is a likelihood of confusion between the products [or services] of the plaintiff and the defendant." *Id.* (citations omitted). The Distributor Letter is an infringement of ORR Safety's trade dress rights for several reasons. First, Ironclad is attempting to use the goodwill of the KONG brand developed over the course of years by ORR Safety to get ORR Safety's KONG distributor network to purchase the KONG Vibram Counterfeit. It is no accident that the KONG Vibram Counterfeit gloves have the characteristics of the visual appearance of the KONG gloves; in some instances it looks like Ironclad simply omitted the KONG Mark. This brand and trade dress confusion is intentional on behalf Ironclad, as it wants to piggyback on KONG's success to the benefit of the KONG Vibram Counterfeit.

The KONG Vibram Counterfeit clearly shares the characteristics of the visual appearance of the KONG glove, which under the definition of "KONG" under the Agreements makes them by definition KONG gloves. *See* Declaration of Mark Wiktorski. ¶ 15, Appendix pp. 10-15. Consider the following side-by-side comparison of KONG gloves with their KONG Vibram Counterfeit counterparts:[9]

---

[9] ORR Safety notes that the blatant replication of the KONG gloves by Ironclad in creating the KONG Vibram Counterfeit is more obvious when shown in color. ORR Safety has filed this pleading as a colored PDF to aid in the

| KONG | KONG Vibram Counterfeit |
| --- | --- |
|  | |

comparison.   ORR Safety further states that it has asked for examples of the KONG Vibram Counterfeit gloves to be produced pursuant to request for production under FRCP 36.   Despite the fact that responsive documents and things were due to be produced on December 29, ORR Safety still has not received a single responsive document, much less the requested gloves.   ORR Safety requests that Ironclad be ordered to produce these gloves immediately in order to further support ORR Safety's trade dress analysis at the requested evidentiary hearing. *See* Motion for Expedited Discovery.









First, many of the KONG Vibram Counterfeits share the exact same name as the corresponding KONG it knocks off. *See* Declaration of Mark Wiktorski ¶ 15, Appendix pp. 10-15.  Moreover, the color palates of the gloves are in many instances nearly identical to the KONG it copies. *Id.* Appendix pp. 10-15.   Ironclad has expanded its KONG Vibram Counterfeits to include knock-offs that even mirror the palm materials and other fabrics of

existing KONG gloves. *Id.* Appendix pp. 10-15. Furthermore, the thermoplastic rubber placement on the finger to the finger-tip is nothing more than a blatant copy of KONG's design. *Id.* Appendix pp. 10-15. The cuff design of each of the knockoffs is nearly identical to KONG. *Id.* Appendix pp. 10-15. Upon information and belief, the product fabric is sourced and cut from the same rolls as that of the KONG gloves each copies. *Id.* Appendix pp. *10-15.* In sum, the overall glove appearance of Ironclad's counterfeit line looks exactly like KONG in the characteristics of visual appearance. *Id.* Appendix pp. 10-15; *see* Declaration of Milton Bell ¶ 3; Appendix p. 183; *see also* Declaration of Desiree Vanderham ¶3, Appendix p, 185-186.

What is more, and as detailed in ORR Safety's Counterclaim, many of the counterfeit gloves now offered by Ironclad were styles, designs, and developments that were conceived of by ORR Safety for the KONG product line, yet were converted by Ironclad for this counterfeit line of KONG knock-offs. *See* Declaration of Mark Wiktorski ¶ 15, Appendix pp. 10-15. And ORR Safety knows that this is confusing to at least one of ORR Safety's member of its distributor network, who identified the gloves as confusingly similar in function and name, and is concerned that the Vibram KONG Counterfeit will only dilute KONG's goodwill in the marketplace. *Id.* Appendix pp. 10-15; *See* Declaration of Milton Bell ¶ 3, Appendix p. 183; *see also* Declaration of Desiree Vanderham ¶ 3, Appendix pp. 185-186. In sum, there is no question that ORR Safety has a likelihood of success on the merits that the KONG Vibram Counterfeit is a trade dress infringement of the KONG gloves.

