**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **IRONCLAD PERFORMANCE WEAR CORPORATION,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 3:15-cv-03453-D** |
| **ORR SAFETY CORPORATION,** | |
| **Defendant** | |

---

**ORR SAFETY CORPORATION'S BRIEF IN SUPPORT OF MOTION FOR SANCTIONS**

---

## I.  TABLE OF CONTENTS

**TABLE OF CONTENTS**……………………………………………………………..2

**TABLE OF AUTHORITIES**…………………………………………………3-4

**I. INTRODUCTION**……………………………………………………………5

**II.      FACTUAL BACKGROUND**…………………………………………....10

          **A.      The Protective Order**…………………………………………...10

          **B.      Ironclad Requests and ORR Produces Highly Confidential Sales   Information**……………………………………………...10

          **C.      Ironclad Acknowledged The Sales Data Was Designated AEO**……………………………………………………………...12

          **D.      Ironclad Proceeds to Disclose AEO Information In Violation Of The Order**……………………………………………………....13

          **E.      Ironclad's Delayed Acknowlegement To Its Violation Of The Order**…………………………………………………14

**III.     LEGAL STANDARD**……………………………………………………...19

**IV.      ARGUMENT**…………………………………………………………...21

          **A.      The Court Should Dismiss Ironclad's Claims Relating To A Breach of Section 2.1**…………………………………………....21

          **B.      Alternatively, Many Other Sanctions Are Appropriate**……...26

          **C.      ORR Is Entitled To Its Fees And Costs Related To Ironclad's Violation**……………………………………………………31

**V.      CONCLUSION**…………………………………………………………32

**CERTIFICATE OF SERVICE**……………………………………………..33

## II. TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Allergan, Inc. v. Sandoz Inc.*
    No. 2:09-CV-182, 2011 WL 2563238, at *1 (E.D. Tex. June 28, 2011)…….19, 22, 26, 27

*Am. Nat'l Bank & Trust Co. ex rel. Emerald *601 Invs. LP v. AXA Client Solutions, LLC*
    2002 WL 1067696 (N.D.Ill. May 28, 2002), *aff'd,* 2002 WL 1838144
    (N.D.Ill. Aug. 12, 2002)…………………………………………………………….20

*Batson v. Neal Spelce Assocs.*
    765 F.2d 511, 514 (5th Cir.1985)…………………………………………………..22

*Boland Marine & Mfg. Co. v. Rihner*
    41 F.3d 997, 1005 (5th Cir.1995)…………………………………………………..21

*Chambers v. NASCO, Inc.*
    501 U.S. 32, 43–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)………………………..20, 21

*Chilcutt v. United States*
    4 F.3d 1313, 1323 n. 23 (5th Cir.1993)…………………………………………...19, 20

*D'Onofrio v. SFX Sports Grp., Inc.*
    256 F.R.D. 277, 280 (D.D.C. 2009)……………………………………………...24

*Falstaff Brewing Corp. v. Miller Brewing Co.*
    702 F.2d 770, 784 (9th Cir.1983)…………………………………………………..20

*Lewis v. Wal–Mart Stores, Inc.*
    2006 WL 1892583, *3 (N.D.Okla. July 10, 2006)………………………………….20

*Life Technologies Corp. v. Biosearch Techs., Inc.*
    No. C-12-00852 WHA JCS, 2012 WL 1600393, at *1 (N.D. Cal. May 7, 2012)…...27, 31

*Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*
    86 F.3d 464, 467 (5th Cir.1996)…………………………………………………….20

*Orthoflex, Inc. v. ThermoTek, Inc.*
    No. 3:10-CV-2618-D, 2015 WL 4486756 (N.D. Tex. July 23, 2015)…………………..27

*Pressey v. Patterson*
    898 F.2d 1018, 1021 (5th Cir.1990)………………………………………………..19

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*
    685 F.3d 486, 488-89 (5th Cir. 2012)…………………………………………....19

*Systemic Formulas, Inc. v. Kim*
No. 1:07-CV-159 TC, 2011 WL 9509 (D. Utah Jan. 3, 2011)…………………………..31

*Talkington v. City of Fort Worth*
No. 4:12-CV-585-A, 2013 WL 6065442 (N.D. Tex. Nov. 15, 2013)…………………...22

*Thermotek, Inc. v. Orthoflex, Inc.*
No. 3:11-CV-870-D, 2015 WL 4486756 (N.D. Tex. July 23, 2015)……………………31

*Toon v. Wackenhut Corrections Corp.*
250 F.3d 950, 952 (5th Cir.2001)……………………………………………………..20

*Trenado v. Cooper Tire & Rubber Co.*
274 F.R.D. 598, 600 (S.D. Tex. 2011)…………………………………………....…20

*U.S. ex rel. Johnson v. Golden Gate Nat. Sr. Care, L.L.C.*
No. CIV. 08-1194 DWF/JJK, 2013 WL 1182905 (D. Minn. Mar. 21, 2013)………..23, 24

*United States v. Lewis*
174 F.3d 881, 885 (7th Cir.1999)……………………………………………………..24

## Rules and Statutes

Fed. R. Civ. P. 37……………………………………………………………10, 19, 20, 31

## I.   __INTRODUCTION__

Over a month ago, Plaintiff/Counter-Defendant Ironclad Performance Wear Corporation ("Ironclad") admittedly violated the Court's January 6, 2016 Agreed Protective Order (the "Order") (DN-25) by improperly disclosing to its chief officers Defendant/Counter-Plaintiff ORR Safety Corporation's ("ORR's") highly confidential sales and pricing information that had been designated Attorneys' Eyes Only ("AEO").   The confidential information provided included, for every glove sold by ORR over the course of eight years, the amount sold, the price paid, and the customer that bought them.   Since then, ORR has attempted to resolve the dispute without asking the Court for sanctions.   ORR agreed to take Ironclad at its word – that it was working toward a resolution on this very sensitive issue.   For the past week, however, Ironclad ignored ORR's attempts to bring the issue to a head; Ironclad dismissed requests for meet and confers about materials Ironclad promised to produce weeks ago and failed to respond to ORR's very reasonable request for attorneys' fees related to Ironclad's violation.   It is now patently clear why.

