IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IRONCLAD PERFORMANCE WEAR CORPORATION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:15-cv-03453-D |
| ORR SAFETY CORPORATION, | § § § | |
| Defendant. | § § | |

## MEMORANDUM IN OPPOSITION TO ORR SAFETY CORPORATION'S MOTION FOR SANCTIONS

Michael A. Sherman (Cal. Bar No. 94783)
(admitted pro hac vice)
Barak Kamelgard (Cal. Bar. No. 298822)
(admitted pro hac vice)
STUBBS ALDERTON & MARKILES, LLP
15260 Ventura Boulevard, 20th Floor
Sherman Oaks, California 91403
Telephone: (818) 444-4500
Facsimile: (818) 444-4520
masherman@stubbsalderton.com
bkamelgard@stubbsalderton.com

Daniel H. Charest
State Bar No. 24057803
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, Texas 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wthompson@burnscharest.com

*Attorneys for Plaintiff/Counterclaim Defendant*

**TABLE OF CONTENTS**

I.    BACKGROUND ............................................................................................................. 2

II.   AUTHORITY .............................................................................................................. 12

III.  ARGUMENT ................................................................................................................ 13

    A.   The Court should reject ORR's attempt to use the AEO issue to avoid its breach of
        Section 2.1. ......................................................................................................... 14

    B.   The Court should decline the menu of "other" sanctions ORR suggests. ............................ 28

    C.   The Court should not award further financial sanctions against Ironclad. ............................ 33

IV.   CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

*Allergan, Inc. v. Sandoz Inc.,*
No. 2:09-cv-182, 2011 U.S. Dist. LEXIS 69429 (E.D. Tex. June 28, 2011) ........................ 14, 16, 17

*Batson v. Neal Spelce Associates, Inc.,*
765 F.2d 511 (5th Cir. 1985) ................................................................................................. passim

*Chapman & Cole & CCP, Ltd. v. Itel Container Int'l B.V.,*
865 F.2d 676 (5th Cir. 1989) ................................................................................................. 13

*F.D.I.C. v. Conner,*
20 F.3d 1376 (5th Cir. 1994) ................................................................................................. 29

*Geiserman v. MacDonald,*
893 F.2d 787 (5th Cir. 1990) ................................................................................................. 16, 17

*Lewis v. Tex. Instruments Inc. Emple. Health Bens. Plan,*
No. 3:12-cv-4577-L-BN, 2014 U.S. Dist. LEXIS 85182 (N.D. Tex. June 23, 2014) ...................... 12

*Life Techs. Corp. v. Biosearch Techs., Inc.,*
No. C-12-00852 WHA (JCS), 2012 WL 1600393, (N.D. Cal. May 7, 2012) ........................ 29, 30, 33

*Pegues v. PGW Auto Glass, L.L.C.,*
451 F. App'x 417 (5th Cir. 2011) ........................................................................................... 16

*Peoples v. Aldine Indep. Sch. Dist.,*
No. 06-2818, 2008 U.S. Dist. LEXIS 47946 (S.D. Tex. June 19, 2008) ............................... 12

*Pressey v. Patterson,*
898 F.2d 1018 (5th Cir. 1990) ............................................................................................... 12, 13

*Roadway Express, Inc. v. Piper,*
447 U.S. 752 (1980) ............................................................................................................... 13

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.,*
685 F.3d 486 (5th Cir. 2012) ................................................................................................. 13

*Talkington v. City of Fort Worth,*
No. 4:12-cv-585-A, 2013 U.S. Dist. LEXIS 163365 (N.D. Tex. Nov. 15, 2013) .......... 14, 15, 16, 17

*Tollett v. City of Kemah,*
285 F.3d 357 (5th Cir. 2002) ................................................................................................. 13

*Trenado v. Cooper Tire & Rubber Co.,*
274 F.R.D. 598 (S.D. Tex. 2011) ........................................................................................... 13

*Visto Corp. v. Seven Networks, Inc.*,
   No. 2:03-cv-333-TJW, 2006 U.S. Dist. LEXIS 91453 (E.D. Tex. Dec. 19, 2006) ........................... 29

**RULES**

Fed. R. Civ. P. 37 ..................................................................................................................... passim

## MEMORANDUM IN OPPOSITION TO ORR SAFETY
## CORPORATION'S MOTION FOR SANCTIONS[1]

Ironclad Performance Wear Corporation ("Ironclad") has remedied the situation caused by the undersigned counsel's inadvertent disclosure of attorney's eyes only ("AEO") materials. The recipients of the Attachment Email and the Link Email have provided sworn testimony on the matter explaining in detail how they addressed the matter—both in reporting the issue to their lawyers and in assisting in the permanent deletion of the AEO materials. Ironclad has employed an IT consulting firm to search for and to permanently delete all errant copies of the AEO materials, to identify any evidence of unreported copies of AEO materials, and to report on the steps taken to achieve those tasks. Ironclad has responded to each and every reasonable inquiry and request issued by ORR Safety Corporation ("ORR") regarding the AEO issue. And the undersigned counsel's law firm issued a check to cover more than the reasonable and necessary expenses ORR incurred as a result of the AEO issue. In the interim, ORR has not posed any further questions. No issue remains.

All of these things were either done or in motion when ORR filed its motion for sanctions (doc. 83) and memorandum and appendix (docs. 84-85) (collectively, the "Sanctions Motion"). But ORR refused to accept Ironclad's efforts to remedy the undersigned counsel's unfortunate error and eliminate any prejudice. Instead, ORR persisted on the course of using the AEO issue to seek a litigation advantage by demanding relief far in excess of the merits of this situation. The Court should reject ORR's overwrought Sanctions Motion because the motion lacks support, both in law and fact, because ORR has received all appropriate relief through Ironclad's remedial efforts, and because ORR should not be allowed to turn this issue into an advantage in the litigation.

---

[1] Ironclad incorporates by reference the facts, arguments, and authorities set out in Ironclad's Motion for *Nunc Pro Tunc* Relief from Agreed Protective Order (doc. 87), Ironclad's memorandum in support (doc. 88), and the appendix in support of Ironclad's motion (doc. 89) (collectively, the "Relief Motion") in all respects. For the purposes of clarity, this brief adopts and will employ the definitions set out in the above-named filings. Pursuant to Local Rule 5.1(c), Ironclad has included its response and brief in a single document.

# I.   BACKGROUND[2]

**Undersigned counsel responds to ORR's subsequent requests**

In its Sanctions Motion, ORR sets out a timeline and quotes an email sequence from June 11-12, 2016, up front, in bold. (*See* doc. 84, at 6 (quoting email correspondence).) The parts of the emails ORR quotes are accurate. But ORR's exclusion of both preceding and subsequent emails robs the quoted portions of context. By posturing the email sequence as it does, ORR seeks to give the impression that Ironclad failed to respond to ORR's requests and, thereby, necessitated the Sanctions Motion. That is false. The full account reaffirms Ironclad's consistent, timely responses and efforts to address the AEO issue.

On June 30, 2016, ORR identified its $40,000 demand, for the first time, along with a list of eight additional requests.[3] The undersigned, while vacationing with family for the Fourth of July holiday (and with co-counsel and clients scattered due to the holiday), responded the same evening:

> As you know, I've been taking the lead on this issue, Jenny. Unfortunately, I am out of the office through the Fourth of July week with family. I will continue to coordinate the IT vendor, as best as I can. And, hopefully, we'll have the initial questions answered by them soon. But I will not be in a position to respond to this email in detail. I will say that we will do our best to answer ORR's additional questions to the extent we can. As to the rest, though, I can't tell you the client's position at the moment. Thanks.[4]

---

[2] Ironclad expressly incorporates by reference the "Background" section of its memorandum in support Ironclad's Relief Motion (doc. 88, at 2-28) and the materials cited therein. The Background section in this memorandum picks up at the conclusion of the Background section in Ironclad's Relief Motion.

[3] *See* Declaration of Daniel Charest (July 13, 2016) ("Charest 7/13 Declaration"), ¶ 17, at IC APP 38. Ironclad covered this time in its Relief Motion. (*See* doc. 88, at 19-20.) But Ironclad's Relief Motion did not attach the underlying emails because, frankly, it had responded to the underlying requests. Since ORR pretends Ironclad did not respond, Ironclad provides the additional detail here.

[4] *See* Declaration of Daniel Charest (Aug. 3, 2016) ("Charest 8/3 Declaration"), ¶ 2, at IC APP 100; Exhibit O to the Charest 8/3 Decl., at IC APP 107.

MEMORANDUM IN OPPOSITION TO ORR SAFETY CORPORATION'S
MOTION FOR SANCTIONS                                                          Page 2

The next day, July 1, 2016, counsel for ORR asked for "a firm commitment on the attorneys' fees" by the end of the day, if possible.[5] Again, the undersigned counsel explained that Ironclad was "willing to work on providing additional information to the extent possible" regarding the eight-part requests ORR had posed but, as to the attorney's fees, Ironclad needed support, which had not been provided despite Ironclad's requests and ORR's promises to provide it:

> As to the fees, I'd earlier asked you for detail to support whatever amount ORR expected to assert. I think you said you'd provide that information about a week ago. I haven't seen that, to my knowledge. Now ORR has pegged its cost (I assume that's the basis) at $40,000. That number only heightens the need for support behind the claim.[6]

On Wednesday, July 6, 2016, counsel for ORR requested, and the undersigned counsel immediately agreed, that production of ORR's billing records would not waive privilege.[7] Later that day, for the first time, ORR produced the FMD Invoice.[8] After prioritizing the attorney's fees issue, ORR did not follow up on the eight-part requests in Ms. Stinnett's June 30 email until Monday, July 11, 2016 (the first work day after the Fourth of July holiday week) in which ORR—in the email it emphasized in the Sanctions Motion—asked about payment and "the other outstanding items" involving the AEO issue.[9]

In the Sanctions Motion, ORR confirms that Mr. Sherman deferred to the undersigned counsel when asked by ORR's counsel for the status of the AEO issue. (*See* doc. 84, at 6 (quoting emails).) And ORR admits that, on July 12, 2016, ORR told Ironclad that it "w[ould] wait to hear

---

[5] *See* Exhibit O to the Charest 8/3 Decl., at IC APP 106.