Second, Ironclad's Distributor Letter insinuates that the KONG Vibram Counterfeit is simply the next iteration of KONG – the brand that ORR Safety developed with this very distributor network to which the letters were sent. This is a slightly different tactic by Ironclad – by making recipients believe the KONG Vibram Counterfeit is associated with KONG gloves,

but is the supposedly better version of the same, Ironclad is attempting to dilute the value of KONG by replacing it with the KONG Vibram Counterfeit.  The fact that the KONG Vibram Counterfeit is highlighted in the same advertisement to ORR Safety's KONG distributor network proves that Ironclad is doing just that.  One need look no further than the bolded, italicized language of the Distributor Letter wherein Ironclad states that the KONG Vibram Counterfeit is the new iteration of KONG, and will soon overtake KONG as the preferred glove for "performance, durability, and safety" by offering "amazing dexterity and flexibility in all weathers and climates . . ." with "proven durability", "proven grip" which in both instances is advertised as being "nine (9) times better . . . than any other glove on the market." *See* Distributor Letter.  The Distributor Letter establishes ORR Safety's claim that Ironclad is sacrificing the KONG brand only to sell its other products, including the KONG Vibram Counterfeit.  In other words, Ironclad is offering KONG directly to ORR Safety's distributor network, but then states that KONG is inferior.

Because Ironclad terminated the parties' Agreements without cause (*i.e.*, ORR Safety was in no way in breach of the parties' Agreements despite the fact that Ironclad clearly was, as set out in this Motion and in the Counterclaim), Ironclad will ultimately be forced to assign to ORR Safety the "KONG Marks and the goodwill associated therewith, including any and all trademark registrations and trademark applications throughout the world" pursuant to Section 7.2(A) of the Agreements and must license "any patents in the United States or elsewhere that have issued for the [KONG gloves] . . together with any inventions or improvements now or hereafter embodied in the [KONG gloves]" pursuant to Section 7.3 of the Agreements.  Appendix pp. 96-97.  Therefore, because the KONG Mark (in addition to the KONG Trade Dress) legally belongs to

ORR Safety, Ironclad's most recent actions with the Distributor Letter clearly violate Tex. Bus. & Com. Code Ann. § 16.29 – Texas's Anti-Dilution Statute.

The Texas Anti-Dilution Statute provides that a "person may bring an action to enjoin an act likely to injure a business reputation or to dilute the distinctive quality of a mark registered under this chapter or Title 15, U.S.C., or a mark or trade name valid at common law, regardless of whether there is competition between the parties or confusion as to the source of goods or services." Tex. Bus. & Com. Code Ann. § 16.29    In order to recover, a plaintiff must demonstrate that it owns a distinctive mark and that "there is a likelihood of dilution due to either 'blurring' or 'tarnishing.' " *Express One Int'l, Inc. v. Steinbeck*, 53 S.W.3d 895, 899 (Tex. App.-Dallas 2001, no pet.) (citing *Exxon Corp. v. Oxford Clothes, Inc*., 109 F.3d 1070, 1081 (5th Cir.1997)). "A registered mark is 'presumed to be distinctive.' " *E. & J. Gallo Winery*, 129 F.Supp.2d at 1038 (citing *Lois Sportswear, U.S.A., Inc*., 799 F.2d at 871). "Dilution by blurring occurs only when the plaintiff's trade name is used by another as his own trade name, thereby weakening the plaintiff's ability to use the name as a unique identifier of its goods and services." *Express One Int'l*, 53 S.W.3d at 899 (citing *E. & J. Gallo Winery*, 129 F.Supp.2d at 1038). Dilution by tarnishing occurs when another uses it "in a manner that tarnishes or appropriates the goodwill and reputation associated with the name." *Id.* Tarnishing addresses instances in which a defendant uses "a trade name similar to that of the plaintiff on products that are markedly inferior or of a different quality and nature than those of the plaintiff." *Id*. at 899–900 (citing *Exxon Corp*., 109 F.3d at 1084 n. 21).

This is why Ironclad's most recent attempt at diluting the KONG brand is so problematic; if Ironclad is allowed to continue diluting the KONG market by directly advertising the KONG Vibram Counterfeit with KONG, ORR Safety will ultimately own a worthless brand even at the

end of successful litigation. Or, if the KONG Vibram Counterfeits do not live up to the standards of the KONG, ORR Safety's customer base will associate the bad results of the KONG Vibram Counterfeits with the KONG, to the detriment of the KONG brand.  By using KONG Vibram Counterfeits and KONG gloves in the same promotions, Ironclad misrepresents the nature, characteristics, and qualities of the KONG Vibram Counterfeits and KONG gloves.  For these reasons, ORR Safety will be successful on its trade dress and dilution claims.

## II.   ORR SAFETY WILL SUFFER IRREPARABLE HARM ABSENT AN INJUNCTION.

Ironclad's actions relating to the utilization of ORR Safety's confidential distributor network to both sell KONG and the KONG Vibram Counterfeit, as well as its continued trade dress confusion in advertising KONG together with the KONG Vibram Counterfeit, will cause irreparable harm for several reasons.