Instead of addressing its serious violation of the Order in good faith, Ironclad was frantically working to quickly file a premature motion for partial summary judgment using the *very same AEO information it improperly disclosed*.   More than half of the motion for summary judgment contains the AEO information that ORR believes, due to Ironclad's violation, should be struck from the case in the entirety.   In fact, as is made clear by the timing of the email dialogue below, Ironclad rushed to file the motion for summary judgment once ORR made clear that it was going to file the motion regarding the AEO because of Ironclad's continued lack of response:

> *We have many outstanding issues that we have attempted to resolve over*
> *the last several weeks.   As of today, despite repeated requests for*

*responses, I have not heard from Ironclad on (1) payment of the AEO attorneys' fees and the other outstanding items requested in this regard and (2) my June 24, 2016 letter detailing the remaining privilege issues. If we do not hear from you and reach an acceptable resolution, we are going to file the appropriate motions.  We have more than adequately met and conferred and/or tried to meet and confer on these issues.*

- **Correspondence from J. Stinnett to M. Sherman and the rest of Ironclad's Legal Team, Monday, July 11, 2016 at 7:04 PM. Appendix p. 161.**

*Daniel [Charest, co-counsel for Ironclad with Mr. Sherman] is handling AEO issues, and I understand he will be responding substantively, either later today or tomorrow.*

- **Correspondence from M. Sherman to J. Stinnett, Tuesday, July 12, 2016 at 1:48 PM. Appendix p. 160.**

*[W]e will wait to hear from Daniel tomorrow on AEO, but cannot wait any longer than that on whether or not fees will be paid.*

- **Correspondence from J. Stinnett to M. Sherman, Tuesday, July 12, 2016 at 9:14 PM. Appendix p.159.**

*Docket Text 77: MOTION for Summary Judgment filed by Ironclad Performance Wear Corporation (Charest, Daniel)*

- **Filed on Tuesday, June 12, 2016 at 11:26 PM**

Plainly Ironclad *intentionally* filed the motion containing the improperly disclosed AEO information before this Court had time to rule on the appropriate sanction for the breach.  This blatant attempt at taking advantage of the Northern District of Texas's meet and confer requirements – which ORR's counsel has followed to the letter - is just the latest example of Ironclad and its counsel's pattern of bad faith and lack of respect for the Court's Order.  Enough is enough.

Pursuant to the Order and Rule 37(b) of the Federal Rules of Civil Procedure, ORR moves this Court for sanctions against Ironclad based on Ironclad's improper disclosure of ORR's highly confidential sales and pricing information.  Ironclad's counsel admittedly provided

to Ironclad employees – including its Chief Executive Officer, Jeff Cordes, and its Chief Financial Officer, William Aisenberg - information that ORR had designated as AEO pursuant to the Order.  This was a direct and per se violation of the Court's Order, which specifically stated that AEO information exchanged during discovery could not be disclosed to the other party's employees.

A further indicator of bad faith is the manner in which Ironclad and its attorneys have dealt with their violation of the Order.  Ironclad's employees were in possession of the AEO material for over two days before they deleted some of the information,[1] and Ironclad's counsel failed to even notify ORR of this violation until a week after it first improperly distributed the highly confidential information.  Moreover, while Ironclad's counsel knew they had violated the Order but had not informed ORR about the violation, Ironclad's counsel were simultaneously attempting to negotiate with ORR to remove the AEO designation from that very material.  The only conclusion is that Ironclad's attempt to remove the AEO designation was a surreptitious effort by Ironclad to avoid ever having to acknowledge its improper disclosure and sanctionable conduct.  Only when ORR's counsel made it clear that they would not change the AEO designation of their client's most competitively sensitive information and so as to effectively hand it over to the very entity that has already done ORR great damage did Ironclad's counsel finally admit the breach.

As described below, the egregious behavior by Ironclad and its counsel is regrettably consistent with Ironclad's actions before and after the litigation was filed.  They stop at nothing in seeking an unfair competitive advantage over ORR, a company that brought Ironclad to the

---

[1] At this point ORR has no way of knowing or confirming that the entirety of the AEO information has been deleted or when it was deleted by Ironclad because Ironclad still has yet to provide ORR with detailed information about the disclosure.  More disconcerting, of course, is what happened with the AEO information before it was deleted by Ironclad.

proverbial table of the leaders in the petrochemical and offshore exploration industry.  Ironclad has already demonstrated its indifference to keeping confidential information that it contractually agreed to protect by misappropriating ORR's confidential distributor network in violation of the parties' Exclusive Distributorship Agreement, as amended.  *See* DN 35.  As the Court is aware, ORR previously filed a motion to enjoin Ironclad from using that confidential distributor network as soon as it knew that Ironclad was, in fact, marketing selling KONG and KONG Vibram Counterfeit gloves together and directly to the confidential customer base that ORR solely developed for KONG.  Unfortunately, it became obvious in the course of expedited discovery granted by this Court that ORR's fears were already realized.  Ironclad has already entered into sales relationships with ORR's largest international distributors to purchase KONG and/or KONG Vibram Counterfeit, while simultaneously devaluing and diluting the KONG brand by flooding the market with inventory.  Because the irreparable harm has been done, and there is no way to put the genie back in the bottle as it relates to ORR's confidential distributor network, temporary injunctive relief is moot and ORR has no choice but to seek relief in the form of damages.

But now, the information Ironclad's counsel has inappropriately disclosed to key Ironclad employees could have an effect far more catastrophic than even Ironclad's misappropriation of ORR's confidential distributor network of KONG gloves.  ORR fears Ironclad will again use ORR's confidential information to undermine ORR's entire glove sales (even beyond KONG and the petrochemical and offshore exploration market the KONG line serves) by using all of ORR's glove sales and pricing data over the course of years for all of its customers, including data as timely as from the past few months, to simply undercut ORR in the market.  Ironclad now knows what specific customers buy, how often they buy it over the course of years, how much of

8

it they buy, and how much they pay for it – for gloves in which Ironclad has a host of competitive and comparable items.  The only difference is that this time Ironclad is in violation of a Court Order, not "merely" in breach of the parties' contracts.[2]  Because of the potentially draconian adverse impact of the improper disclosure of this AEO information to ORR's direct competitor, and the bad faith delay and attempted cover-up of a violation that could have been quickly and easily remedied, ORR asks the Court to enter the most appropriately punitive and comprehensive sanctions against Ironclad allowable under Rule 37(b).

Finally, Ironclad has been less than forthcoming in providing complete information about the extent of its violation, how Ironclad's counsel allowed it to happen, and what Ironclad has done to attempt to remedy the violation.  ORR still is unaware of how much of its AEO Sales Data was reviewed by Ironclad or how long Mr. Cordes had access to the information before he supposedly deleted the information.  The only information ORR has obtained is what appears to be carefully worded email correspondence and declarations with many unanswered questions outstanding.[3]  Accordingly, an evidentiary hearing is likely necessary to understand the scope of the violation and the appropriate remedy.

---

[2] Ironclad and Mr. Cordes have made it clear on numerous occasions that they are "not big contract guys."  Appendix p. 68.  In fact, Mr. Cordes testified that he had not even reviewed the contracts with ORR before concluding that he could not "in good conscious allow [the Agreements with ORR] continue."  Appendix p. 47. Of course, Mr. Cordes made this drastic conclusion about Ironclad's key commercial partner only two months into his tenure at Ironclad.

[3] As discussed below, ORR requested detailed information regarding when the disclosure occurred, what was actually disclosed, what steps were taken to remedy the situation.  ORR has only received partially unredacted emails and some carefully worded declarations, and has yet to receive the promised forensic report.