[6] *See* Exhibit O to the Charest 8/3 Decl., at IC APP 106.

[7] *See* Exhibit O to the Charest 8/3 Decl., at IC APP 105.

[8] *See* Charest 7/13 Decl., ¶¶ 17-18, at IC APP 38-39. For a copy of the FMD Invoice (with redactions as provided by ORR), *see* Exhibit L to Charest 7/13 Decl., at IC APP 63-70.

[9] *See* Charest 8/3 Decl., ¶ 3, at IC APP 100; Exhibit P to the Charest 8/3 Decl., at IC APP 113 (reflecting the email chain quoted in the Sanctions Brief).

from [the undersigned counsel] tomorrow [i.e., July 13] on AEO, but cannot wait any longer than that on whether or not fees will be paid."[10]

But ORR omits from its timeline (*see* doc. 84, at 6) the fact that, at 9:57 AM CDT on July 13, 2016—the day ORR set as the deadline to respond—the undersigned counsel both provided a brief update and asked to talk about the AEO issue: "Can you talk, Jenny, at 2pm central? I'm waiting on the report from the IT vendor and one declaration. Hopefully, I'll have them by then. Thanks."[11] Nor does ORR disclose to the Court that, at 1:56 PM CDT on July 13, 2016, as the requested call time approached without response from ORR, the undersigned counsel (a) updated ORR on the IT vendor status, (b) provided the three additional declarations ORR had requested, and (c) responded to *each* of ORR's additional eight-part requests from the June 30 email:

> I haven't heard from you, Jenny, about getting together at 2pm per my earlier email today. In the interim, I'll respond as best as I can. Please see below for responses to the specific issues you set out below. [Responses to ORR's eight-part requests interlineated in text.]
>
> I've attached three supplemental declarations here. I am waiting for the IT vendor's report (which should arrive this afternoon). I'll pass that along. But the upshot is that everything checked out and has been contained.
>
> As to the attorney's fees, I've conferred with the client and have a response. But it is, I think, better handled by phone.
>
> When can you talk?
>
> Thanks.[12]

That same day, at 3:34 PM CST on July 13, 2016, after being unable to contact ORR's counsel regarding the AEO issue (despite significant efforts, including being dropped several times and waiting on hold while receiving emails from ORR's counsel but being told they were not

---

[10] *See* Exhibit P to the Charest 8/3 Decl., at IC APP 111.

[11] *See* Exhibit P to the Charest 8/3 Decl., at IC APP 110.

[12] *See* Charest 8/3 Decl., ¶ 4, at IC APP 101; Exhibit Q to the Charest 8/3 Decl., at IC APP 116-124.

available to talk), the undersigned counsel emailed a copy of the letter enclosing a check for $11,000—from his firm's own account—to ORR.[13] The letter, which had been sent (with the check) by mail the day before, set out Ironclad's position:

> I have received Fultz Maddox invoice no. 147238. Please see the enclosed check from my firm for $11,000 for payment on that invoice. I have not and will not ask for reimbursement from my client for this amount, as the client acted without blame in any of this.
>
> From the beginning of these AEO events, I (along with my client) have striven to address the problem fully and rectify all of ORR's legitimate concerns. But the events do not support an award of sanctions. And, more importantly, the events do not support the amount of time and effort your firm spent to prepare a motion for sanctions before the IT vendor completed its investigation (or, in fact, before it even began). The investigation has concluded with the IT vendor confirming—as we have stated from the beginning—that the recipients of the AEO materials made no copies and properly deleted the AEO materials upon recognition of their contents. We have upheld our duties. We have answered (and will continue to answer) ORR's legitimate questions and concerns. ORR never needed a motion to obtain that cooperation.
>
> We are willing to compensate ORR for the legitimate work incurred related to the AEO issues but not for the time incurred preparing an unnecessary motion for sanctions.[14]

More than an hour later, ORR filed its Sanctions Motion at 4:49 PM CDT on July 13, 2016.[15]

All of the above-referenced correspondence on the AEO issue—including the parts ORR omitted from its timeline—took place <u>before</u> ORR filed its Sanctions Motion. That is, ORR had responses to each of its questions, it had the additional declarations it had requested, and it had received confirmation that the IT vendor had completed the investigation and final deletion without incident—all before ORR filed its Sanctions Motion.

---

[13] *See* Charest 8/3 Decl., ¶ 5, at IC APP 101; Exhibit R to the Charest 8/3 Decl., at IC APP 126.

[14] *See* Charest 8/3 Decl., ¶ 5, at IC APP 101; Exhibit R to the Charest 8/3 Decl., at IC APP 130.

[15] *See* Charest 8/3 Decl., ¶ 6, at IC APP 101; Exhibit S to the Charest 8/3 Decl., at IC APP 133.

ORR did not mention any of that to the Court. But ORR concedes the point—to a certain extent—in its certificate of conference, in which ORR admits (unlike in the memorandum) that the undersigned counsel responded to ORR's requests on July 13, 2016. (*See* doc. 83, at 3 (conceding that "Mr. Charest responded in an email dated July 13, 2016").) But the certificate of conference contains many, many false statements, including suggesting only one email—there were several— from the undersigned counsel, mischaracterizing the content of those emails (all of which are now available for the Court's review), and ignoring the extraordinary effort the undersigned counsel undertook to speak with ORR that day. Indeed, the certificate of conference disregards the extraordinary efforts that Ironclad and its counsel had been making over the prior six weeks to work with ORR to answer OTT's questions and provide all reasonable assurance and remedial efforts.

The certificate of conference also mischaracterizes both the participants and the content of key events. While signed by ORR's lead counsel, Mr. Fultz, and written in the first person, the June 17, 2016 conversation described in the certificate of conference took place between the undersigned counsel, Mr. Sherman, and Ms. Stinnett.[16] Mr. Fultz did <u>not</u> participate in that discussion.[17] Mr. Fultz's absence from the June 17, 2016 conversation explains his mischaracterization of its contents.

Neither Ms. Stinnett nor Mr. Fultz <u>ever</u> relayed a message, as the certificate of conference indicates, that ORR offered to "resolve the dispute if Ironclad provided all additional information satisfying ORR's concerns and reimburses ORR for its fees incurred." (Doc. 83, at 3.) If ORR had made that offer, the AEO issue would put to bed. To the contrary, ORR demanded (a) that Ironclad pay for ORR's expenses and fees (without being able to state or verify the amount), (b) that Ironclad agree to the litigation death penalty by refraining from using the disclosed documents at any time or for any purpose in the litigation, <u>and</u> (c) that Ironclad agree to the business death penalty by

---

[16] *See* Charest 7/13 Decl., ¶ 13, at IC APP 36.

[17] *See* Charest 7/13 Decl., ¶ 13, at IC APP 36.

refraining from contacting or selling to any party identified in any of the disclosed documents at any time.[18] That was the extent of ORR's June 17, 2016 demand.

Mr. Fultz's certificate of conference, like the Sanctions Motion, attempts to paint a picture of reason (at the expense of accuracy). But ORR's unreasonable, overreaching approach to the AEO issue—which continues in the Sanctions Motion—pushed the parties to this point, including the need to seek protection from the Court in the Relief Motion. The Court should be wary of ORR's self-serving "facts" and ORR's attempts to re-write events—all offered without factual bases—to advance ORR's ambitions.

**Undersigned counsel receives and provides G-C Partners' final report**

On the day ORR filed its Sanctions Motion, July 13, 2016, G-C Partners, the IT vendors engaged to conduct the forensic examination and deletion (at ORR's request), issued the G-C Partners Report, which describes both the work G-C Partners had performed in this case and their findings.[19] G-C Partners confirm that each of the declarants had reported the events accurately: no one had made copies of or otherwise disseminated the AEO materials, the only remnants of the AEO materials had been created automatically by the devices (not the users) and, ultimately, removed from their devices.[20] In particular, the G-C Partners Report provides that, as to Mr. Aisenberg's computer, "[n]o copies of AEO Disclosure Information were found as manually saved or recoverable stand-alone files."[21] And, as to Mr. Cordes' computer, the G-C Partners Report confirms his declaration: "Recoverable stand-alone versions of the AEO Disclosure Information were located in the Outlook Deleted Items folder" but "[n]o other copies of AEO Disclosure

---

[18] *See* Charest 7/13 Decl., ¶ 13, at IC APP 36.

[19] *See* Charest 7/13 Decl., ¶ 28, at IC APP 42; *see also* Exhibit N to the Charest 7/13 Decl., at IC APP 75-80.

[20] *See* Exhibit N to the Charest 7/13 Decl., at IC APP 75-80.

[21] *See* Exhibit N to the Charest 7/13 Decl., at IC APP 77.

Information were found as recoverable stand-alone files."[22] The C-G Partners Report lays to rest all of ORR's speculation (all of which lacks any basis in fact) because G-C Partners' forensic searches did not find copies of the only AEO materials Mr. Cordes opened anywhere on his computer:

> Our analysis of Mr. Cordes' laptop indicates that the user <u>did not save</u> the "ORR0000851_AEO.xlsx" file, because we <u>did not identify any alternative versions of the "ORR0000851_AEO.xlsx" file anywhere on this system</u> using the established search criteria."[23]

Finally, the G-C Partners Report concludes without question that G-C Partners succeeded in "permanently remov[ing] all remnants of the identified data, even beyond the means of computer forensic methods" by wiping the unallocated space of such devices.[24] The G-C Partners Report permits no doubt that the AEO materials have been dealt with appropriately.

On July 13, 2016, as soon as Ironclad received a signed copy and confirmed it covered the appropriate subject matter, Ironclad provided a copy of the G-C Partners Report to ORR.[25] The following day, Ironclad provided ORR with the core exhibits to the G-C Partners Report.[26] Ironclad withheld three exhibits—the logs from the wiping utility from each wiped device—because "[t]hose exhibits are large text files and, basically, a mass of data" and "they contain . . . every file name on the subject device at the time of wiping."[27] In the transmittal email, Ironclad offered to discuss the

---

[22] *See* Exhibit N to the Charest 7/13 Decl., at IC APP 77.

[23] *See* Exhibit N to the Charest 7/13 Decl., at IC APP 77.

[24] *See* Exhibit N to the Charest 7/13 Decl., at IC APP 79.