### A.  Damages cannot be quantified.

First, the Fifth Circuit has found an injury to be irreparable if it cannot be undone through monetary relief.  *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir.1985).  [T]he key word ... is irreparable, and an injury is irreparable only if it cannot be undone through monetary remedies.  Thus, the possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weigh[ ]s heavily against a claim of irreparable harm.  *Propath Services, L.L.P. v. Ameripath, Inc.*, CIV.A.3:04-CV-1912-P, 2004 WL 2389214, at *6-7 (N.D. Tex. Oct. 21, 2004).

In this situation, ORR Safety already knows that a large portion of its harm will likely be unquantifiable.  First, ORR Safety does not know how many of the members of its distributor network received the Distributor letter from Ironclad.  Although four ORR Safety customers have come forward regarding the Distributor Letter, ORR Safety has no idea the breadth of the

rest of the recipients' confusion.  At least one recipient of the Distributor Letter stated that it simply did not want to be involved in the ORR Safety/Ironclad dispute.  Declaration of Mark Wiktorski ¶ 21, Appendix p. 23. This indicates that some members of the distributor network may simply go a completely different direction and will neither purchase from ORR Safety nor Ironclad; it is these sorts of injuries to the reputation that will not be able to be calculate at the end of the litigation and disgorge from Ironclad's profits.  *Id*.  Appendix p. 23.

Second, and more urgent, if Ironclad is allowed to continue soliciting ORR Safety's confidential distributor network to purchase KONG or KONG Vibram Counterfeit, or is allowed to continue to advertise KONG and the KONG Vibram Counterfeit together, it will not only permanently alienate ORR Safety's customer base, but it will also permanently dilute the very brand that ORR Safety has developed – KONG.  *See* Declaration of Mark Wiktorski ¶ 10, Appendix pp. 6-7.  Even if ORR Safety ultimately wins on all claims, and it is confident it will, if Ironclad is allowed to continue, ORR Safety will be permanently cut out of the market that it has developed, will be left with no distributor network to sell KONG, and the KONG brand will be permanently cannibalized by the KONG Vibram Counterfeit.  *Id.* An injunction is crucial to the KONG brand.

**B.  Damages cannot be calculated when determining exploitation of client base.**

Second, the Fifth Circuit has stated that damages are incalculable when determining the exploitation of clientele. *Merrill Lynch, Pierce, Fenner & Smith*, 658 F.2d 1098, 1102 n. 8 (5th Cir.1981).  Here, Ironclad is attempting to exploit for its own gain the customer base that ORR Safety has spent years developing.  ORR Safety has spent significant financial resources into the KONG brand and distributor network.  Ironclad is attempting to usurp that goodwill and reputation as its own.  "In a situation where trade secrets and goodwill are involved, the threat is

significant that the harm experienced by the misappropriation or misuse of trade secrets will be irreparable...." *Am. Express Fin. Advisors, Inc. v. Scott*, 955 F. Supp. 688, 693 (N.D.Tex.1996). The continued exploitation of ORR Safety's confidential distributor network causes irreparable harm to ORR Safety and KONG.

### C.  Likelihood of confusion constitutes irreparable harm.

As to the confusion caused by the Distributor Letter's trade dress infringement, unfair competition, and market dilution, a substantial likelihood of confusion constitutes irreparable injury in a trademark case.  *See Urgent Gear, Inc. v. Savoia*, 3:01-CV-2190-D, 2001 WL 1577395, at *4 (N.D. Tex. Dec. 10, 2001) (Fitzwater, J.) (internal citations omitted); *see also Joy Mfg. Co. v. CGM Valve & Gauge Co.*, 730 F. Supp. 1387, 1394 (S.D.Tex.1989) ("When a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm, regardless of the actual quality of the defendant's goods.").  Therefore, because ORR Safety has shown that confusion will be caused by Ironclad to continue to advertise the KONG Vibram Counterfeit together with the KONG glove to ORR Safety's distributor network, irreparable harm has also been proven.

### D.  Ironclad's questionable financial position makes it unlikely that ORR Safety will be able to collect upon any judgment even if it could quantify damages.

Based on Ironclad's tenuous financial position, ORR Safety is not confident it will be able to collect upon any judgment for damages even if ORR Safety was able to calculate all of them.  The mere fact that economic damages may be available does not always mean that a remedy at law is "adequate." For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions. *See, e.g., Lee v. Bickell*, 292 U.S. 415, 421, 54 S.Ct. 727, 78 L.Ed. 1337 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient ... to uphold the remedy by

injunction"). Courts have also determined that if a meaningful decision on the merits would be impossible without an injunction, the district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy. See *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686–87 (5th Cir.1980) ("[E]ven were [plaintiff's] remedy limited to damages, an injunction may issue to protect that remedy."). Even when the ultimate relief sought is money damages, "extraordinary circumstances"-such as evidence showing that the defendant is likely to become insolvent before final judgment or that the defendant intends to dissipate his assets to make a judgment awarding damages uncollectible-"may give rise to the irreparable harm required for a preliminary injunction." *See Amegy Bank Nat. Ass'n v. Monarch Flight II, LLC*, 2011 WL 6091807, at *6 (S.D. Tex. Dec. 7, 2011)