## II.  FACTUAL BACKGROUND

### A.  The Protective Order.

In advance of producing any discovery in this case, the parties recognized that they each possessed relevant information containing highly confidential information that would cause significant economic harm if revealed to the opposing party's business people.  Accordingly, the parties negotiated a proposed protective order, pursuant to Rule 26, that would protect the parties when producing confidential information.  After negotiating the proposed order, the parties submitted the proposal to the Court, who subsequently entered the Order with a few modifications. (*See* Order, DN-25.)  The Order provides that a producing party may designate information as "Confidential Attorney Eyes Only" ("AEO") if it "is comprised of information the producing party deems especially sensitive, which may include, but is not limited to, confidential research and development, financial, technical, marketing, [or] any other sensitive trade secret information." (Order at 2.)  AEO information may be disclosed only to "(a) outside counsel for the receiving party; (b) supporting personnel employed by outside counsel, such as paralegals, legal secretaries, data entry clerks, legal clerks, private photocopying services; (c) experts or consultants; and (d) [any individual to whom counsel for the producing party agrees it may be disclosed]."  (*Id.* at 5-6.)  Paragraph 17 of the Order provides that the Order "will be enforced by the sanctions set forth in Fed. R. Civ. P. 37(b) and any other sanctions that may be available to the presiding judge, including the power to hold parties or other violators of this Protective Order in contempt."  (*Id.* at 8-9.)

### B.  Ironclad Requests and ORR Produces Highly Confidential Sales Information.

On April 18, 2016, Ironclad requested sales data relating to seven (7) gloves, six (6) of which Ironclad had identified in its Complaint as connected with ORR's alleged breaches of

Section 2.1 of the Distributorship Agreement.  Appendix pp. 87-88.  ORR produced the data as an Excel spreadsheet, and named the file ORR00000318_CONFIDENTIAL ATTORNEY EYES ONLY.xlsx.  The document contained information ORR considered extremely sensitive as it indicated the precise price it sold each particular glove and identified the customer to whom the glove was sold.  On April 19, 2016, Ironclad requested additional sales data in their Second Set of Expedited Discovery Requests Nos. 3-15.  *See, .e.g.*, Request No. 13, Appendix pp. 93-94. ORR responded and produced a complete list of all of ORR's gloves' sales data from 2009 through present, which was split into two spreadsheets due to the large amount of data.  Again, ORR, pursuant to the Order, designated the information AEO, and named the files ORR0000850 – 0000851_CONFIDENTIAL ATTORNEY EYES ONLY.xlsx (collectively, with ORR00000318_CONFIDENTIAL ATTORNEY EYES ONLY.xlsx, the "AEO Sales Data").

The AEO Sales Data is critically and necessarily confidential, so as to protect ORR's ability to compete in the marketplace.  Disclosure of the AEO Sales Data would allow Ironclad (or any other competitor) to undercut ORR's pricing for a specific customer for a specific product.  This information is the core of ORR's hand protection safety business, and Ironclad, a struggling hand protection manufacturer new to the direct distribution market would find the information extremely valuable. Moreover, the AEO Sales Data would allow Ironclad (or any other competitor) to see changes in pricing over time for each customer, the quantities each customer has purchased of a type of glove, all of which would allow Ironclad to make various pricing decisions that would damage ORR's ability to compete against Ironclad for that same customer.   This disseminated AEO information would be particularly damaging to ORR given Ironclad's decision to flood the market with confusingly similar, but inferior, products at substantially reduced prices, all in violation of Ironclad's contractual obligations.

**C.  Ironclad Acknowledged The Sales Data Was Designated AEO.**

After ORR produced the AEO Sales Data, Ironclad requested that ORR de-designate the AEO Sales Data as Confidential, so that Ironclad's counsel could share the information with Ironclad's employees. Appendix p. 45.  ORR explained that the information was highly sensitive and refused to allow Ironclad to disclose portions of the AEO Sales Data to anybody other than outside legal counsel.

Shortly after ORR produced the AEO Sales Data, Ironclad took the deposition of ORR's corporate representative.  Ironclad's CEO, Jeff Cordes, attended the deposition as an observer. During certain portions of the deposition, Ironclad's attorney asked ORR's corporate representative about information ORR considered AEO, including the AEO Sales Data. Appendix pp. 99-105, Ironclad's counsel not only objected but claimed he would ask the Court to remove the designation.  Appendix p. 105.  Nevertheless, Mr. Cordes left the deposition during those lines of questions, fully aware of ORR's position regarding the confidentiality of the AEO Sales Data.  Appendix p. 101.  In fact, ORR's counsel explained in detail the basis for ORR's position that the AEO Sales Data was highly sensitive and why it should be designated AEO:

> MR. FULTZ:  First of all, I'd like to note Mr. Sherman has asked me for 850, 851, and 318 Bates numbers.  And he believes that Mr. Cordes should be available under the protective order that would put my client at a competitive disadvantage that items that were sold to customers on certain dates and certain models and certain prices would put us as a competitive disadvantage. That's why it needs to be attorneys' eyes only.

> Appendix p. 101.

After the deposition, ORR agreed to designate certain information, such as the glove model description and model number as Confidential, allowing Ironclad's employees to see some of the information but keeping the most sensitive information – the collective AEO Sales

Data - as AEO.  Appendix pp. 145-146.  Ironclad, however, continued to demand – even after the

AEO Sales Data was disclosed and before informing ORR of the improper disclosure – that ORR

de-designate all of the information, as discussed below.

**D.  Ironclad Proceeds to Disclose AEO Information In Violation of the Order.**

On June 1, 2016, at 5:49 PM (CDT) Ironclad counsel Daniel Charest emailed to

Ironclad's co-counsel, as well as Ironclad's CEO, Jeffrey Cordes, and Ironclad's CFO, William

Aisenberg, a summary outline (the "AEO Summary Outline")[4] relating to this case that contained

AEO information.[5]  Appendix pp. 49-63.  The AEO Summary Outline contained highly sensitive

information about ORR's glove sales, including dates of sales, total sales, pricing information,

and the names of ORR's customers to whom the gloves were sold, *i.e.*, it summarized the most

pertinent and competitively damaging information contained in the AEO Sales Data in a concise

and easy to read format.  Appendix pp. 54-61.  In fact, the AEO Summary Outline specifically

states that the source of this information was from the AEO Sales Data.  Appendix p. 55

("ORR0000850 – [sales data]").  Moreover, the subject matter of the AEO Summary Outline

appears to be somehow related to the very fact that the sales data was designated AEO.

Less than an hour after disregarding the AEO designation and disclosing ORR's AEO

information to Ironclad employees, at 6:34 PM (CDT), Mr. Charest sent Messrs. Cordes and

---

[4]  Ironclad designated this document as Attorney Eyes Only; however, it appears to contain only *ORR's* confidential information.

[5]  Much of the cover email and the AEO Summary Outline were redacted, and thus ORR is unable to confirm the context or extent of the disclosure.  ORR therefore requests the Court either order a complete disclosure – without waiving Ironclad's privilege – or conduct an *in camera* review of the material to confirm the scope of the disclosure is limited and confirm the context of the disclosure. Indeed, if, for example, the AEO Summary Outline was for a possible motion to ask the Court to de-designate the AEO Sales Data, that would certainly suggest Ironclad and its counsel intentionally ignored the designation, as it would be impossible to describe the arguments *without* disclosing the underlying AEO Sales Data.