[25] *See* Charest 8/3 Decl., ¶ 7, at IC APP 101; Exhibit T to the Charest 8/3 Decl., at IC APP 136-148. Ironclad received an unsigned version of the G-C Partners Report at 4:27 PM CDT. *See* Exhibit T to the Charest 8/3 Decl., at IC APP 141. Ironclad notified G-C Partners of the oversight, which led to a signed version being provided at 6:33 PM CST. *See* Exhibit T to the Charest 8/3 Decl., at IC APP 141. Later in the evening, the undersigned counsel expressed some confusion about the content of the G-C Partners Report. *See* Exhibit T to the Charest 8/3 Decl., at IC APP 149. But an hour later the issue got resolved. *See* Exhibit T to the Charest 8/3 Decl., at IC APP 149. The undersigned counsel explained this sequence to ORR. *See* Exhibit T to the Charest 8/3 Decl., at IC APP 136.

[26] *See* Charest 8/3 Decl., ¶ 7, at IC APP 101 Exhibit U to the Charest 8/3 Decl., at IC APP 153.

[27] *See* Exhibit U to the Charest 8/3 Decl., at IC APP 153.

exhibits and possible means to evaluate the wiping logs: "I'd be happy to talk with y'all about a way to review [the withheld exhibits] that makes sense if you really want to see them. I can also walk you through . . . the other exhibits. Let me know if you want to talk. Thanks."[28]

**ORR rejects payment and makes no further effort on AEO issue**

On July 18, 2016, Ironclad, through counsel, received a letter, dated July 15, 2016, in which ORR returned the $11,000 check.[29] In its letter, ORR enclosed the check, stating that "ORR Safety Corporation will not be accepting this check," but said nothing more.[30] That letter is the last word from ORR on the AEO issue since Ironclad responded to the eight-part requests on July 13, 2016.

ORR has not asked to meet with G-C Partners.[31] It has not asked to discuss the exhibits to the G-C Partners Report.[32] It has not asked to discuss the withheld exhibits to the G-C Partners Report.[33] It has not sought more information or followed up on Ironclad's responses to the eight-part requests.[34] It has not sought further information or additional remedial efforts.[35] ORR has gone silent on the AEO issue despite the Sanctions Motion's assertions that it needs the Court's help. Simply put, Ironclad has adhered and corrected any prejudice ORR has identified. But ORR wants more.

**Ironclad did not "rush to file the summary judgment motion"**

A central premise to ORR's Sanctions Motion is that "Ironclad rushed to file the motion for summary judgment once ORR made clear that it was going to file the motion regarding the AEO

---

[28] *See* Exhibit U to the Charest 8/3 Decl., at IC APP 153.

[29] *See* Charest 8/3 Decl., ¶ 8, at IC APP 101; Exhibit V to the Charest 8/3 Decl., at IC APP 159-160.

[30] *See* Exhibit V to the Charest 8/3 Decl., at IC APP 159.

[31] *See* Charest 8/3 Decl., ¶ 8, at IC APP 101.

[32] *See* Charest 8/3 Decl., ¶ 8, at IC APP 101.

[33] *See* Charest 8/3 Decl., ¶ 8, at IC APP 101.

[34] *See* Charest 8/3 Decl., ¶ 8, at IC APP 101.

[35] *See* Charest 8/3 Decl., ¶ 8, at IC APP 101.

because of Ironclad's continued lack of response." (Doc. 84, at 5; *see also* doc. 84, at 5 ("Instead of addressing its serious violation of the Order in good faith, Ironclad was frantically working to quickly file a premature motion for partial summary judgment . . . .").) The sections above address— and refute—the notion of Ironclad's "continued lack of response." But ORR's assertion that Ironclad "rushed" the summary judgment motion or "file[d] a premature motion" to subvert the AEO issue not only lacks any factual basis but also contradicts reality.

It is true that the undersigned counsel's office handled the summary judgment filing under his login credentials because of the nature of the filing and supporting materials (including manual filing for two native Excel files, six videos, and seven glove samples.[36] As a result, as ORR prominently set out in its Sanctions Motion, the ECF report showed the undersigned counsel's name.[37] But the undersigned counsel had very little involvement with the filing process.[38] To the contrary—and in direct contradiction to ORR's assertion—the undersigned counsel spent the vast majority of his time after returning from the Fourth of July vacation (and a good amount of time during the vacation) handling the AEO issue to the exclusion of other work.[39]

Ironclad has been working on a summary judgment motion for a long, long time. The initial work—including the generation of the MSJ Outline and the collection of supporting materials assembled in the Sharefile—took place in the undersigned counsel's firm well before June 1, 2016.[40] Starting in June 2016, the undersigned counsel's firm handed over the project to Mr. Sherman's firm

---

[36] *See* Charest 8/3 Decl., ¶ 9, at IC APP 102.

[37] *See* Charest 8/3 Decl., ¶ 9, at IC APP 102.

[38] *See* Charest 8/3 Decl., ¶ 9, at IC APP 102.

[39] *See* Charest 8/3 Decl., ¶ 9, at IC APP 102.

[40] *See* Charest 8/3 Decl., ¶ 10, at IC APP 102; *see also* Exhibits A-D to the Declaration of Daniel Charest (June 16, 2016) ("Charest 6/16 Declaration"), at IC APP 5-26. An unredacted copy of these exhibits has been delivered to the Court.

to bring the motion to fruition.[41] The materials contained in the MSJ Outline and the Sharefile demonstrate the extensive work that went, all done before June 1, 2016, for the summary judgment project.[42] Far from the AEO issue driving the summary judgment filing, it was the transmittal of the summary judgment materials that caused the AEO issue. ORR has reversed the cause for the effect. ORR has the timing all wrong and reversed the cause for the effect.

Aside from trying to complete the project efficiently, Ironclad did not "race" or "prematurely" file the summary judgment motion as a result of the AEO issue—or for any other reason.[43] Ironclad completed the summary judgment briefing as soon as it could.[44] And all of the work that went into the summary judgment motion—the vast majority of which came from Mr. Sherman's firm—proceeded independent of the work on AEO issue.[45] To be as clear as possible, the timing of the summary judgment motion neither changed nor got changed by Ironclad's efforts to resolve the AEO issue.[46] When the undersigned counsel recognized that ORR would stand on its unreasonable demands of $40,000 in fees and, in effect, death penalty sanctions in the litigation and for Ironclad's core business of selling gloves to industry, and after he learned from the FMD Invoice that ORR had prepared a brief seeking sanctions, he focused his efforts on drafting the Relief

---

[41] *See* Charest 8/3 Decl., ¶ 10, at IC APP 102. The Attachment Email, the MSJ Outline, the Link Email, and the Sharefile make the timing abundantly clear. *See generally* Exhibits A-B to the Charest 6/16 Decl., at IC APP 5-21. In the Attachment Email, for example, the undersigned counsel pointed out that Mr. Sherman's "firm w[ould] be handling the heavy lifting on [the summary judgment] project" while transmitting the 14-page MSJ Outline. *See* Exhibit A-B to the Charest 6/16 Decl., at IC APP 5-21.

[42] *See* Charest 8/3 Decl., ¶ 10, at IC APP 102; *see also* Exhibits C-D to the Charest 6/16 Decl., at IC APP 22-26.

[43] *See* Charest 8/3 Decl., ¶ 11, at IC APP 102.

[44] *See* Charest 8/3 Decl., ¶ 11, at IC APP 102.

[45] *See* Charest 8/3 Decl., ¶ 11, at IC APP 102.

[46] *See* Charest 8/3 Decl., ¶ 11, at IC APP 103.

Motion.[47] But, in no way, did Ironclad (or its counsel) accelerate the filing of the summary judgment motion in response to the AEO issue or, in particular, ORR's wild argument that the AEO materials should be stricken from the case.[48] ORR can offer no support for its claim because the claim is simply not true.

## II.    AUTHORITY

The Agreed Protective Order permits "[a]ny party [to] petition the presiding judge for good cause shown if the party desires relief from a term or condition of this Protective Order." (Doc. 25, ¶ 17.) And, as long as the Agreed Protective Order remains in effect, the Court retains the authority within its discretion to modify protective orders. *See Lewis v. Tex. Instruments Inc. Emple. Health Bens. Plan*, No. 3:12-cv-4577-L-BN, 2014 U.S. Dist. LEXIS 85182, at *4 (N.D. Tex. June 23, 2014) (Horan, M.J.) (citing cases). Under either authority, the Court could order Ironclad and its attorneys relieved of any further obligation relating to the AEO issues described above under the facts set out above and in the Relief Motion. *See, e.g., Peoples v. Aldine Indep. Sch. Dist., No. 06-2818*, 2008 U.S. Dist. LEXIS 47946, at *4-5 (S.D. Tex. June 19, 2008) (Rosenthal, J.) (ordering a discrete amendment to the protective order).

Likewise, the Agreed Protective Order provides that the Court may enforce its order "by the sanctions set forth in Fed. R. Civ. P. 37(b) and any other sanctions as may be available to the presiding judge, including the power to hold parties . . . in contempt." (Doc. 25, ¶ 17.) If the Court determines that a violation of its order occurred, the Court has broad discretion to fashion an appropriate remedy. *See Pressey v. Patterson*, 898 F.2d 1018, 1021 (5th Cir. 1990) (noting that the district court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct" because "the trial judge . . . is most familiar with the circumstances surrounding the litigation"); *see*

---

[47] *See* Charest 8/3 Decl., ¶ 12, at IC APP 103.

[48] *See* Charest 8/3 Decl., ¶ 12, at IC APP 103.

*also Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488-89 (5th Cir. 2012) (noting the discretion afforded to district courts as pertains to protective orders). That discretion finds limits in that more severe remedies, such that impact the litigation, are associated with willful or bad faith violations and prejudice. *See Trenado v. Cooper Tire & Rubber Co.*, 274 F.R.D. 598, 600 (S.D. Tex. 2011) (citing *Pressey*), 898 F.2d at 1021).