Throughout the course of our relationship, Ironclad has not maintained a healthy financial condition; this is detailed in ORR Safety's Counterclaim. *See* Declaration of Mark Wiktorski ¶ 21, Appendix p. 23. Ironclad is unlikely to improve its financial performance. *Id.* Appendix p. 23. Due to Ironclad's investment in the KONG Vibram Counterfeit along several other Ironclad-branded glove products (which will require a significant cash outlay and inventory position), its lack-luster sales (the loss of ORR Safety as a customer and the economic down-turn in the industrial segment), and its borrowing rate, it is ORR Safety's belief that Ironclad is overleveraged and unlikely to be able to satisfy any judgment that could be entered against it in this lawsuit. *Id.* Appendix p. 23.

Therefore, in light of the utilization of the distributor network and other highly confidential information, as well as Ironclad's likely inability to pay for damages at the conclusion of the litigation, the Court should find that ORR Safety has met the burden of proving irreparable injury.

41

### III.   INJUNCTIVE RELIEF WILL NOT CAUSE SUBSTANTIAL HARM TO OTHERS.

Because the court would be granting an injunction that enforces the terms of the parties' Agreements, namely the confidentiality provision, it is not imposing a hardship on Ironclad that exceeds the terms to which it has already agreed. *See Johnson Service Group, Inc. v. Olivia France*, 763 F. Supp. 2d 819, 831 (N.D. Tex. 2011).  In contrast, there is a substantial threat that ORR Safety will suffer irreparable injury if the court does not grant an injunction. As explained above, Ironclad's actions could permanently harm ORR Safety's distributor network relationships, as well as the dilute the KONG brand.  Furthermore, any harm to Ironclad does not outweigh the losses ORR Safety will incur in lost customer goodwill, trade secrets, and lost business if the injunction is not granted.  *See Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Wright*, No. Civ.A.3:93CV01101–D, 1993 WL 13036199, at *5 (N.D. Tex. July 2, 1993) (Fitzwater, J).  Finally, an injunction will prevent Ironclad from using ORR Safety's distributor network to compete unfairly but will not prevent them from competing by lawful means without using the same.  *See Lason Services, Inc. v. Rathe*, CIV.A.3:02CV2110-D, 2003 WL 21728184, at *7 (N.D. Tex. Mar. 14, 2003) (Fitzwater, J).  Therefore, the balance of the hardships weighs in favor of injunctive relief.

### IV.   PUBLIC INTEREST WILL BE SERVED BY INJUNCTIVE RELIEF.

Finally, granting injunctive relief will not disserve the public interest because "it is in the public interest to uphold contracts and to enforce a remedy to which the parties have expressly agreed[.]" *AmeriSpec, Inc. v. Metro Inspection Servs., Inc*., 2001 WL 770999, at *6 (N.D. Tex. July 3, 2001) (Fitzwater, J.) (citing Tex. Bus. & Comm. Code Ann. § 15.51(a)).  Further, the public interest calculus is subsumed within the merits of the trade dress infringement claim: because ORR Safety is entitled to trade dress protection, it necessarily follows that the

preliminary injunction serves the public interest.  *See Sunbeam Products, Inc. v. West Bend Co.,* 123 F.3d 246, 260 (5th Cir. 1997).

## CONCLUSION

ORR Safety clearly meets all of the prerequisites to entitle it to a temporary restraining order and preliminary injunction prevention Ironclad from soliciting its confidential distributor network information and confusingly (and tortiously) advertising the KONG gloves together with the KONG Vibram Counterfeit.

Respectfully submitted,

 s/ Jennifer Metzger Stinnett
Benjamin C. Fultz (admitted *pro hac vice*)
Jennifer Metzger Stinnett (admitted *pro hac vice*)
FULTZ MADDOX DICKENS PLC
2700 National City Tower
Louisville, Kentucky 40202
Telephone: (502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmdlegal.com
jstinnett@fmdlegal.com

-and-

Gregory M. Sudbury
Texas Bar No. 24033367
Rachel Lee Hytken
Texas Bar No. 24072163
QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Main)
(214) 871-2111 (Fax)
gsudbury@qslwm.com

*Counsel for Defendant and Counterclaim Plaintiff ORR Safety Corporation*

**CERTIFICATE OF SERVICE**

On February 23, 2016 I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ Jennifer Metzger Stinnett
Counsel for Defendant and Counterclaim Plaintiff