Aisenberg, as well as Ironclad's outside counsel[6] an email with a link to a site where the recipient could download the documents supporting the statements in the AEO Summary Outline containing the AEO Sales Data.  Appendix pp. 2-3.  Among the many documents available for download were the AEO Sales Data, the deposition transcript of ORR's corporate representative (which contained AEO Sales Data information), and two additional summaries of the AEO Sales Data (collectively, with the AEO Summary Outline sent at 5:49 PM (CDT), the "Disclosed AEO Information").   Appendix p. 1. The list of the documents compiled by Ironclad's counsel explicitly indicated that the documents contained AEO information.  *Id.*  On June 1, 2016, at 10:02 PM (CDT ), Mr. Cordes downloaded the files from the website hosting the files.[7] Appendix pp. 4, 34, 147.  The Disclosed AEO Information was now on Ironclad's servers, in Ironclad's email boxes, and on Ironclad's mobile devices.

### E.  Ironclad's Delayed Acknowledgment its Violation of the Order.

After having the Disclosed AEO Information for the entire day, Mr. Cordes purportedly informed Mr. Aisenberg via telephone that he thought Ironclad's counsel may have circulated AEO information.   This conversation, like much of Ironclad's story, is uncorroborated or explained in any detail, by any evidence other than carefully worded declarations and self-serving emails from Ironclad's counsel.   Mr. Cordes, however, did not personally contact his counsel.  Nor did Mr. Cordes – who was well aware, given his experience in the deposition, that he was prohibited from reviewing ORR's AEO information – delete the summary or any of the Disclosed AEO Information at that point.  Appendix 147-149.

---

[6] *See supra* n. 3.

[7] Curiously, Mr. Sherman, who claims to have handled the investigation, fails to even acknowledge that Mr. Cordes downloaded the AEO materials.  Appendix pp. 107-108.

The following day, Mr. Aisenberg purportedly contacted Mr. Sherman to inform him that Ironclad's counsel had provided the Disclosed AEO Information.   Appendix p. 44.[8]   Mr. Sherman subsequently instructed Messrs. Cordes and Aisenberg, via an email at 11:04 AM (CDT) on June 8, to delete the files containing the AEO Sales Data that were provided via a link in the June 1 email of 6:35 PM (CDT), without instructing his client to delete, remove, or refrain from reviewing the AEO information contained in the summary sent in the earlier email. Appendix p. 5.  Mr. Sherman also asked Messrs. Cordes and Aisenberg to "please confirm that you have not in any manner forwarded the materials to anyone, or printed them to hard copy." (*Id.*)  Mr. Aisenberg provided an almost immediate response, stating at 11:27 AM (CDT) that he has not "followed the link to the information in the email in question, nor have forwarded or printed any of the materials," Appendix p. 6.[9]

Mr. Cordes, however, did not respond.  Instead, Mr. Sherman, had to follow up two days later, on Sunday June 5, to "get some confirmation" that everything was deleted.  Appendix p. 12. Mr. Cordes finally confirmed Monday morning, June 6, at 3:51 AM (PDT) – *five* days after the initial disclosure, and *three* days after Mr. Sherman requested a response about the Disclosed AEO Information – that he "deleted and no related email traffic or data saved or sent," Appendix p. 12.  Again, Mr. Cordes provides no information regarding when the information

---

[8]  Ironclad again failed to provide any evidence to support this story.  The only contemporaneous evidence, the 11:04 AM (CDT) email from Mr. Sherman, does not provide any specifics, only stating "It has been brought to my attention".  Appendix p. 5.  Again, Ironclad's repeated vague and unspecified documentation strongly suggests Ironclad is playing games with what it is and is not revealing about its arrant violation of the Order.

[9] Mr. Aisenberg did not say whether he deleted the email containing the link or any other related materials.  Mr. Sherman waited two days before asking Mr. Aisenberg to confirm it was deleted. Appendix p. 9.  Mr. Aisenberg confirmed that he deleted everything related to the link; however, he did not say when he deleted the information contained therein.  *Id.*

was deleted, whether and when Mr. Cordes accessed the Disclosed AEO Information, or what portion of the Disclosed AEO Information Mr. Cordes reviewed.  Appendix 147-149.[10]

On June 7, six days after disclosing AEO Information in the AEO Summary Outline, Mr. Sherman "just realized that the [redacted] that Daniel sent to [Mr. Cordes and Mr. Aisenberg] on June 1 **with the outline as an attachment** also compromises our position under the Protective Order,"  Appendix p. 15.  Mr. Sherman acknowledged that up to that point he had only addressed the violation of the Order "as respects the 'link' to evidence that … Dan [Charest] had forwarded" and not the AEO Summary Outline.  (*Id.*)  Later that day, Mr. Cordes confirmed "the email has been deleted. To be clear I did not any time read or review the email."  Appendix p. 17.  Mr. Cordes, however, never confirmed that he did not read the AEO Summary Outline.  Mr. Aisenberg confirmed that he had not printed the AEO Summary Outline and removed the materials; however, Mr. Aisenberg, too, did not confirm that he never accessed or read the AEO Summary Outline.  Appendix p. 20. Accordingly, ORR has no assurance that Ironclad did not review the AEO Summary Outline, which in fact, is a clearer and more direct way of understanding the AEO Sales Data.   Indeed, the AEO Summary Outline highlights several specific gloves, each of the customers who purchased each of those gloves, when they bought those gloves, and the prices the customer paid during that time.  Appendix pp. 49-63.

Finally, at 9:26 AM (CDT) on Wednesday, June 8, Ironclad informed ORR about Ironclad's violation of the Order.  Appendix p. 22.  Ironclad neither explained why Ironclad waited so long to inform ORR nor did Ironclad's counsel reveal that they had waited five days

---

[10] And suffice to say, ORR has more than good reason to believe that Mr. Cordes and Mr. Aisenberg would use this information despite knowing that they were not supposed to per the Order.  The best predictor of future behavior is past behavior.  *See Williamson-Dickie Holding Company, et al. v. Jeffrey D. Cordes, et al.*, Dallas County District Court No. DC-14-08309.  The Complaint in that action alleges "widespread fraudulent practices" against Mr. Cordes and Mr. Aisenberg at their previous employer.

16

before realizing they needed to instruct their client to ignore the summary. The parties then held

a telephone conference during which ORR asked many of these same questions. During the call,

Ironclad's counsel again failed to explain why he chose not to inform ORR of the violation while

at the same time demanding to meet and confer about removing the AEO designation from those

documents. Instead, Ironclad requested that ORR provide a list of all the information ORR

would need to evaluate the appropriate remedy and the extent of the violation. Appendix pp. 23-

25.

       After Ironclad counsel responded vaguely but did not confirm it would provide all of the

requested information, ORR again requested confirmation. Appendix pp. 37, 40. On June 9,

Ironclad purportedly agreed to provide all such information. Ironclad provided a handful of

emails and the four requested (albeit bare-boned) declarations. After ORR reviewed the

documentation, it noted numerous vague assertions which raised additional questions, including

why Mr. Sherman failed to indicate whether he had actually spoken to Mr. Cordes regarding the

extent he has viewed the Disclosed AEO Information. The documentation fails to identify when

Mr. Cordes *actually deleted* the information. In response, ORR met and conferred with Ironclad

in a final effort to avoid filing this Motion. During that meet and confer, Ironclad indicated it

would consider reimbursing ORR for the fees incurred and provide additional information

requested. On June 30, ORR provided a list of additional information from Ironclad, as well as

the fees Ironclad incurred in addressing Ironclad's violation. (Appendix p. 151) Ironclad

responded by asking for detailed information about ORR's fees, which ORR subsequently

provided, but failing to agree to produce the other information. (Appendix p. 154.) A week

after requesting the additional information and receiving no response, ORR again asked for the

information but received no substantive response. (Appendix p. 153.)