Rule 37-based monetary sanctions, if appropriate, must qualify both as <u>reasonable</u> and <u>caused by</u> the infraction of the underlying order. *Batson v. Neal Spelce Associates, Inc.*, 765 F.2d 511, 516 (5th Cir. 1985) ("Under Rule 37(b)(2)(E) of the Federal Rules of Civil Procedure, a party may be personally liable for <u>reasonable</u> expenses including attorney's fees <u>caused by</u> the failure to comply with a discovery order." (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980)); *see also Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002) (citing *Chapman & Cole & CCP, Ltd. v. Itel Container Int'l B.V.*, 865 F.2d 676, 687 (5th Cir. 1989), and *Batson*, 765 F.2d at 516, for the proposition that, based on the plain language of Rule 37, monetary sanction must be both reasonable and caused by an infraction of a discovery order). Unreasonable costs or costs that do not result from the violation of the underlying order cannot form part of a monetary award under Rule 37. *Id.*

## III.   ARGUMENT

As Ironclad stated in the Relief Motion, the resolution of the AEO issue falls squarely within the Court's discretion. In the Relief Motion and above, Ironclad sets out—with evidence and factual support—the steps it has taken to address the AEO issue. By contrast, ORR hurls wild accusations, with scant support other than unsubstantiated argument, and seeks a wide array of severe sanctions, most of which are of the nature reserved for willful, recalcitrant offenders.

But the facts here do not support any sanction. Under any reasonable measure, Ironclad and its attorneys have upheld their obligations resulting from the AEO issue. The Court should approvingly recognize, not punish, Ironclad's proactive response. And the Court should not let

ORR convert the AEO issue into a tactical advantage. The Court should deny ORR's Sanctions Motion.

**A.      The Court should reject ORR's attempt to use the AEO issue to avoid its breach of Section 2.1.**

As the summary judgment motion makes clear, ORR has been in material breach of Section 2.1 for years due to its sale of competing gloves. (*See generally* docs. 77-82 (describing and supporting ORR's breach of Section 2.1).) The production of ORR00000318, ORR00000850, and ORR00000851, which ORR described as including information on "every glove sold by ORR over the course of eight years" (doc. 84, at 5) confirmed that ORR had breached the agreement. As the litigation team deciphered ORR's sales records, the breach shown within ORR's records came into focus.

Faced with the knowledge of its actions, as shown in ORR00000318, ORR00000850, and ORR00000851, and, later, Ironclad's summary judgment motion, ORR has seized on the AEO issue in an attempt to wiggle out of its Section 2.1 breach. At base, that is the aim of the Sanctions Motion. But neither the facts nor the law support the sanction that ORR urges—dismissal of Ironclad's Section 2.1 claims—which, in effect, would serve as a death penalty to Ironclad's case.[49]

**1.      The law does not support dismissal of Ironclad's Section 2.1 claims.**

In support of its assertion that the Court should dismiss Ironclad's Section 2.1 claims, ORR relies on three cases: *Batson v. Neal Spelce Assocs.*, 765 F.2d 511 (5th Cir.1985); *Talkington v. City of Fort Worth*, No. 4:12-cv-585-A, 2013 WL 6065442, 2013 U.S. Dist. LEXIS 163365 (N.D. Tex. Nov. 15, 2013); and *Allergan, Inc. v. Sandoz Inc.*, No. 2:09-cv-182, 2011 WL 2563238, 2011 U.S. Dist. LEXIS 69429 (E.D. Tex. June 28, 2011). (*See* doc. 84, at 22 (citing *Batson*, *Talkington*, and *Allergan*).) But,

---

[49] ORR's requested sanction would also advance its counterclaim, as Ironclad determined to terminate the underlying agreement because of the Section 2.1 breach. And, without the ability to prove the claim, Ironclad would find the defense to ORR's counterclaim far more difficult.

rather than support ORR's argument, these cases show the high bar courts in the Fifth Circuit set—a bar the facts here come nowhere near—before imposing the severe sanctions of dismissing claims.

In *Batson*, Judge Grady Jolly explained the Fifth Circuit's view and reminded that, "[a]lthough the district court's discretion under Rule 37 is broad, we have repeatedly emphasized that it is not unlimited, and <u>we have often characterized a dismissal with prejudice as a 'draconian' remedy, or a 'remedy of last resort' only to be applied in extreme circumstances</u>." 765 F.2d 511, 515 (5th Cir. 1985) (emphasis added). In *Batson*, the plaintiff failed to produce financial records that the defendant had requested and doggedly pursued for a year. *Id.* at 513-14. A week before the trial, after the trial court had ordered the documents produced but the plaintiff continued to withhold them, the defendant filed a motion for sanctions. *Id.* at 514. The trial court, on the day trial was to begin, granted the sanctions motion and dismissed the plaintiffs' claims with prejudice. *Id.* Even under these egregious facts and the party's refusal to comply with the trial court's order, the Fifth Circuit found that the trial court had abused its discretion, reversed the order of dismissal, and remanded the case for the trial court's consideration of "a less drastic sanction" as opposed to "the ultimate sanction of dismissal." *Id.* at 515-16. Far from supporting ORR's position, *Batson* stands for the proposition that courts in the Fifth Circuit must limit dismissal sanctions to "a 'remedy of last resort' <u>only to be applied in extreme circumstances</u>." *Id.* at 515 (emphasis added).

In *Talkington*, Judge McBryde dismissed the plaintiff's claims as a sanction. 2013 U.S. Dist. LEXIS 163365, at *1-2. But *Talkington*, shows the high bar required for dismissal because the egregious conduct in that case. The plaintiff, a *pro se* prisoner litigant, sued the City of Fort Worth under 42 U.S.C. § 1983. *Id.* at *2. In the course of the litigation, the plaintiff obtained legal counsel and the parties arranged for a deposition of the plaintiff. *Id.* On the day of the scheduled deposition, the plaintiff's attorney filed a motion to withdraw because <u>the plaintiff had escaped, become a fugitive, and skipped the deposition</u>:

> he had recently been released from jail on bond, but had cut off his
> ankle monitor and become a fugitive. [The plaintiff's attorney] had
> attempted to call plaintiff's cell phone number, but the number was
> inoperative at the time she attempted contact. As might be expected,
> plaintiff failed to appear for his November 4, 2013 deposition.

*Id.* *2-3. Eventually, the plaintiff got arrested again and opposed the dismissal of his case. *Id.* at *3. But, after the plaintiff went back into custody, the defendant encountered "a significant hurdle in scheduling another deposition at the jail" and, therefore, could not depose the plaintiff "in time to use the deposition to support any dispositive motion." *Id.* at *6.

Judge McBryde concluded that the facts warranted dismissal sanctions because "Plaintiff's decision to remove his ankle monitor and attempt to remain at large, and his decision not to appear for his deposition, were all willful decisions of his own making" and, the court explained, "[t]his conduct is directly attributable to plaintiff, rather than [the attorney], and did not result from any confusion or misunderstanding on plaintiff's part." *Id.* at *5. Citing *Batson*, Judge McBryde held that, because of the prejudice to the defendant, the facts of the case "demonstrate[ ] the type of aggravating factors contemplated by the Fifth Circuit as warranting dismissal of this action." *Id.* at *6-7 (citing *Batson*, 765 F.2d at 514, and *Pegues v. PGW Auto Glass, L.L.C.*, 451 F. App'x 417, 418 (5th Cir. 2011)). Far from supporting ORR's position, *Talkington* highlights the wide gulf between the facts of this case and those required before imposing dismissal sanctions.

The third case, *Allergan*, does not even involve dismissal sanctions. In *Allergan*, the district court faced a question of how to deal with the defendants' failure to notify the plaintiff of their disclosure of the plaintiff's confidential information to an expert as required under the protective order. 2011 U.S. Dist. LEXIS 69429, at *13-15. While the defendants had notified the plaintiff as to nine other experts, the defendants failed to do so with respect to the tenth "through an inadvertent oversight." *Id.* at *15. Judge Ward, applying the factors set out in *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir. 1990), determined that (a) defendants had "failed to provide a legitimate reason"

for the infraction, (b) the testimony of the tenth expert was "not absolutely critical for Defendants' case," (c) allowing the testimony would "severely prejudice" the plaintiff, and (d) remedying the issue through other means (such as an extension of the scheduling order) proved "not feasible" because of the particularities of the case. *Id.* at \*18-19.

As it does not impose dismissal sanctions, *Allergan* cannot be read to support that remedy for ORR. To the contrary, *Allegeran* shows the trial court, guided and restrained by the factors set out in *Geiserman*, imposing a sanction only where (a) the violator provided no explanation, (b) the sanction did not prohibit anything that was "absolutely critical" to its case, (c) failure to act would "severely prejudice" the other party, and (d) no other means existed to remedy the situation.

Properly viewed, *Allegeran*, like *Talkington* and *Batson*, reduce to a common theme. In the Fifth Circuit, dismissal sanctions serve as "a 'remedy of last resort' <u>only to be applied in extreme circumstances</u>." *Batson*, 765 F.2d at 515 (emphasis added). Only when a court encounters sufficient "aggravating factors," like those present in *Talkington* (i.e., purposefully subverting the litigation process and creating substantial prejudice), does dismissal become an appropriate sanction. *Talkington*, 2013 U.S. Dist. LEXIS 163365, at \*6-7 (citing *Batson*, 765 F.2d at 514). Otherwise, courts should impose, if any, "a less drastic sanction" as opposed to "the ultimate sanction of dismissal." *Batson*, 765 F.2d at 515-16. But, even when considering such lesser sanctions, *Allegeran* teaches that sanctions become proper when no excuse exists, the sanction affects a non-critical aspect of the case, the other party would incur severe prejudice, and no other means of addressing the situation exists. *Allergan*, 2011 U.S. Dist. LEXIS 69429, at \*18-19 (applying *Geiserman*, 893 F.2d at 791). ORR's preferred sanction does the opposite of the very authority it cites—and the Fifth Circuit's approach to such matters—seeking the death penalty for an unintentional infraction, handled swiftly and effectively, that generated no harm. Fifth Circuit authority simply does not support dismissing Ironclad's Section 2.1 claims.

2.      **The facts do not support dismissal of Ironclad's Section 2.1 claims.**

ORR advances four sets of so-called "facts" to support its claim that "Ironclad's [and its counsel's] actions involve bad faith" and, therefore, warrant dismissal of Ironclad's Section 2.1 claims. (*See* doc. 84, at 21 (listing reasons).) Aside from the reality that, even if true, Fifth Circuit authority rejects dismissal under the "facts" ORR posits, the fact is that ORR's "facts" are not facts. Nor do the events ORR attempts to contort warrant dismissal sanctions.