Instead, Ironclad apparently focused its attention on hurriedly filing a motion for partial summary judgment in the middle of the night based on the very AEO information it had disclosed.  (*See* DN 77-82.)  In fact, ORR's AEO information that was improperly disclosed is the entire basis for Ironclad's motion for summary judgment.  Ironclad argues – in a motion replete with questions of material fact – that ORR sold gloves in violation of Section 2.1 of the parties' Agreements.  In fact, over half the brief is presumably the exact same summary of AEO information that Ironclad's counsel disclosed to its clients without ever thinking it was problematic under the Order.  Given the lack of any impending deadline for the motion and the timing of the filing, the *only* conclusion is that Ironclad had no intention of ever providing the additional information or paying ORR's fees.  Instead, it wanted to delay the meet and confer process on the AEO just long enough for it to file its motion containing the very AEO information at issue.  Indeed, the following day, Ironclad responded by agreeing to provide some, but not all, of the requested information, and only agreeing to pay a fraction of the costs ORR incurred in responding to the violation.

Moreover, despite agreeing to engage an electronic forensic consultant to delete and provide information about electronic versions of the Disclosed AEO Information, the consultant was not scheduled to begin the work until Wednesday, June 15, and no report has been provided. Of course, had Ironclad promptly informed ORR of the improper disclosure, the process would have begun well before then and ORR could have been reasonably certain by now that the Disclosed AEO Information was purged completely from all of Ironclad's systems and electronic devices.  Ironclad has made it clear to ORR that it would not agree to fully disclose the summary of the AEO Sales Data, and instead provided a highly redacted versions of the same. Furthermore, Ironclad has made it clear that it will not agree to any punitive remedy for its

behavior – including the most basic sanction that is given in situations routinely when a disclosure was truly inadvertent and bad faith does not exist – ORR's attorneys' fees and costs in dealing with the breach.

## III.  LEGAL STANDARD

Fed.R.Civ.P. 37(b) empowers the courts to impose sanctions for failures to obey discovery orders. In addition to a broad range of sanctions, including contempt, Fed.R.Civ.P. 37(b)(2) authorizes the court to impose a concurrent sanction of reasonable expenses, including attorney's fees, caused by the failure to obey a discovery order.   "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" Allergan, Inc. v. Sandoz Inc., No. 2:09-CV-182, 2011 WL 2563238, at *1 (E.D. Tex. June 28, 2011) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763-64 (1980)).

The district court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Pressey v. Patterson,* 898 F.2d 1018, 1021 (5th Cir. 1990). This discretion, however, is limited. "[U]sually,… a finding of bad faith or willful misconduct [is required] to support the severest remedies under Rule 37(b)—striking pleadings or dismissal of a case." *Id.* at 1021. Lesser sanctions do not require a finding of willfulness. *See Chilcutt v. United States,* 4 F.3d 1313, 1323 n. 23 (5th Cir.1993) (stating that district courts "have authority to grant a broad spectrum of sanctions" under Rule 37(b), and neither the Fifth Circuit nor the Supreme Court has ever determined that the lack of willful, contumacious, or prolonged misconduct prohibits all sanctions). *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co*., 685 F.3d 486, 488-89 (5th Cir. 2012).   Awarding monetary sanctions, and attorney's fees and expenses is viewed by the Fifth

19

Circuit as one of the least severe remedies afforded by Rule 37(b). *See Chilcutt,* 4 F.3d at 1320 n.

17; *see also Trenado v. Cooper Tire & Rubber Co.*, 274 F.R.D. 598, 600 (S.D. Tex. 2011)

Many courts have concluded that attorney's fees and costs, as well as other appropriate

sanctions, should be awarded, at a minimum, under Rule 37(b)(2) for a violation of a protective

order irrespective of motive or bad faith. *See, e.g., Falstaff Brewing Corp. v. Miller Brewing Co.,*

702 F.2d 770, 784 (9th Cir.1983) (awarding attorney's fees and costs pursuant to Rule 37(b)(2)

for a violation of a protective order); *Am. Nat'l Bank & Trust Co. ex rel. Emerald *601 Invs. LP*

*v. AXA Client Solutions, LLC,* 2002 WL 1067696, *5, *7 (N.D.Ill. May 28, 2002) (same), *aff'd,*

2002 WL 1838144, *6 (N.D.Ill. Aug. 12, 2002); *see also Lewis v. Wal–Mart Stores, Inc.,* 2006

WL 1892583, *3 (N.D.Okla. July 10, 2006) (same); *Trenado v. Cooper Tire & Rubber Co.*, 274

F.R.D. 598, 600-01 (S.D. Tex. 2011).  Indeed, under Fed. R. Civ. 37(b) the Court "must" award

reasonable expenses, including attorney's fees, incurred as a result of the violation, "unless the

noncompliance was substantially justified or other circumstances make an award of expenses

unjust." *Id.*

Finally, separate from its authority under Rule 37, this Court may also issue sanctions

under its inherent power, but only upon a showing of bad faith. *See Chambers v. NASCO, Inc.,*

501 U.S. 32, 43–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Toon v. Wackenhut Corrections*

*Corp.,* 250 F.3d 950, 952 (5th Cir.2001) ("The court must make a specific finding of bad faith"

before issuing sanctions under its inherent powers.).  "The threshold for the use of the inherent

power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d

464, 467 (5th Cir.1996). A court's inherent power to sanction "may be exercised only if essential

to preserve the authority of the court," *id.*, and only when the court "finds that 'fraud has been

practiced upon it, or that the very temple of justice has been defiled,' " *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir.1995) (quoting Chambers, 501 U.S. at 46).

ORR has no choice but to believe Ironclad's actions involve bad faith based on the facts that: (1) Ironclad did not view the summary of the AEO Sales Data as a violation of the Order, (2) Ironclad and its counsel waited days to delete the Disclosed AEO Information and even longer to report the violation of the Order to ORR, (3) Ironclad's counsel asked for a meet and confer to de-designate the very AEO material they knew had been produced to their client yet at the same time failed to disclose the breach of the Order to ORR, and (4) Ironclad asked ORR to wait to review *any* additional information requested before ORR filed a motion for sanctions, yet never provided a single piece of subsequent information, instead focusing on a premature 49-page motion for summary judgment involving the very same AEO material.  Unfortunately, based on the limited – and carefully scripted – information ORR has received, the Court may determine an evidentiary hearing is necessary before making a finding of bad faith.  To the extent the Court orders an evidentiary hearing, ORR reserves its right to supplement this motion with any additional facts revealed at such a hearing.  But even if with a hearing, where Ironclad's CEO, CFO, and counsel of record would be providing sworn testimony, it is hard to conceive what the explanation could be for their actions in dealing with this blatant contempt of a Court order.