➤   *"Ironclad did not view the summary of the AEO Sales Data as a violation of the Order"*
    (Doc. 84, at 21, 22-23.)

ORR looks to Mr. Sherman's issuance of the Second Notice, on Tuesday, June 7, 2016, as proof that both (a) Mr. Sherman and the undersigned counsel knew the extent of information in the MSJ Outline and (b) determined that summaries of the AEO documents were not AEO. This assertion wholly twists the reality of the events as they unfolded.

When the Ironclad executives self-reported and notified the attorneys of the issue—an undisputed fact which, standing alone, should eliminate any notion of bad faith—the executives had very limited ability to describe the documents, since neither had the AEO materials open for very long at all. Mr. Aisenberg opened the Attachment Email and the MSJ Outline but closed them both moments later after reviewing "only the first paragraph or two" of the 14-page MSJ Outline, none of which contains AEO materials.[50] While Mr. Aisenberg received the Link Email, he never accessed the Sharefile.[51] Similarly, Mr. Cordes accessed the Link Email and the Sharefile but, upon becoming

---

[50] *See* Declaration of William Aisenberg (June 16, 2016) ("Aisenberg 6/16 Declaration"), ¶ 3, at IC APP 81; *see also* Exhibit B to the Charest 6/16 Decl., at IC APP 8-9 (MSJ Outline containing no AEO materials in the first two pages).

[51] *See* Aisenberg 6/16 Decl., ¶ 2, at IC APP 81; *see also* Exhibit G to the Charest 7/13 Decl., at IC APP 45 (Access Log showing no access to the Sharefile by Mr. Aisenberg).

concerned that the contents were AEO materials, Mr. Cordes "ended the session, closed the ZIP file, and did not explore the Sharefile materials thereafter."[52]

The initial reports to the undersigned counsel (which happened on a Friday morning) relayed Mr. Cordes' experience and, therefore, focused on the Sharefile and Link Email.[53] Mr. Sherman's initial instruction called for the Ironclad executives to not access the materials—which they had been doing even without instruction as soon as the issue became known.[54] That same day, Mr. Sherman formally instructed Mr. Cordes and Mr. Aisenberg on the AEO issue by telling them to "immediately delete such e-mail or e-mails, delete any materials that may have been downloaded off of those e-mails including the link, delete any notes (if any) that may have been made relating to such materials."[55] As a result of the First Notice, both Mr. Cordes and Mr. Aisenberg deleted <u>all</u> of the AEO materials—including the Attachment Email, the Link Email, and the Sharefile.[56] Neither

---

[52] *See* Declaration of Jeffrey Cordes (June 17, 2016) ("Cordes 6/17 Declaration"), ¶ 3, at IC APP 85.

[53] *See* Cordes 6/17 Decl., ¶ 5, at IC APP 86 (describing Mr. Cordes' report to Mr. Aisenberg); Aisenberg 6/16 Decl., ¶ 5, at IC APP 82 (describing Mr. Cordes' report to Mr. Aisenberg), ¶ 6, at IC APP 82 (describing Mr. Aisenberg's report to Mr. Sherman); Declaration of Michael Sherman (June 16, 2016) ("Sherman 6/16 Declaration"), ¶ 2, at IC APP 89 (describing Mr. Aisenberg's report to Mr. Sherman), ¶ 4, at IC APP 90 (describing Mr. Sherman's report to the undersigned counsel); Charest 6/16 Decl., ¶ 5, at IC APP 2 (describing Mr. Sherman's report to the undersigned counsel).

[54] *See* Cordes 6/17 Decl., ¶ 6, at IC APP 86 (describing Mr. Sherman's initial instructions to the Ironclad executives); Aisenberg 6/16 Decl., ¶ 6, at IC APP 82 (same); Sherman 6/16 Decl., ¶ 4, at IC APP 90 (same); Charest 6/16 Decl., ¶ 5, at IC APP 2 (same).

[55] *See* Cordes 6/17 Decl., ¶ 7, at IC APP 86 (describing Mr. Sherman's First Notice instruction); Aisenberg 6/16 Decl., ¶ 7, at IC APP 82 (same); Sherman 6/16 Decl., ¶ 6, at IC APP 90 (same); Charest 6/16 Decl., ¶ 6, at IC APP 2 (same); *see also* Exhibit E to the Charest 6/16 Decl., at IC APP 28. (First Notice).

[56] *See* Cordes 6/17 Decl., ¶ 8, at IC APP 86 (describing the deletion of all AEO materials); Aisenberg 6/16 Decl., ¶ 8, at IC APP 83 (same). Because of his concern regarding the litigation hold, Mr. Cordes "single" deleted the Attachment Email and Link Email though he "double" deleted the Sharefile materials. *See* Cordes 6/17 Decl., ¶ 8, at IC APP 86. Mr. Aisenberg "double" deleted the Attachment Email and Link Email, the only AEO materials on his computer. Aisenberg 6/16 Decl., ¶ 8, at IC APP 83.

Mr. Cordes nor Mr. Aisenberg had saved the MSJ Outline, so they had nothing to delete in that regard.[57] As a result, all of the AEO materials had been deleted pursuant to the First Notice.

The fact that, from Friday's First Notice (which resulted in the deletion of all AEO materials) to Tuesday's Second Notice, the undersigned counsel and Mr. Sherman dug into the materials and, out of an abundance of caution, issued the Second Notice to ensure complete coverage shows a proper response, not a view that the MSJ Outline lacked AEO information. And, in any event, the First Notice had the desired effect because all of the AEO materials got deleted— and had been deleted before the Second Notice went out.[58]

ORR attempts to underscore its point (which is not even valid) by asserting that the undersigned counsel "circulat[ed] a summary that was specifically about AEO information to Ironclad's employees." (Doc. 84, at 23.) This vastly overstates the content of the MSJ Outline and the purpose of the Attachment Email. ORR furthers this theme by naming the MSJ Outline the "AEO Summary Outline" as if the MSJ Outline summarized only AEO information. (*See* doc. 84, at 13.) A review of the MSJ Outline—even in redacted form—shows far less than half of the 14-page outline contained AEO information.[59]

As the Attachment Email and MSJ Outline make clear, the undersigned counsel intended to circulate work product to co-counsel for further efforts on the summary judgment motion.[60] The

---

[57] *See* Cordes 6/17 Decl., ¶¶ 4, 11, at IC APP 86-87; Aisenberg 6/16 Decl., ¶¶ 3, 12, at IC APP 81-83.

[58] *See* Cordes 6/17 Decl., ¶ 9, at IC APP 87 (noting that Mr. Cordes had already deleted the AEO materials "[b]y the time [he] received the Second Notice); Aisenberg 6/16 Decl., ¶ 9, at IC APP 83 (noting that Mr. Aisenberg had already deleted the AEO materials "[b]y the time [he] received the Second Notice).

[59] *See generally* Exhibit B to the Charest 6/16 Decl., at IP APP 8-21. (containing roughly ten pages overall of non-AEO work product).

[60] *See* Charest 6/16 Decl., ¶¶ 2-3, at IC APP 1-2; *see also* Exhibits A and B to the Charest 6/16 Decl., at IP APP 5-21. (Attachment Email ("Please see the attached outline for [a motion for summary judgment]. As I understand it, Michael's folks are working on from a global perspective and will

MEMORANDUM IN OPPOSITION TO ORR SAFETY CORPORATION'S
MOTION FOR SANCTIONS                                                    Page 20

undersigned counsel copied the client contacts to keep them aware of the progress and to confirm that Mr. Sherman's firm would "be handling the heavy lifting on [the MSJ project]."[61] The undersigned counsel's error stemmed from his failure to appreciate the content of the MSJ Outline and the Sharefile materials, an oversight the undersigned counsel recognized from the beginning: "I did not intend to violate the [protective] order. While I was unfamiliar with the materials included in the [MSJ] Outline and the Sharefile, I recognize that I should have been more diligent in understanding what I sent to the clients."[62] But the MSJ Outline was not, as ORR would depict, a summary of AEO materials sent expressly to the clients. Nothing of the sort.

ORR's other arguments in this section make even less sense. ORR suggests that Mr. Sherman violated his duties under the protective order because he did not immediately read the Attachment Email, Link Email, or the AEO materials contained therein and warn the clients not to read them. (*See* doc. 84, at 23 ("Not once does Mr. Sherman acknowledge his failure to protect ORR's AEO Sales Data or even review materials sent to his client.").) ORR's argument would impose strict liability on each member of the trial team to ensure perfection. But the world does not work that way. Further, ORR would suggest that Mr. Sherman actively participated in a violation of the Court's order despite the fact that Mr. Sherman had no personal awareness of the contents of the Attachment Email, MSJ Outline, Link Email, or Sharefile because he did not read the e-mails

---

handle the assembly of the [motion and evidence].") and MSJ Outline (memo from the undersigned counsel's firm to Mr. Sherman's firm)).

[61] *See* Charest 8/3 Decl., ¶ 10, at IC APP 102; *see also* Exhibits A and B (Attachment Email ("I understand Michael's firm will be handling the heavy lifting on [the MSJ project], so we will stand down on unless anyone asks us to pitch or answer any questions. But we are ready and willing in the event y'all need us.") and MSJ Outline), at IC APP 5-21.

[62] Charest 6/16 Decl., ¶ 12, at IC APP 1-2; *see also* Charest 6/16 Decl., ¶ 2 ("Earlier that day, I had received the Outline as finished work product from attorneys and staff in my firm. And, while I had reviewed the Outline and made comments to prior iterations, I neither created the Outline nor had an in-depth familiarity with its contents."), ¶ 3 ("I received the link to the Sharefile from a staff member within my firm, who, at my direction, compiled all materials referenced in the Outline.").

and attachments until Friday, June 3, 2016, when the Ironclad executives self-reported the AEO

issue. Indeed, Mr. Sherman was the recipient, not sender, of these documents. No facts support

ORR's reckless view as regards Mr. Sherman. And the Court should not accept ORR's invitation to

a fantasy parallel universe.