## IV.   ARGUMENT

### A.  The Court Should Dismiss Ironclad's Claims Relating To A Breach of Section 2.1.

Ironclad sought the AEO Sales Data as part of its claim that ORR breached Section 2.1 of the Distributorship Agreement by selling certain non-KONG gloves.  Ironclad's bad faith delay in recognizing the disclosure, attempting to hide the disclosure by de-designating the information

as AEO, and its inevitable use of the AEO Sales Data demands a remedy that would cure the prejudice resulting from Ironclad's conduct and deter such conduct in the future.

When considering dismissal of a claim pursuant to Rule 37, the court also considers additional aggravating factors such as whether the conduct is attributable directly to the plaintiff, rather than the attorney, and whether the violation was "grounded in confusion or sincere misunderstanding of the court's orders." *Batson v. Neal Spelce Assocs.*, 765 F.2d 511, 514 (5th Cir.1985); *Talkington v. City of Fort Worth*, No. 4:12-CV-585-A, 2013 WL 6065442, at *2 (N.D. Tex. Nov. 15, 2013). Here, the evidence uncovered thus far makes clear that Ironclad's willful violation of the Order is more than a "sincere misunderstanding." Rather, the ongoing delay in full disclosure of the events and Ironclad's attempt to de-designate the very documents it ***knew*** had already been disclosed demonstrates the need to penalize Ironclad and deter such conduct in the future. *Allergan*, 2011 WL 2563238, at *1-2.

First, Ironclad's decision to send the AEO Summary Outline that contained the AEO Sales Data was not grounded in confusion. Based on the internal correspondence, Ironclad only thought disclosing the AEO Sales Data and two other documents was problematic. *See, e.g.,* Appendix pp. 8, 15-16. Ironclad's counsel didn't even recognize there might be an issue with the AEO Summary Outline until *four days after* realizing the AEO Sales Data was improperly disclosed. None of the attorneys with responsibility claim to have had any "in-depth familiarity" with the AEO Summary Outline or the fact that it actually contained AEO Sales Data. For example, Mr. Charest, the named partner who sent out the email from his law firm address claims, "I neither created the Outline nor had an in-depth familiarity with its contents." Appendix p.110. Mr. Sherman abdicates all responsibility for reviewing what is sent to his client, never even claiming he read the AEO Summary Outline or the email containing the AEO

22

Summary Outline.  Appendix pp. 106-109.  In fact, according to Mr. Sherman, "the only infraction appears to have been an oversight by Mr. Charest," Appendix 109.  Not once does Mr. Sherman acknowledge his failure to protect ORR's AEO Sales Data or even review materials sent to his client.  Moreover, while he claims he and Mr. Cordes acted appropriately, he does not appear to have had *a single telephone conversation* with Mr. Cordes to identify the scope of the information Mr. Cordes viewed, when Mr. Cordes deleted the information, or even to confirm Mr. Cordes understood the instructions.  Appendix pp. 106-107.  Instead, Mr. Sherman identifies two short emails from Mr. Cordes as his "investigation" to satisfy his concern that Mr. Cordes acted appropriately.  Appendix pp. 106-109.

In fact, none of the declarations or emails provide any assurance that Ironclad counsel had previously refrained from any discussion about the summary or the legal strategy contained in the AEO Summary Outline, as required under the Order.  Moreover, given Ironclad's lack of understanding that the Order precludes using AEO information in summaries, ORR is rightfully concerned that Ironclad's counsel has circulated and may eventually circulate additional summaries containing other AEO information similar in nature to the AEO Summary Outline. Indeed, even to the extent Ironclad claims the disclosure was inadvertent, Ironclad has made no effort to explain why it was circulating a summary that was specifically about AEO information to Ironclad's employees.  *See U.S. ex rel. Johnson v. Golden Gate Nat. Sr. Care, L.L.C.,* No. CIV. 08-1194 DWF/JJK, 2013 WL 1182905, at *5 (D. Minn. Mar. 21, 2013) ("But because Defendants have made no effort to explain how that carelessness led to a violation of the Court's Order, the Court finds it difficult to take this excuse at face value.").

Second, Mr. Cordes received the Disclosed AEO Information on Wednesday, June 1 but failed to confirm that he had deleted the information for four days.  Mr. Cordes, however, was

particularly aware that he was not allowed to see the AEO Sales Data as he was repeatedly

instructed to leave the deposition during questioning on the exact same data.  Appendix pp. 99-

105. Mr. Cordes does not deny that he looked at the Disclosed AEO Information.  Appendix

147-149.[11]  Having looked at the Disclosed AEO Information, Mr. Cordes cannot unlearn this

highly sensitive information.  *See United States v. Lowis,* 174 F.3d 881, 885 (7th Cir.1999)

(noting the difficulties of "unringing the bell."); *See D'Onofrio v. SFX Sports Grp., Inc.,* 256

F.R.D. 277, 280 (D.D.C. 2009).  As one court recently noted:

> "When an opponent ignores its obligations in handling information it receives
> under a protective order, the producing party's confidence that its sensitive
> information will be safeguarded erodes. The Court's confidence that its orders
> will be followed erodes as well. That erosion of confidence changes the
> landscape of the discovery process for the producing party and the Court's
> expectations that litigation can be effectively managed, and there lies the harm."
> *U.S. ex rel. Johnson v. Golden Gate Nat. Sr. Care, L.L.C.*, 2013 WL 1182905, at *7.[12]

Third, Ironclad's counsel knowingly and deliberately concealed Ironclad's improper

disclosure for five days, while at the same time corresponding with ORR's counsel on other

matters, including a request to de-designate the AEO Sales Data.  Specifically, Ironclad's

---

[11] ORR is particularly concerned given the fact that despite asking for this information, Mr. Cordes provides little detailed assurances regarding what he reviewed and when he deleted the Disclosed AEO Information beyond stating he does not recall very much information and that at some point he deleted the Disclosed AEO Information that he downloaded. Appendix 147. Of course, had Ironclad actually conducted a thorough investigation, including talking to Mr. Cordes immediately after the disclosure, perhaps Mr. Sherman could have provided ORR with such assurances before Mr. Cordes "forgot" these critical facts.

[12] Indeed, at issue with this case is the fact Ironclad previously used ORR's confidential customer data to steal ORR's confidential distributor network for KONG. ORR moved to enjoin Ironclad from using that confidential information as quickly as possible. Unfortunately, in the course of expedited discovery it became obvious that the irreparable harm that could be cured by an injunction had already been done, as Ironclad successfully entered into sales relationships with several of ORR's customers. ORR's decision to forego injunctive relief is not based on a lack of evidence demonstrating misappropriation. Rather, ORR has learned that such relief is no longer viable because it was simply too late. ORR fears, absent Court sanctions, Ironclad will use the AEO Sales Data quickly, leading to additional economic damages. This Court is now the only hope ORR has from preventing Ironclad's use of the Disclosed AEO Information.