> *"Ironclad and its counsel waited days to delete the Disclosed AEO Information and even longer to report the violation of the Order to ORR"*
> (Doc. 84, at 21, 23-24.)

ORR complains about Ironclad's delay before deletion and notice to ORR. (Doc. 84, at 21,

23-24.) And, from that ill-founded position, ORR incorrectly asserts that, during the "delay," Mr.

Cordes reviewed the AEO materials and, therefore, should be sanctioned "especially when he had

days to review [the AEO materials]" because Ironclad cannot "unring the bell." (Doc. 84, at 28

("Even if Mr. Charest's disclosure were inadvertent, that information was accessed and viewed by

Mr. Cordes and ORR cannot do anything to 'unring that bell' – especially when he had days to

review it."); *see also* doc. 84, at 24 ("Having looked at the Disclosed AEO Information, Mr. Cordes

cannot unlearn this highly sensitive information.").) ORR's argument stacks inaccuracies on top of

conjecture.

First, the facts set out in the above section wholly refute ORR's "delay" assertion: the

Ironclad executives deleted the AEO materials pursuant to the instructions in the First Notice—

issued the same day Mr. Sherman learned of the AEO issue—and before he sent the Second

Notice.[63] Even if the AEO materials resided on the devices for "days," as ORR contends without

---

[63] *See* Cordes 6/17 Decl., ¶ 9, at IC APP 87 (noting that Mr. Cordes had already deleted the AEO materials "[b]y the time [he] received the Second Notice); Aisenberg 6/16 Decl., ¶ 9, at IC APP 83 (noting that Mr. Aisenberg had already deleted the AEO materials "[b]y the time [he] received the Second Notice).

basis, the Ironclad executive did not access them during that interval.[64] ORR cannot show any prejudice from having the AEO materials on the computers without accessing them.

Nor should ORR point to the mere existence of the AEO materials on the devices as harmful. When the undersigned counsel discovered that Mr. Cordes had only "single" deleted the Attachment Email and the Link Email (which made the materials accessible in his deleted items folder), ORR requested that the AEO-containing emails remain on Mr. Cordes' computer until the IT vendor could complete the forensic capture.[65] As a result of ORR's preference, the AEO materials ORR complains about stayed accessible on Mr. Cordes' computer for nine additional days (i.e., from June 10, 2016, when ORR stated its preference, to June 18, 2016, when the IT vendor "double" deleted files[66]). ORR complains about a supposed four-day passage of time between the First Notice and the Second Notice—though it does not demonstrate any actual delay in deletion. But it ignores the fact that that the AEO materials remain readily accessible on Mr. Cordes' computer for an additional nine days at ORR's request.

Second, reality rejects ORR's false claims that Cordes "had days to review [the AEO materials]" (doc. 84, at 28) and that, "[h]aving looked at the Disclosed AEO Information, Mr. Cordes cannot unlearn this highly sensitive information," (doc. 84, at 24). Both Ironclad executives provided sworn testimony that they did not access the AEO materials after the initial interactions except to delete them and, further, that they have no specific memory of the contents of the AEO

---

[64] *See* Cordes 6/17 Decl., ¶¶ 10-11, at IC APP 87; Aisenberg 6/16 Decl., ¶¶ 10-12, at IC APP 83.

[65] *See* Charest 7/13 Decl., ¶ 8, at IC APP 34 (describing the steps taken to adhere to ORR's preference as to the AEO materials).

[66] *Compare* Charest 7/13 Decl., ¶ 8, at IC APP 34 (noting that ORR stated its preference on June 10, 2016), *and* Charest 7/13 Decl., ¶ 14, at IC APP 36-37 (describing the "double" deletion on June 18, 2016); Declaration of Tom Felton (July 12, 2016), ¶ 4, at IC APP 95-96 (same).

MEMORANDUM IN OPPOSITION TO ORR SAFETY CORPORATION'S
MOTION FOR SANCTIONS                                                          Page 23

materials.[67] Even beyond that, forensic evidence shows that Mr. Cordes had access to AEO materials for <u>eight minutes</u>—not the "days to review" that ORR told the Court.

According to the G-C Partners Report, Mr. Cordes opened ORR00000851 after downloading the Sharefile.[68] The spreadsheet contains 418,746 lines of data.[69] The G-C Partners Report explains using forensic evidence that the file—and its 418,746 lines of data across eleven columns—was open for <u>less than ten minutes</u> (i.e., the ZIP file from the Sharefile was opened at 9:02 PM and ORR00000851 closed at 9:10 PM).[70] Not surprisingly, Mr. Cordes did not commit any of that spreadsheet to memory in that brief time.[71] ORR's "unring the bell" argument ignores the brief encounter with a massive amount of data. And ORR's statement to the Court that Mr. Cordes reviewed the AEO materials "for days" lacks veracity and represents another attempt—by any means—to overstate the AEO issue.[72]

Finally, ORR's assertion that Mr. Cordes should have acted differently because he "was particularly aware" about the AEO materials (doc. 84, at 23-24) disregards the reality that <u>Mr.</u>

---

[67] *See* Cordes 6/17 Decl., ¶¶ 10-11, at IC APP 87; Aisenberg 6/16 Decl., ¶¶ 10-12, at IC APP 83.

[68] *See* Charest 7/13 Decl. ¶ 4, at IC APP 33; Exhibit N to the Charest 7/13 Decl., at IC APP 75-80 (G-C Partners Report).

[69] *See* Charest 7/13 Decl. ¶ 4, at IC APP 33; Exhibit N to the Charest 7/13 Decl., at IC APP 75-80 (G-C Partners Report).

[70] *See* Charest 7/13 Decl., ¶ 4, at IC APP 33; Exhibit N to the Charest 7/13 Decl., at IC APP 77 (G-C Partners Report).

[71] *See* Cordes 6/17 Decl., ¶¶ 10-11, at IC APP 87.

[72] Another example of ORR's overstated approach—and the Sanctions Motion provides many—appears in ORR's criticisms of Ironclad's counsel. Offering no factual support, ORR says "both Mr. Charest and Mr. Sherman have acknowledged they are not particularly concerned with how and when ORR's AEO information is being used or sent out." (Doc. 84, at 29.) Balderdash. And, later in the same section, ORR claims that "Ironclad's counsel is not able to identify who actually downloaded ORR's AEO Sales Data." (Doc. 84, at 29.) Flat out false. To make that claim, ORR has to hope the Court completely ignores the fact that Mr. Cordes' own declaration says he accessed the Sharefile. *See* Cordes 6/17 Decl., ¶ 3, at IC APP 85. And the "unnamed user," which ORR contends "demonstrate[es] yet another security concern," merely tracks the Access Log's designation of "Anonymous" under the "User" column. *See* Exhibit G to the Charest 7/13 Decl., at IP APP 45. ORR's overwrought characterization of facts simply cannot be trusted.

<u>Cordes reported his concerns when he recognized the potential issue</u>. His awareness of AEO sensitivity might support a negative conclusion <u>if</u> he had not reported the issue. <u>But he did</u>. Mr. Cordes acted correctly and professionally. ORR's argument simply makes no sense.

As to the timing of Ironclad's report to ORR, history supports Ironclad's cautious approach. Ironclad ensured it had taken sufficient steps to avoid dissemination, achieve deletion, and protect the AEO materials. But the few days it took do not show bad faith. Nor do they create prejudice.

➤ *"Ironclad's counsel asked for a meet and confer to de-designate the very AEO material they knew had been produced to their client yet at the same time failed to disclose the breach of the Order to ORR"* (Doc. 84, at 21, 24-25.)

ORR has harbored the false suspicions that the MSJ Outline was "really" a motion to de-designate AEO materials and that, by sending the document to Ironclad, Ironclad's attorneys intended to disclose AEO information. (Doc. 84, at 13 n.5 ("Indeed, if, for example, the AEO Summary Outline was for a possible motion to ask the Court to de-designate the AEO Sales Data, that would certainly suggest Ironclad and its counsel intentionally ignored the designation, as it would be impossible to describe the arguments *without* disclosing the underlying AEO Sales Data.").) As the AEO issue played out—despite Ironclad telling ORR that the MSJ Outline was, in fact, an outline for a summary judgment motion—ORR has persisted in this odd but false suspicion. The issue remained central to ORR's thinking, as is shown as one of the questions (and Ironclad's answers) from the eight-point requests from the June 30 email:

> [ORR request no. 5:] Additional removal of redactions sufficient to demonstrate the [MSJ] Outline contained no references to a motion to de-designate the AEO materials.
>
> [Ironclad response:] They don't. We can submit the materials to the Court for inspection on this issue, if you like. But I don't see how we can remove redactions (without removing them all) to prove this.[73]

---

[73] *See* Exhibit Q to the Charest 8/3 Decl., at IC APP 117-118.

The Court has the MSJ Outline, in unredacted form. A simple review will confirm Ironclad's repeated statements to ORR that the MSJ Outline was not a motion to de-designate AEO materials. Indeed, it contains no references to any such motion.

While Ironclad has not questioned the AEO designations for the purposes of the current briefing, ORR over-designated much of the materials at issue here. ORR's over designations of information as confidential or AEO had been a brewing issue for a long time before the undersigned counsel sent the Attachment Email and the Link Email. The first questions about ORR's AEO designation of its sales data began in late April, when ORR produced ORR00000318, and continued into May, when ORR produced ORR00000850 and ORR00000851.[74] During the deposition of Mark Wiktorski, on May 10, 2016, the designation issue resurfaced.[75] Eventually, by agreement of counsel, ORR de-designated columns B and C (ORR's part number and part description) from ORR00000850 and ORR00000851 in mid-May.[76] But that agreement only addressed those columns. Mr. Sherman, who took the Wiktorski deposition, had been responsible, within the Ironclad legal team, to address the designations issues. The actions ORR describes in the Sanctions Motion only show that Mr. Sherman continued that effort. Since the AEO issue arose, Ironclad has not pressed the issue further. But it remains a live issue because of the wholesale manner in which ORR has thrown a cloak of secrecy over information that ought not be designated confidential or, in certain instances, AEO.

---

[74] *See* Charest 8/3 Decl., ¶ 13, at IC APP 103.