counsel learned of the improper disclosure no later than June 3 at 11:04 AM (CDT).  *See* Appendix p. 5.  Two hours later, Ironclad's counsel contacted ORR's counsel to discuss various other discovery items, without even mentioning that Ironclad had violated the Order,  Appendix pp. 35-36.  Later that day, Ironclad's counsel sent a lengthy letter to ORR's counsel on two different discovery issues *again* without mentioning its failure to comply with the Order.  Appendix pp. 28-31.  Ironclad's inexcusable decision to delay informing ORR only compounded Ironclad's other inexcusable oversight.  Had Ironclad promptly informed ORR of the improper disclosure as soon as Ironclad realized *any* violation had occurred, ORR would have been able to make sure Ironclad recognized that the AEO Summary Outline contained AEO information.  More egregiously, on Sunday, June 5, Ironclad had the audacity to request a telephone conference to discuss a meeting on Tuesday morning[13] to discuss Ironclad's request to de-designate documents ORR had marked AEO.  Appendix pp.32-33.  Ironclad's counsel explicitly noted Ironclad's intent "to seek an order de-designating certain documents marked by ORR as AEO (including the spreadsheets we had touched on during the ORR 30(b)(6))." (*Id.*)   Yet Ironclad once again failed to mention that it had already violated the very Order that ORR was relying on to protect that information.  There is simply no reason why Ironclad should have even suggested such a topic without disclosing its improper handling of the AEO Sales Data.  Such intentional concealment can only be considered bad faith.[14]

---

[13]  By proposing Tuesday morning, Ironclad was suggesting to hold a discussion on de-designating the AEO Sales Data a day before Ironclad's counsel eventually told ORR of its violation.  Similarly, Ironclad later delayed responding to any requests for additional information so it could file a motion for partial summary judgment.

[14] This intentional concealment is just one of many recent examples of Ironclad's failure to be fully forthcoming with ORR. For example, ORR has had to request multiple times, and Ironclad agreed, that Ironclad supplement its privilege logs because of incomplete, misleading, and improper descriptions.  Ironclad also concealed its decision to ignore an ESI Agreement by not even testing the agreed upon search terms on relevant custodians' data.  Given this pattern,

Based on Ironclad's improper motives and intentional actions, the appropriate sanction should be to strike the very claims which Ironclad was trying to support through these tactics. The Court should make clear that Ironclad's tactics should not be repeated.  By removing any claims relating to a purported Section 2.1, this Court will not only make certain that Ironclad no longer has any basis for accessing this data, but will deter Ironclad from such improper conduct in connection with any of its remaining claims and defenses.

Accordingly, the Court, either based on the above evidence or after hearing additional facts at an evidentiary hearing, strike all claims relating to ORR's purported breach of Section 2.1 of the Distributorship Agreement.

### B.  Alternatively, Many Other Sanctions Are Appropriate.

To the extent following an evidentiary hearing, the Court determines there is insufficient evidence to support dismissal of Ironclad's claims relating to a breach of Section 2.1, ORR requests the Court fashion a just sanction that provides a sufficient remedy for the harm and deters future conduct.[15]   "Rule 37(b)(2) requires that any sanction be just and that the sanction must be related to the particular claim which was at issue in the order to provide discovery." *Allergan, Inc. v. Sandoz Inc.*, No. 2:09-CV-182, 2011 WL 2563238, at *2 (E.D. Tex. June 28, 2011) (citing *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 413 (5th Cir.2004)). "The sanctions available under Rule 37 are flexible, and the court has broad discretion to apply

---

Ironclad counsel's latest concealment of its own violation and delayed recognition that *its own summary* contained AEO information only leads ORR to question if Ironclad's purported inadvertent disclosure is more than mere inadvertence.

[15] An evidentiary hearing may be necessary to determine the full extent of Ironclad's disclosure and purported remediation.  ORR has already noted significant pieces of information that are missing from Ironclad's submissions.  An evidentiary hearing is likely the only way for the Court and ORR to fully evaluate Ironclad's information.  ORR also reserves the right to request alternative sanctions based on any additional facts learned at an evidentiary hearing.

them in as many or varied forms in light of the facts of each case." *Orthoflex, Inc. v. ThermoTek, Inc.*, No. 3:10-CV-2618-D, 2015 WL 4486756, at *7 (N.D. Tex. July 23, 2015) (quoting *Guidry v. Cont'l Oil Co.*, 640 F.2d 523, 533 (5th Cir. 1981).

In *Allergan*, a party violated a protective order by providing confidential information to an expert without first requiring disclosing the expert to the other side and allowing the other side to object to the disclosure of confidential information. *Allergan*, 2011 WL 2563238, at * 1. The court refused to limit the sanctions to monetary damages, noting "such sanctions would be ineffective to cure the prejudice resulting from [the party's] conduct and deter such conduct in the future." Instead, the court precluded the party from using the expert at trial and precluded the party (or any of its experts) from relying on any portions of that expert's report. *Id.* at *3. Indeed, the *Allergan* court even applied such a remedy where the party claimed the violation was inadvertent, noting "the Court concludes that condoning [the party's] 'inadvertent oversight' would undermine the Court's integrity and ability to enforce its own rules. *Id.* at *2.

Accordingly, ORR requests that Ironclad be precluded from using, relying on, or citing to any AEO Sales Data at any time in this litigation – including all references in the premature and strategically filed motion for summary judgment. Such a sanction would be directly tied to Ironclad's conduct and deter the possibility that ORR's AEO Sales Data would be mishandled again. Moreover, monetary sanctions simply will not remedy the fact that Ironclad's employees actually viewed, and had improper access to, ORR's highly confidential information.

Another sanction that ORR requests is precluding Mr. Charest and Mr. Sherman from further handling any of ORR's confidential information. In *Life Technologies Corp. v. Biosearch Techs., Inc.,* No. C-12-00852 WHA JCS, 2012 WL 1600393, at *1 (N.D. Cal. May 7, 2012) (applying law of the 5th Circuit), the defendant's counsel forwarded to the defendant's

CEO of Jeffry Mann, an email including embedded links to confidential information.  The court noted that the lawyer's disclosure "[a]lthough inadvertent, Mann's disclosure of AEO information to his client resulted from his failure to even glance at the documents he sent to Cook, which were clearly designated AEO."  *Id.*, at * 9.  As a remedy, the court barred that attorney from further access to AEO documents.  *Id.*, at * 11 ("The Court cannot conclude that the disclosure of 2,963 pages of AEO, proprietary scientific laboratory notebooks to the CEO of a rival company did not cause Life Tech any prejudice.")

Here, Mr. Charest was aware that both the AEO Summary Outline and the underlying supporting AEO Sales Data contained information designated as AEO.  Indeed, the titles of several documents included the term "AEO".  Nevertheless, Mr. Charest failed to adequately protect ORR's highly confidential, proprietary information.  Even if Mr. Charest's disclosure were inadvertent, that information was accessed and viewed by Mr. Cordes and ORR cannot do anything to "unring that bell" – especially when he had days to review it.  With respect to Mr. Sherman, he too failed to even glance at the email to see that his client improperly received AEO information.  Moreover, when he did tell Ironclad to delete the AEO Sales Data, he failed to notice that the AEO Summary Outline contained AEO information.  His failure to notice that Messrs. Cordes and Aisenberg had received AEO information in the summary allowed them to continue to access the AEO Summary Outline for several additional days.  Of course, he also failed to tell ORR's counsel about the breach for days, and in fact, tried to remove the AEO designation in order to sweep the issue under the rug. Seemingly, only when ORR's counsel made clear that its position on the AEO designation of the AEO Sales Data would not change and that Ironclad would have to file a motion with the Court did the disclosure finally get reported.