[75] ORR's designated representative impeached its counsel's designation of the materials as AEO, by repeatedly testifying that "who" purchased gloves, "what" gloves were purchased, and "how much" the gloves cost has not been maintained as confidential in ORR's dealings with its customers. *See e.g.,* Deposition of Mark Wiktorski as Corporate Representative (May 10, 2016) ("ORR (Wiktorski) Deposition"), 121:17-127:10. For a true and correct copy of an excerpt of the ORR (Wiktorski) Deposition, *see* Exhibit W to the Charest 8/3 Declaration, at IC APP 162-168.

[76] *See* Charest 8/3 Decl., ¶ 13, at IC APP 103.

Ironclad did not seek to de-designate the AEO materials in an attempt to avoid disclosing the AEO issue or to hide anything from ORR. To the contrary, Ironclad self-reported to ORR once it determined the extent of the issue, understood the scope and reach of what had occurred, and had taken remedial measures to ensure no dissemination. ORR's attempt to twist Mr. Sherman's effort to address his "to do" list into an ulterior, bad faith motive both overlooks the unresolved nature of that AEO designation issue and lacks factual support.

> ➢ *"Ironclad asked ORR to wait to review any additional information requested before ORR filed a motion for sanctions, yet never provided a single piece of subsequent information, instead focusing on a premature 49-page motion for summary judgment involving the very same AEO material"*
> (Doc. 84, at 21.)

While ORR did not develop this theme in the argument portion of its Sanctions Motion, ORR contends in its opening that, "[i]nstead of addressing its serious violation of the Order in good faith, Ironclad was frantically working to quickly file a premature motion for partial summary judgment using the *very same AEO information it improperly disclosed.*" (Doc. 84, at 5.) And ORR goes on: "Ironclad rushed to file the motion for summary judgment once ORR made clear that it was going to file the motion regarding the AEO because of Ironclad's continued lack of response." (Doc. 84, at 5.) ORR misrepresents the facts—partly because it cannot know the task assignments within Ironclad's legal team but partly because it omits several exchanges from Ironclad to ORR providing the very information it claims it never got.

The fact section above[77] refutes ORR's allegations and establishes not only that the summary judgment motion proceeded independent of the AEO issue (i.e., ORR's lack of knowledge within the Ironclad legal team) but also that Ironclad responded—extensively—to ORR's requests for further information (i.e., ORR's failure to describe the full extent of conversation to the Court). The Court should reject ORR's incorrect contention that Ironclad "rushed" the summary judgment

---

[77] *See* discussion, *supra*, pp. 10-12 (Ironclad did not "rush to file the summary judgment motion"), which is included by reference here.

motion and—with it—any negative inference ORR attempts to spin. The facts belie ORR's position because all the work that went into the MSJ Outline and in collecting the materials in the Sharefile demonstrates that Ironclad's legal team had been hard at work preparing a summary judgement motion well before June 1, 2016 (when the MSJ Outline was sent).

## B.   The Court should decline the menu of "other" sanctions ORR suggests.

After failing to convince on the Section 2.1 dismissal sanction, ORR urges the Court to select some "other" sanction to gain some advantage out of the AEO issue. (*See* doc. 84, at 26-31.) ORR's proposals range from attacking the lawyers to attacking the client. But none of them find support in the law or facts. Ironclad addresses each "other" sanction in order ORR presents them.

> ➤ *Ironclad should be prohibited from using the sales data in from ORR00000318, ORR00000850, and ORR00000851 in the litigation.*
> (Doc. 84, at 27.)

ORR provides no legal authority for this sanction. Nor does it explain that the impact of the sanction would be tantamount to dismissing Ironclad's Section 2.1 claims (and its defenses to ORR's counterclaims). The spreadsheets reflected in ORR00000318, ORR00000850, and ORR00000851 contain details of ORR's sales of competing gloves in violation of Section 2.1. (*See generally* docs. 77-82 (summary judgment briefing describing the sale of competing gloves shown in ORR00000318, ORR00000850, and ORR00000851).) ORR's estimate—though overstated—sets the amount of AEO materials utilized in the summary judgment briefing at "[m]ore than half" of the summary judgment brief. (Doc. 84, at 5.) ORR's request that the Court forbid Ironclad's use of these materials in the litigation only dresses ORR's dismissal argument in different clothing. The Court should reject the proposed sanction for the same reasons it should not dismiss Ironclad's Section 2.1 claim. Either sanction is, in effect, a death penalty sanction.

   ➢ *The attorneys involved should not be able to handle AEO materials.*
     (Doc. 84, at 27.)

In support of its position, ORR cites to a Norther District of California case, *Life Techs. Corp.*

*v. Biosearch Techs., Inc.*, in which the trial court applied Fifth Circuit law. No. C-12-00852 WHA (JCS),

2012 WL 1600393, (N.D. Cal. May 7, 2012). But ORR gets the case all wrong. The Court should not

follow ORR down its errant path.

*Life Technologies*'s analysis focused on the existence of prejudice because of the severity of a

sanction that would prohibit an attorney from accessing AEO materials: "some of the least harsh

sanctions, such as establishment of certain facts, do not require a showing of prejudice, let alone a

finding of bad faith or willfulness. [And,] while lesser sanctions may be imposed without a showing

of prejudice, more severe sanctions are justified <u>only if the opposing party has suffered some</u>

<u>palpable prejudice</u>." *Id.*, 2012 U.S. Dist. LEXIS 63974, at *34-35 (quoting *F.D.I.C. v. Conner*, 20 F.3d

1376, 1380 n.3 (5th Cir. 1994) (emphasis added)). The *Life Technologies* court recognized that barring

an attorney from accessing AEO information served as a sufficiently severe sanction to require a

showing of prejudice. *See id.*, 2012 U.S. Dist. LEXIS 63974, at *35 (citing, again, *Conner*, 20 F.3d at

1380 n.3). ORR's argument fails because it has not suffered and cannot show prejudice.[78]

The record remains clear that Ironclad dealt with the AEO issue effectively and

professionally, contained the information quickly, and completely eliminated any possibility of

further dissemination. No prejudice befell ORR. Without prejudice, the "more severe" sanction of

prohibiting an attorney to access AEO information cannot stand. Under *Life Technologies*, ORR's

---

[78] The *Life Technologies* court considered but rejected *Visto Corp. v. Seven Networks, Inc.*, No. 2:03-cv-333-TJW, 2006 WL 3741891, 2006 U.S. Dist. LEXIS 91453 (E.D. Tex. Dec. 19, 2006), as authoritative because *Visto Corp.* focused on the attorneys' conduct, rather than resulting prejudice. *See Life Techs.*, 2012 U.S. Dist. LEXIS 63974, at *34-35 (discussing *Visto Corp.*). But, even if an attorney's actions justified such sanctions in the absence of prejudice—a position ORR's authority rejects—the purported actions ORR ascribes to the attorneys involved here (even if true) pales in comparison to the "bad faith and willfulness" addressed in *Visto Corp. See Life Techs.*, 2012 U.S. Dist. LEXIS 63974, at *35 (discussing *Visto Corp.*). Under either measure, the sanction does not fit.

inability to show any prejudice resulting from the AEO issue proves terminal to this sanction. And ORR's focus on the attorneys' purported failures (all of them overstated, unsubstantiated, and refuted) misses the point the case teaches. ORR can show neither prejudice nor bad faith.

> ➢ *Mr. Sherman should lose his* pro hac vice *admission.*
> (Doc. 84, at 29-30.)

ORR cites Local Rule 83.8(b) as authority for the possible "revocation of pro hac admissions." (Doc. 84, at 29.) ORR, itself, says that the revocation of Mr. Sherman's *pro hac vice* admission, as a sanction, would exceed the severity of the AEO-restriction sanction (above). (*See* doc. 84, at 29 (describing the revocation of *pro hac vice* admission as "possibly a more stringent punishment" than precluding attorneys' access to AEO information).) But that effectively eliminates it as a viable sanction because *Life Technologies* requires prejudice to ORR. And ORR has none.

But, more important, ORR's request demonstrates its complete lack of perspective. ORR would excise the lead lawyer from the case out of spite. Mr. Sherman did nothing wrong. The most ORR can conjure amounts to Mr. Sherman's issuance of the Second Notice when the First Notice had achieved the deletion, Mr. Sherman's purported "delay" in reporting the AEO issue to ORR (even though it was a matter of days and Ironclad self-reported the issue through Mr. Sherman), and Mr. Sherman's continuation of the ongoing conversation about de-designating AEO documents. None of Mr. Sherman's actions, no matter how ORR twists them, equate to bad faith or any other basis to impose sanctions, whether under Local Rule 83.8(b) or otherwise. Nor do these actions support revocation of Mr. Sherman's *pro hac vice* admission—which would deprive Ironclad of the attorney of its choice.

> ➢ *Ironclad should not contact or sell to the customers listed in* ORR's sales records.
> (Doc. 84, at 30.)

Ironclad's business centers on selling technical gloves to industry all over the world. Citing no authority, ORR asks the Court to enjoin Ironclad from selling gloves (or anything else) to every

glove buyer in ORR's world-wide reach since 2009. In its three-sentence request, ORR leaves unsaid

that the proposed sanction would be, in effect, a business death penalty for Ironclad. The AEO sales

data at issue covers every glove buyer in ORR's world-wide network since 2009—including current

customers of KONG® gloves and many other current Ironclad customers. Even if the sanction

were limited to the buyers identified in the MSJ Outline, that would restrict Ironclad's ability to

pursue major oil and gas companies even though Ironclad bears no blame for the AEO issue. No

cases in the Fifth Circuit suggest this broad authority under Rule 37 (or elsewhere). And the facts of

the case would never support the application of such an extraordinary sanction—even if it did exist.

> *The Court should defer "all proceedings" on Ironclad's summary judgment motion.*
> (Doc. 84, at 30.)