28

Moreover, both Mr. Charest and Mr. Sherman have acknowledged they are not particularly concerned with how and when ORR's AEO information is being used or sent out. Mr. Sherman claims no responsibility for any oversight of ORR's AEO information, noting the only "infraction appears to have been an oversight by Mr. Charest," ignoring his own responsibility under the Order for reviewing emails sent to his client and to himself. Meanwhile, Mr. Charest claims he did not have "an in-depth familiarity with its contents." Both attorneys agreed that "it was the responsibility of counsel to maintain materials containing Confidential Information or Confidential Attorney Eyes Only Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Protective Order." (Order at 4.) Even during his purported investigation, in which he claims that his "office has undertaken extensive efforts to track down the AEO materials and ensure they are recovered," Mr. Sherman fails to identify *who downloaded* ORR's AEO Sales Data on June 1, 2016 at 9:02 PM CDT from IP address 173.57.47.174 from Richardson, Texas. Appendix p.108. Indeed, both Mr. Charest and Mr. Sherman simply claim it was an "unnamed user," demonstrating yet another security concern, as Ironclad's counsel is not able to identify who actually downloaded ORR's AEO Sales Data. An appropriate remedy would be to preclude both Mr. Charest and Mr. Sherman from further access to ORR's AEO information.

It is undisputed that Ironclad's counsel violated the Court's Order. But Ironclad's attorneys' actions have gone even further than the initial breach now and *more* than warrant disciplinary action by this Court, either in the form discussed above (*i.e.*, precluding them from accessing AEO information), or possibly a more stringent punishment (*i.e.*, revocation of pro hac admissions). Local Rule 83.8(b) provides just the mechanism to do so, stating that: "[a]

presiding judge, after giving opportunity to show cause to the contrary, may take any appropriate disciplinary action against a member of the bar for: (1) conduct unbecoming a member of the bar; (2) failure to comply with any rule or order of this court; (3) unethical behavior; (4) inability to conduct litigation properly; (5) conviction by any court of a felony or crime involving dishonesty or false statement; or (6) having been publicly or privately disciplined by any court, bar, court agency or committee."

Another appropriate remedy would be for the Court to enjoin Ironclad from communicating with or selling any products to any of the customers identified in the AEO Summary Outline. Ironclad should not be allowed to use the Disclosed AEO Information to aid in its ongoing efforts to steal ORR's customers using ORR's confidential proprietary information. Again.

ORR requests the Court stay any consideration or briefing on Ironclad's partial motion for summary judgment (DN 77), in light of the questionable timing of its filing. It is clear that Ironclad deliberately induced ORR to refrain from filing this Motion under the false promise that it would provide all the requested additional information about the violation. ORR reached out in good faith, pursuant to its obligations under this Court's rules to meet and confer one last time prior to filing a motion for sanctions. ORR accepted Ironclad's promise to provide additional information. Yet Ironclad had no intention of ever providing all such additional information. Ironclad simply wanted to delay ORR's ability to seek relief from the Court while Ironclad could focus all of its resources on preparing a motion for partial summary judgment (months before the close of fact discovery). The Court should not condone such behavior and, at a minimum, stay all proceedings on Ironclad's motion.

Finally, ORR also requests Ironclad and its counsel be precluded from further access to any of ORR's Confidential information until ORR and the Court have adequate assurances that a) Ironclad has sufficiently deleted all of the Disclosed AEO Information from all electronic devices, and b) Ironclad and its attorneys demonstrate that they have implemented specific safeguards to prevent any additional violations of the Order.[16]

### C.  ORR Is Entitled To Its Fees And Costs Related To Ironclad's Violation.

At a minimum, Rule 37(b) requires the Court to make Ironclad pay for ORR's reasonable costs and fees caused by Ironclad's failure to comply with the Order.  *See, e.g., Life Technologies*, 2012 WL 1600393, at *12.  Such a remedy is mandatory once Ironclad violated the Order, unless the Court finds that the violation was "substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C); *Thermotek, Inc. v. Orthoflex, Inc.*, No. 3:11-CV-870-D BF, 2015 WL 4138722, at *3 (N.D. Tex. July 7, 2015) ("Instead of, or in addition to any sanction permitted by Rule 37(b)", the court must award reasonable costs and fees).  A party's discovery conduct is substantially justified only if it is "a response to a genuine dispute, or if reasonable could differ as the appropriateness of the contested action." *Thermotek, Inc. v. Orthoflex, Inc.*, No. 3:11-CV-870-D, 2015 WL 4486756, at * 8 (N.D. Tex. July 23, 2015) (quoting *S.E.C. v. Kiselak Capital Grp., LLC*, 2012 WL 369450, at *5 (N.D.Tex. Feb.3, 2012)) (internal quotation marks omitted).  There can be no dispute that Ironclad did, in fact, violate the Order, and that it was inappropriate for Ironclad to have access to the Disclosed AEO Information.  To the extent Ironclad wishes to claim that its conduct is

---

[16] ORR also reserves its right to seek damages resulting from lost sales due to the disclosure of the Disclosed AEO Information.  *See Systemic Formulas, Inc. v. Kim*, No. 1:07-CV-159 TC, *2011 WL 9509, at *3 (D. Utah Jan. 3, 2011)* (ordering "that gross sales figures be supplied to determine whether sanctions related to unfair market advantage might be appropriate" as result of improper disclosure of confidential customer information)

substantially justified or such an award would be unjust, the burden is on Ironclad to make such a showing. *Id.*

ORR continues to evaluate Ironclad's claims that the Disclosed AEO Information has been removed completely and securely from Ironclad's electronic systems. Accordingly, the total sum of ORR's reasonable costs and fees is not final. ORR therefore asks the Court to allow it an opportunity to submit the specific monetary fee amount sometime in the near future to avoid having to seek multiple awards.

## V.    CONCLUSION

For the aforementioned reasons, the Court should a) strike all claims or defenses related to ORR's purported breach of Section 2.1 of the Distributorship Agreement, and/or, in the alternative, b) fashion a just sanction that provides a sufficient remedy for the harm and deters future conduct, including the sanctions described above. The Court should also award ORR its reasonable costs and fees incurred in connection with Ironclad's improper disclosure.

Respectfully submitted,

 s/Benjamin C. Fultz
Benjamin C. Fultz (admitted *pro hac vice*)
Jennifer Metzger Stinnett (admitted *pro hac vice*)
Corey M. Shapiro (admitted *pro hac vice*)
FULTZ MADDOX DICKENS PLC
2700 National City Tower
Louisville, Kentucky 40202
Telephone: (502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmdlegal.com
jstinnett@fmdlegal.com

-and-

Gregory M. Sudbury
Texas Bar No. 24033367

Rachel Lee Hytken
Texas Bar No. 24072163
QUILLING, SELANDER, LOWNDS, WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Main)
(214) 871-2111 (Fax)
gsudbury@qslwm.com

*Counsel for Defendant and Counterclaim Plaintiff Orr Safety Corporation*

## CERTIFICATE OF SERVICE

On July 13, 2016 I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

s/ Benjamin C. Fultz
*Counsel for Defendant and Counterclaim Plaintiff Orr Safety Corporation*