ORR rehashes its incorrect assertion that Ironclad duped ORR into giving Ironclad time in

order to file the summary judgment motion and, based on that false premise, says "[t]he Court

should not condone such behavior." (Doc. 84, at 30.) Rather than reiterate the facts regarding the

timing of the summary judgment motion and Ironclad's continuous effort to respond to ORR's

many demands (set out in detail above and incorporated here by reference), Ironclad notes that

ORR's assertion, that "Ironclad had no intention of ever providing all such additional information,"

cannot survive the <u>multiple</u> emails and attempts to contact ORR by telephone, which occurred well

<u>before</u> it filed its Sanctions Motion.[79] ORR complains to the Court about Ironclad's lack of

---

[79] Starting at **9:57 AM CDT** on July 13, 2016, the undersigned counsel both provided a brief update and asked to talk later in the afternoon about the AEO issue. *See* Exhibit P to the Charest 8/3 Decl., at IC APP 110 ("Can you talk, Jenny, at 2pm central? I'm waiting on the report from the IT vendor and one declaration. Hopefully, I'll have them by then. Thanks."). At **1:56 PM CDT** on July 13, 2016, as the requested 2pm call time approached without response from ORR, the undersigned counsel (a) updated ORR on the IT vendor status, (b) provided three additional declarations (in response to ORR's demand for them), and (c) responded to each of ORR's additional eight-part requests from the June 30 email. *See* Exhibit Q to the Charest 8/3 Decl., at IC APP 116. At **3:34 PM CDT** on July 13, 2016, after being unable to contact ORR's counsel regarding the AEO issue (despite significant efforts), the undersigned counsel forwarded a copy of a letter enclosing a check for $11,000—from his firm's own account—to ORR. *See* Exhibit R to the Charest 8/3 Decl., at IC

responsiveness and gamesmanship. But, in reality, ORR had responses to each of its questions, it had the additional declarations it had requested, and it had received a report that the IT vendor had completed the investigation and final deletion without incident—all before ORR filed its Sanctions Motion. In reality, ORR did not want to meet and confer before filing the Sanctions Motion.[80] It wanted an undeserved tactical advantage to attack the proof of its glove sales, in violation of its contractual obligations, which form the core of this dispute. ORR's actions—making assertions to the Court despite having facts to the contrary—are the actions the Court should not condone.

The two issues of summary judgment and AEO disclosure do not relate in the manner that ORR tries to portray. No valid reason exists to stay the summary judgment proceedings.[81]

➤ *Ironclad and its attorneys should lose access to all confidential information.*
(Doc. 84, at 30.)

Again citing no authority, ORR asks the Court to bar access to ORR's confidential materials—the vast majority of ORR's produced documents in the case—until (a) Ironclad demonstrates the AEO materials have been deleted and (b) Ironclad and its attorneys implement "specific safeguards" to protect AEO information. As to the first condition, ORR has received confirmation. The G-C Partners Report establishes that fact.[82] As to the second, the infraction was the undersigned counsel's error in forwarding work product without appreciating the content within the materials. It is safe to say that, the undersigned counsel and Mr. Sherman, who have spent

---

APP 126. And, at **4:49 PM CDT**, on July 13, 2016, ORR filed its Sanctions Motion. *See* Exhibit S to the Charest 8/3 Decl., at IC APP 133. ORR hid these facts from the Court.

[80] ORR's certificate of conference, signed by Mr. Fultz (who did not even participate in the events he purports to describe), contains numerous misstatements in an ill-fated attempt to color ORR's actions in a positive light. For a more complete discussion of the errors in Mr. Fultz's certificate of conference, *see* the discussion of the certificate of conference, *supra*, at 6-7.

[81] As a courtesy, Ironclad agreed to extend ORR's response time on the summary judgment motion by twenty days. The Court ordered the extension pursuant to an unopposed motion. (*See* doc. 94.)

[82] *See* Exhibit N to the Charest 7/13 Decl., at IC APP 77. (*See also* doc. 88, at 16-19 (describing the steps taken to delete AEO materials), 26-27 (relaying the information in the G-C Partners Report).)

countless hours working to remedy the error, appreciate the importance of not forwarding materials without a full understanding of their content. But the nature of the oversight—one that any attorney could have done—does not lend itself to a particular safeguard.

## C.   The Court should not award further financial sanctions against Ironclad.

In closing, ORR argues that, "[a]t a minimum, Rule 37(b) <u>requires</u> the Court to make Ironclad pay for ORR's reasonable costs and fees caused by Ironclad's failure to comply with the Order." (Doc. 84, at 31 (citing *Life Technologies*, 2012 WL 1600393, at *12).) That is almost correct. The rule calls for payment of reasonable fees and costs "caused by" the underlying infraction "<u>unless</u> the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C).

In the Relief Motion,[83] Ironclad explained that, under Fifth Circuit law applying Rule 37, reimbursement for fees and costs calls for the movant to demonstrate that such fees and costs qualify both <u>reasonable</u> and <u>result from</u> the underlying infraction. (*See* doc. 88, at 33 (citing *Batson*, 765 F.2d at 516, for the proper application of Rule 37).) And the Relief Motion explains in detail, by reference to ORR's counsel's billing records, how the fees incurred by ORR qualify as neither necessary (because Ironclad provided sufficient remedies without the need for roughly $23,000 in unnecessary briefing) nor reasonable (because of the non-AEO fees, roughly $15,000, and the strategic effort to seek sanctions well before the facts became clear). (*See* doc. 88, at 33-34.)

But events after the Relief Motion support the Court finding that "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). The advisory committee notes explain, on identical language in a prior subsection, that the provision allows the Court "a necessary flexibility . . . since the court retains the power to find that other circumstances make an award of expenses

---

[83] Ironclad incorporates by reference the facts, arguments, and authorities set out in its Relief Motion, particularly Parts III.B., in all respects for this argument.

unjust—as where the prevailing party also acted unjustifiably." Advisory Committee Notes on the 1970 Amendments to Fed. R. Civ. P. 37(a)(4). This case presents such an example of unjustified actions by ORR.

ORR demanded payment of $40,000 in addition to other unrealistic demands. The massive costs ORR faces result more from its attempt to gain strategic advantage than actual harm "caused by" the AEO issue. As it turned out (and as Ironclad repeatedly promised), ORR never needed the Sanctions Motion. All of the work performed to prepare (and, now oppose) the Sanctions Motion was wasted. Even before the motion, Ironclad and its counsel complied with ORR's requests and undertook effective steps (at significant expense) to remedy the AEO issue. And Ironclad continued to cooperate with ORR's reasonable requests. Ironclad's cooperation, transparency (as much as can be had in active, disputed litigation), and effective action have been present in abundance. And, in the end, ORR suffered no prejudice. The record supports no other conclusion.

The FMD Invoice, which ORR offered to support its claim, included roughly $15,000 worth of billing from non-AEO matters. Further, ORR's ill-advised and unnecessary "strategy" of drafting a sanctions motion—before Ironclad could complete the IT investigation ORR requested—drove the AEO-related billing off the charts. Of the roughly $33,500 of AEO-related time shown in the FMD Invoice, more than $23,000 of billings relate directly to ORR's preparation of a sanctions motion before ORR knew the extent of the harm—none. Ultimately, the FMD Invoice supports roughly $10,500 in AEO-related but non-sanctions fees. Recognizing that Rule 37 should result in nothing more that the $11,000 payment, based on the FMD Invoice, the undersigned provided that amount. In addition, Ironclad provided many remedial measures and continued cooperation with reasonable requests. All of these remedies came before ORR sought the Court's intervention.

To keep the AEO issue "alive," ORR returned the $11,000 check and pressed its Sanctions Motion. ORR's actions only demonstrate that it seeks strategic advantage—not reimbursement or

true remedial measures.[84] The Court should recognize that ORR's persistence with the Sanctions Motion in this circumstance represents unjustifiable behavior and order Ironclad's and its attorneys' obligations discharged of any further duty.[85]

**\* \* \* \* \* STATEMENT ON ORAL ARGUMENT \* \* \* \* \***

Ironclad believes that, as the record exists, the Court can and should deny ORR's Sanctions Motion and, in addition, grant Ironclad's Relief Motion. But the scope of ORR's misstatements of fact and law may have the effect of causing confusion where none should exist. To the extent the Court desires either explanation or clarification, Ironclad welcomes the opportunity, whether in oral argument or conference, to address these issues.

### IV.  CONCLUSION

For the reasons set out above, and the arguments and authorities set out in the Relief Motion, the Court should deny ORR's Sanctions Motion.

Dated: August 3, 2016.

---

[84] Even though ORR returned the $11,000 check the undersigned counsel offered for ORR's reasonable fees and costs resulting from the AEO issue, the undersigned counsel stands ready to re-issue another check in the same amount—if ORR agrees that doing so would resolve AEO issue.

[85] Even if the Court were of the mind to award fees and costs, ORR has provided no evidentiary support for its motion other than a request that it be heard at a later date. That alone justifies denying the motion for fees and costs. But, to the extent the Court permits ORR to articulate an amount and offer support for the same at some later date, Ironclad reserves the right to respond substantively if and when ORR does so.

Respectfully submitted,

Daniel H. Charest
State Bar No. 24057803
Will Thompson
State Bar No. 24094981
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, Texas 75201
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
dcharest@burnscharest.com
wthompson@burnscharest.com

Michael A. Sherman (Cal. Bar No. 94783)
(admitted pro hac vice)
Barak Kamelgard (Cal. Bar. No. 298822)
(admitted pro hac vice)
STUBBS ALDERTON & MARKILES, LLP
15260 Ventura Boulevard, 20th Floor
Sherman Oaks, California 91403
Telephone: (818) 444-4500
Facsimile: (818) 444-4520
masherman@stubbsalderton.com
bkamelgard@stubbsalderton.com

*Attorneys for Plaintiff/Counterclaim Defendant*

**CERTIFICATE OF SERVICE**

      This is to certify that a true and correct copy of the foregoing instrument has been served on this day, August 3, 2016, via the Court's ECF system as indicated below:

Gregory M. Sudbury
State Bar No. 24033367
Rachel Lee Hytken
State Bar No. 24072163
Quilling, Selander, Lownds, Winslett & Moser, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
gsudbury@qslwm.com
rhytken@qslwm.com

Benjamin C. Fultz
Jennifer Metzger Stinnett
Daniel Hancock (to be admitted *pro hac vice*)
Fultz Maddox Dickens PLC
2700 National City Tower
Louisville, Kentucky 40202
Telephone: (502) 588-2000
Facsimile: (502) 588-2020
bfultz@fmdlegal.com
jstinnett@fmdlegal.com
dhancock@fmdlegal.com

 

                                              Daniel H. Charest